# EXHIBIT D



Nanci L. Clarence
Kate Dyer
Jodi Linker

# CLARENCE
# & DYER LLP

Attorneys At Law
899 Ellis Street
San Francisco, CA 94109
Tel. 415.749.1800
Fax. 415.749.1694

www.clarencedyer.com

January 30, 2005

*Via Facsimile 415.781-6683*

David Replogle, Esq.
550 Montgomery Street, Ste. 550
San Francisco, CA 94111

      Re:    Garcia, et al. V. White
              San Francisco Superior Court
              Case Number 414569

Dear Mr. Replogle:

      I am in receipt of your letter of January 28, 2005. Your claim that I or anyone in this office is in possession of property stolen from Daniel Garcia by Zeke Fennel in November of 2003 is baseless and untrue.

Very truly yours,

Nanci L. Clarence

cc. John Hill, Esq.
By facsimile

# EXHIBIT E

1   DAVID REPLOGLE, State Bar No. 077875
    LAW OFFICES OF DAVID REPLOGLE
2   A Professional Corporation
    595 Market Street, Suite 2360
3   San Francisco, California 94105
    Telephone: (415) 362-4700
4   Facsimile: (415) 974-6433

5   JOHN E. HILL, SBN 045338
    LAW OFFICES OF JOHN E. HILL
6   A Professional Corporation
    8105 Edgewater Drive, Suite 100
7   Oakland, CA 94621
    Telephone: (510) 588-1000
8   Facsimile: (510) 588-1087

9   Attorneys for Plaintiffs
    Daniel Garcia and Joshua Beam
10

11

12                 SUPERIOR COURT OF CALIFORNIA

13              CITY AND COUNTY OF SAN FRANCISCO

14                    UNLIMITED JURISDICTION

15   DANIEL GARCIA, and          )   Case No. 414569
     JOSHUA BEAM,                )
16                               )
          Plaintiffs,            )
17                               )
         vs.                     )   EX PARTE APPLICATION FOR ORDERS:
18                               )   1)  QUASHING DEFECTIVE
     THOMAS F. WHITE, NATHAN     )       DEPOSITION SUBPOENA;
19   LOVAAS, and DOES 1 through  )   2)  DIRECTING DEFENSE COUNSEL
     20, inclusive,              )       TO RETURN STOLEN PROPERTY;
20                               )   3)  DIRECTING DEFENSE COUNSEL
          Defendants.            )       TO DEPOSIT CHILD PORNOGRA-
21   _____)       PHY IN HER POSSESSION TO THE
                                         WITH THE COURT FOR
22                                       DESTRUCTION

23                                   Date: February 1, 2005
                                     Time: 1:30 p.m.
24                                   Dept.: 613

25          Daniel Garcia and Joshua Beam, Plaintiffs in the above-captioned

26   action for childhood sexual abuse and sexual battery, hereby apply to the

27

28   EX PARTE APPLICATION FOR ORDERS QUASHING NOTICE
     OF DEPOSITION, REQUIRING COUNSEL TO RETURN STOLEN
     PROPERTY AND REQUIRING COUNSEL TO DEPOSIT
     CHILD PORNOGRAPHY WITH COURT FOR DESTRUCTION
                                                              -1-

1   court, ex parte, for orders as follows:

2           1.  Quashing the subpoena and notice of deposition transmitted by

3   facsimile on January 28, 2005 purporting to set the deposition of Zeke Fennel

4   7 days later on February 4, 2005.   The notice of deposition purports to set a

5   deposition with less than 10 day's notice as required by Section 2025(f) of the

6   California Code of Civil Procedure.

7           2.  Directing Nanci Clarence and the firm of Clarence & Dyer, LLP

8   to return all documents in their possession given to them by Zeke Fennel and

9   his lawyer on the ground that such documents are the property of Daniel

10  Garcia and were taken by Zeke Fennel without Mr. Garcia's consent.

11          3.  Directing Nanci Clarence and the firm of Clarence & Dyer, LLP

12  to deposit the child pornography in their possession and introduced at the

13  deposition of Daniel Garcia with the court for destruction.

14          The application is brought under Sections 2025 and 1013 of the

15  Code of Civil Procedure and Sections 496 and 311.3 of the Penal Code on the

16  ground that Defendant Thomas F. White failed to give sufficient notice of the

17  deposition of Zeke Fennel under C.C.P. §§ 2025 and 1013, that White's lawyers

18  are in possession of property stolen from Daniel Garcia by Zeke Fennel and

19  that White's lawyers are in the possession of contraband, to wit, child

20  pornography.

21          The application is based on the accompanying memorandum of

22  points and authorities, the accompanying declarations, the entire file in this

23  /////

24  /////

25  /////

26  /////

27

28  EX PARTE APPLICATION FOR ORDERS QUASHING NOTICE
    OF DEPOSITION, REQUIRING COUNSEL TO RETURN STOLEN
    PROPERTY AND REQUIRING COUNSEL TO DEPOSIT
    CHILD PORNOGRAPHY WITH COURT FOR DESTRUCTION

1  matter and on such other evidence as may be presented at the hearing.

2  Dated: January 31, 2005.          Respectfully submitted,

3                                     LAW OFFICES OF DAVID REPLOGLE, APC

4                                     LAW OFFICES OF JOHN E. HILL, APC

5

6

7                                     By, David Replogle
                                      Attorneys for Plaintiff Daniel Garcia

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  EX PARTE APPLICATION FOR ORDERS QUASHING NOTICE
    OF DEPOSITION, REQUIRING COUNSEL TO RETURN STOLEN
    PROPERTY AND REQUIRING COUNSEL TO DEPOSIT
    CHILD PORNOGRAPHY WITH COURT FOR DESTRUCTION                  -3-

1

## PROOF OF SERVICE BY FACSIMILE AND MAIL

2        I declare under penalty of perjury that the foregoing is true and
3   correct:

4        I am a citizen of the United States over the age of eighteen years,
5   employed in the City and County of San Francisco, California, and not a party
    to the within entitled cause; my business address is 550 Montgomery Street,
6   Suite 550, San Francisco, California.

7        On February 1, 2005 I served the following:

8        **EX PARTE APPLICATION FOR ORDERS QUASHING
         DEFECTIVE SUBPOENA, DIRECTING DEFENSE
9        COUNSEL TO RETURN STOLEN PROPERTY AND
         DIRECTING DEFENSE COUNSEL TO DEPOSIT
10       CHILD PORNOGRAPHY IN HER POSSESSION WITH
         THE COURT FOR DESTRUCTION;**

11       **DECLARATION OF DAVID REPLOGLE IN SUPPORT, ETC.**

12       **DECLARATION OF DANIEL GARCIA RE ZEKE FENNEL**

13       **DECLARATION OF DANIEL GARCIA RE POSSESSION OF CHILD
         PORNOGRAPHY BY NANCI CLARENCE;**
14

15       **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT,
         ETC.**

16   on the interested party(ies) in said cause, by transmitting a true copy by
17   facsimile to the number set forth below and thereafter placing a true copy
     thereof enclosed in a sealed envelope with postage thereon fully prepaid in the
18   United States mail at San Francisco, California addressed as follows:

19       Nanci Clarence                    Attorneys for Defendant
         Clarence & Dyer, LLP              Thomas F. White
20       899 Ellis Street
         San Francisco, CA 94109
21       (415) 749-1694

22       William Berland                   Attorneys for Defendant
         Ferguson & Berland                Nathan Lovaas
23       1816 Fifth St.
         Berkeley, CA 94710
24       (510) 548-3143

25       I declare under penalty of perjury that the foregoing is true and
     correct and that this declaration was executed on February 1, 2005 at San
26   Francisco, California.

27

28                                        _____
                                          DAVID REPLOGLE

-1-

1  DAVID REPLOGLE, SBN 077875
   LAW OFFICES OF DAVID REPLOGLE
2  A Professional Corporation
   550 Montgomery Street, Suite 550
3  San Francisco, California 94111
   Telephone: (415) 362-4700
4  Facsimile: (415) 781-6683

5  JOHN E. HILL, SBN 045338
   LAW OFFICES OF JOHN E. HILL
6  A Professional Corporation
   8105 Edgewater Drive, Suite 100
7  Oakland, California 94621
   Telephone: (510) 588-1000
8  Facsimile: (510) 588-1087

9  Attorneys for Plaintiffs
   Daniel Garcia and Joshua Beam
10

11

12              SUPERIOR COURT OF CALIFORNIA

13            CITY AND COUNTY OF SAN FRANCISCO

14                 UNLIMITED JURISDICTION

15  DANIEL GARCIA and              )   Case. No. 414569
    JOSHUA BEAM,                   )
16                                 )   MEMORANDUM OF POINTS AND
              Plaintiffs,          )   AUTHORITIES IN SUPPORT OF
17                                 )   EX PARTE APPLICATION FOR
         vs.                       )   ORDERS QUASHING DEFECTIVE
18                                 )   DEPOSITION SUBPOENA;
    THOMAS F. WHITE, NATHAN        )   DIRECTING DEFENSE COUNSEL
19  LOVAAS, and DOES 1 through     )   TO RETURN STOLEN PROPERTY
       20, inclusive,              )   AND DIRECTING DEFENSE
20                                 )   COUNSEL TO DEPOSIT CHILD
              Defendants.          )   PORNOGRAPHY IN HER
21  _____)   POSSESSION WITH THE COURT

22                                     Date: February 1, 2005
                                       Time: 1:30 p.m.
23                                     Dept.: 613

24                         I

25            INTRODUCTION AND BACKGROUND

26         A.  Factual Background

27            This is an action for childhood sexual abuse and sexual battery

28

1   filed by Daniel Garcia ("Garcia") and Joshua Beam ("Beam"), who were minors

2   when the abuse occurred.  Defendants are Thomas F. White ("White"), a

3   wealthy San Francisco business executive, who was approximately 64 through

4   67 years old when the abuse occurred, and Nathan Lovaas ("Lovaas"), White's

5   personal assistant.

6           The case has been set for jury trial on April 4, 2005.

7           White has no defense.

8           Because White has not defense, his counsel has been engaged in a

9   jihad against Daniel Garcia in an attempt to discredit him.

10           Ms. Clarence, or agents working for or in collaboration with her,

11   have done the following:

12         A.   Their investigator told Daniel Garcia's friends in his hometown

13             of Modesto that he had sex with young children, a blatant lie

14             designed to slander Garcia in his hometown;

15         B.   Their investigator told Denise Caster, a third party unrelated to

16             this case, that Garcia was a male prostitute and therefore should

17             not be trusted;

18         C.   Ms. Clarence or someone in her office downloaded from the

19             internet sexually provocative pictures of Garcia when he was 16

20             taken at the request of her client, Thomas White;

21         D.   Ms. Clarence shoved the child pornography they downloaded

22             from the internet in my face at Garcia's deposition;

23         E.   Stephen Modde, an associate attorney in Ms. Clarence's office,

24             recently used an alias on the internet, contacted Garcia in violation

25             of the State Bar Rules and attempted to pick Garcia up for a sexual

26             encounter with him; and

27         F.   Stuart Hanlon, a member of the White defense team who

28             evidence will show works closely with Ms. Clarence, threatened

1  Garcia with criminal prosecution if he did not drop this civil case

2  in violation of the State Bar Rules.

3  G.   Ms. Clarence's investigators have started to pry into my

4  attorneys' private life, calling unrelated parties and asking them to

5  call Ms. Clarence.

6  In addition to the foregoing, the following suspicious events have

7  transpired recently:

8  H.   The garage at Garcia's parents' home in Modesto was entered

9  by some unknown party who took nothing but riffled through the

10  garbage apparently looking for documents;

11  I.   Garcia's father's bank account was recently compromised by

12  someone attempting to gain access to it without his knowledge or

13  consent.

14  Defense counsel has also embarked on a mission to delve into

15  Garcia's financial records, although financial records have no bearing on this

16  case for childhood sexual abuse.

17  Recently, White's lawyers purported to notice a deposition by

18  facsimile with 7 day's notice.

19  White's lawyers have also come into control, if not technical

20  possession, of records stolen from Garcia in November of 2003 by a third party.

21  Although White's lawyers have been advised that the property is stolen, they

22  refuse to return the property.

23  White's lawyers have also retained the pornographic pictures of

24  Garcia taken when he was 16 at their client's request.

25  /////

26  /////

27  /////

28

## II

### ARGUMENT

**A.    The Deposition Notice of Deposition of Zeke Fennel Was Not Timely Served and Should Be Quashed.**

Section 2025 of the Code of Civil Procedure requires that 10 day's notice be given of any deposition.   Section 1013 of the Code of Civil Procedure provides that if a notice is served by facsimile that the date for compliance is advanced 2 court days.

White's counsel sent a Notice of Deposition by facsimile on January 28, 2005 purporting to set a deposition 7 days later or March 4, 2005. Under the code, the earliest possible date for a deposition served by facsimile on January 28, 2005 would be March 9, 2005, or 10 days plus 2 court days for facsimile service.

Because there was no timely service in accordance with the Code of Civil Procedure, the Notice of Deposition should be, in all respects, quashed.

**B.    Defense Counsel Is in Control or Possession of Documents Stolen from Garcia and Should Be Returned.**

As outlined in the accompanying declarations, Zeke Fennel stole certain court documents and correspondence, including attorney-client communications, from Garcia in November of 2005.   After the documents were stolen, Mr. Fennel and his lawyer attempted to extort $100,000 from Garcia telling him they would turn the documents over to White's lawyers unless he complied.

The documents are stolen and possession of them is a violation of Section 496 of the Penal Code.   Defense counsel is aware that the documents are stolen and should be ordered to return all documents she has received from Mr. Fennel and/or his lawyer to Garcia forthwith.

1
2
3

### C.   Defense Counsel Is in Possession of Child Pornography and Should Be Ordered To Deposit the Material with the Court for Destruction.

4   As outlined in the accompanying declarations, at Garcia's

5 deposition, defense counsel was in possession of sexually graphic material, to

6 wit, pictures of Garcia taken when he was 16 years old.   Although defense

7 counsel has been advised that the pictures are child pornography, Garcia

8 believes that the material remains in defense counsel's possession or under her

9 control.

10   The photographs are contraband, possession of which is a violation

11 of Section 311.3 of the Penal Code.   Defense counsel is aware that the

12 documents are child pornography and should be ordered to deposit all such

13 photographs with the court for destruction.

14

15   ### III

16   ### CONCLUSION

17   For each of the foregoing reasons, it is urged that the application

18 be, in all respects, granted.

19 Dated: February 1, 2005.      LAW OFFICES OF DAVID REPLOGLE, APC

20                              LAW OFFICES OF JOHN E. HILL, APC

21

22

23                              By, David Replogle
                                Attorneys for Plaintiffs

24

25

26

27

28

MEMORANDUM IN SUPPORT OF EX PARTE APPLICATION
Garcia, *et al.* vs. White, *et al.*; SFSC No. 414569                    -5-

1   DAVID REPLOGLE, State Bar No. 077875
    LAW OFFICES OF DAVID REPLOGLE
2   A Professional Corporation
    550 Montgomery Street, Suite 550
3   San Francisco, California 94111
    Telephone: (415) 362-4700
4   Facsimile: (415) 781-6683

5   JOHN E. HILL, SBN 045338
    LAW OFFICES OF JOHN E. HILL
6   A Professional Corporation
    8105 Edgewater Drive, Suite 100
7   Oakland, CA 94621
    Telephone: (510) 588-1000
8   Facsimile: (510) 588-1087

9   Attorneys for Plaintiffs
    Daniel Garcia and Joshua Beam
10

11                  SUPERIOR COURT OF CALIFORNIA

12              CITY AND COUNTY OF SAN FRANCISCO

13                    UNLIMITED JURISDICTION

14  DANIEL GARCIA and              )    Case No. 414569
    JOSHUA BEAM                    )
15                                 )
          Plaintiffs,              )
16                                 )
       vs.                         )    DECLARATION RE POSSESSION
17                                 )    OF CHILD PORNOGRAPHY
    THOMAS F. WHITE, NATHAN        )    BY NANCI L. CLARENCE
18  LOVAAS, and DOES 1 through     )
    20, inclusive,                 )
19                                 )
          Defendants.              )
20

21        I, Daniel Garcia, declare and state:

22        1. I am one of the plaintiffs in the above case. The following facts

23  are known to me personally and if called as a witness I could, and would testify

24  competently thereto.

25        2. This case concerns the sexual abuse of me and another minor

26  when we were each under the age of 18 years. The complaint relates how

27  Defendants systematically lured teenagers, including me and Joshua Beam,

28

1    from the California Central Valley to San Francisco where we were sexually

2    abused by Thomas White ("White") and his assistant Nathan Lovaas ("Lovaas").

3         3.  In September of 2002, upon my return from an extended

4    absence from the San Francisco Bay Area, I met with Agent Marty Parker of the

5    San Francisco office of the FBI.   She had called me and asked that she be able

6    to interview me concerning Thomas White.    A copy of a photograph of Mr.

7    White taken in Thailand is attached hereto, marked Exhibit "A" and

8    incorporated herein.

9         4.   During my meetings with Agent Parker, I became aware that

10   White was being investigated by the FBI in connection with traveling to Mexico

11   and other countries in order to have sex with children.    I was told by Agent

12   Parker that she believed I might be able to assist them since I had been to

13   White's villa in Puerto Vallarta.   At that time, I was just over 20 years old.   I

14   was very troubled and disturbed when I learned the extent of White's abuse of

15   very young children in Mexico.    Shortly thereafter I became very involved in

16   attempting to help White's other victims of childhood sexual abuse.  I have

17   made multiple trips to Mexico and Thailand where I have met with many other

18   of White's young victims.

19        5.  Both White and Lovaas are now in custody and have been

20   charged with traveling to Thailand and Mexico in order to have sex with

21   children, a violation of federal law.  I believe that those charges were filed as a

22   result, in part, of information provided by me to the Federal Bureau of

23   Investigation.   While White was still on the run from the authorities, I advised

24   the Mexican office of Interpol, through my attorney, that White was actually in

25   Thailand.   I have been told that, armed with that information, the Thai

26   authorities were able to put White under surveillance and ultimately

27   apprehend him in February of 2003.   I also provided the FBI with information

28

DECLARATION RE POSSESSION OF CHILD PORNOGRAPHY
GARCIA, *ET AL.* V. WHITE, *ET AL.*, SFSC CASE NO. 414569                                    -2-

1   on the location of White's computer server on which White kept his library of
2   child pornography.  I knew of the location of the server since I had been to
3   White's residence in San Francisco where it was located.  The FBI ultimately
4   seized the computer server which I believe contained evidence used by the
5   authorities in connection with their federal indictment.  Based on the
6   foregoing, I believe that I have been an important resource for the federal
7   government in its efforts to track down and prosecute a ring of wealthy sexual
8   predators.

9          6.  I have also worked with the media to bring the problem of child
10  sex tourism to the attention of the public.  I have been mentioned several
11  times in the San Francisco Chronicle.  There was also an article in People
12  Magazine in October of 2003 exposing White.  A photograph of me and Joshua
13  Beam was the lead into that article.  A copy of the People Magazine article is
14  attached hereto, marked Exhibit "B" and incorporated herein.  I have also
15  appeared on FOX News out of Sacramento and a national news magazine
16  television program which aired a two-part series on White earlier this year.

17         7.  I am likely viewed by White's legal team as the source of many
18  difficulties in their efforts to secure his release.  It has been important for my
19  recovery that I work to make sure Mr. White stays in prison so that he cannot
20  hurt any more children.

21         8.  According to discovery obtained in my case, I have calculated
22  that, based on current values, Mr. White has a net worth in excess of
23  $500,000,000.00.   With that vast fortune at their disposal, White's legal team
24  has been searching for some information in order to compromise me and
25  silence me.  At various times, White's legal team has sent investigators to
26  interview what appears to be everyone I know in the Central Valley.  Those
27  investigators also, at one point, arrived at Joshua Beam's grandmother's house
28

DECLARATION RE POSSESSION OF CHILD PORNOGRAPHY
GARCIA, *ET AL.* V. WHITE, *ET AL.*, SFSC CASE NO. 414569                                    -3-

1 | in Visalia in an effort to get information on her grandson. Steven Gore,
2 | White's investigator, also came to my home in Modesto apparently to speak
3 | with me directly without my attorney's knowledge. My mother answered the
4 | door and refused him entrance to our home.

5 |        9.  In 2003 Ms. Clarence was provided with incontrovertible
6 | evidence that her client is a serial pedophile. In an e-mail sent by Mr. White to
7 | Joshua Beam on September 10, 2003, Mr. White brags that he is in Thailand
8 | living with 6 underage boys and that, as a consequence, "cock is no problem."
9 | A copy of Mr. White's e-mail of September 10, 2002 to Joshua Beam is
10 | attached hereto, marked Exhibit "C" and incorporated herein. Although Mr.
11 | White states that the youngest boy is 11, in truth the youngest boy was a
12 | Cambodian boy named "Jimmy" who was no more than 8 years old. A copy of
13 | a picture of Jimmy and a picture of Jimmy on Lavaas' lap are attached hereto,
14 | marked collectively Exhibit "D" and incorporated herein. I have actually met
15 | with some of the Thai victims near White's home near the beach resort of
16 | Pattaya.

17 |        10.  If White is released, which is one of Ms. Clarence's goals,
18 | White will without a doubt resume living and having sex with very young
19 | children. It is clear to me, therefore, that for Ms. Clarence obtaining some of
20 | White's fortune is more important than protecting very vulnerable children.

21 |        11.  Mr. White is represented in this case by Nanci Clarence, a
22 | lawyer who apparently prides herself in getting charges against men who have
23 | been caught possessing and distributing child pornography either dismissed or
24 | defensed. It is my understanding that Ms. Clarence has been defending
25 | pedophiles at least since 1986. She has also given a continuing education
26 | lecture giving tips to other lawyers on how to get internet pornographers off on
27 | technicalities.

28 |

DECLARATION RE POSSESSION OF CHILD PORNOGRAPHY
GARCIA, *ET AL.* V. WHITE, *ET AL.*, SFSC CASE NO. 414569

-4-

1          12.   Because of my involvement in this case and because she

2    knows there is no defense to her client's actions, Ms. Clarence's line of defense

3    has been simply to try and harass my family and friends and to discredit me.

4          13.   Ms. Clarence, or agents working for or in collaboration with

5    her, have done the following:

6          A.   Their investigator told my friends in my hometown of Modesto

7          that I had sex with young children, a blatant lie designed to

8          slander me in my hometown;

9          B.   Their investigator told Denise Caster, a third party unrelated to

10          this case, that I was a male prostitute (a copy of a statement from

11          Ms. Caster is attached hereto, marked Exhibit "E" and

12          incorporated herein);

13          C.   Ms. Clarence or someone in her office downloaded from the

14          internet sexually provocative pictures of me taken when I was 16

15          at the request of her client, Thomas White (copies of several pages

16          of the transcript of my deposition in which Ms. Clarence discussed

17          the pornography are attached hereto, marked Exhibit "F" and

18          incorporated herein);

19          D.   Ms. Clarence shoved the child pornography they downloaded

20          from the internet in my face at my deposition;

21          E.   Stephen Modde, an associate attorney in Ms. Clarence's office,

22          recently used an alias on the internet, contacted me in violation of

23          the State Bar Rules and attempted to pick me up for a sexual

24          encounter with him; and

25          F.   Stuart Hanlon, a member of the White defense team who

26          evidence will show works closely with Ms. Clarence, threatened me

27          with criminal prosecution if I did not drop this civil case in

28

1    violation of the State Bar Rules.

2    In addition to the foregoing, the following events have transpired

3    recently:

4        G.    The garage at my parents' home in Modesto was entered by

5            some unknown party who took nothing but riffled through the

6            garbage apparently looking for documents;

7        H.    My father's bank account was recently compromised by

8            someone attempting to gain access to it without his knowledge or

9            consent (a copy of my father's declaration is attached hereto,

10            marked Exhibit "G" and incorporated herein); and

11        I.    Ms. Clarence's investigators have started to pry into my

12            attorneys' private life, calling unrelated parties and asking them to

13            call Ms. Clarence.

14        14.    As set forth above, at my deposition in this case, Ms. Clarence

15    shoved pictures of me she had apparently downloaded from the internet.   A

16    few weeks prior to that deposition, her associate, Stephen Modde, using an

17    alias, had attempted to solicit me for sex over the internet.

18        15.  Two of the pictures in Ms. Clarence's possession were taken

19    when I was 16 years old.   Mr. White, her client, had requested that he have

20    pictures of me in the nude.   One picture showed my totally erect penis.   One

21    picture showed my bare buttocks in a provocative pose.    Ms. Clarence knew

22    these pictures to be pornographic since that was the obvious reason she

23    shoved them in my face at the deposition.

24        16.    Ms. Clarence then attached the pornography to the original

25    deposition transcript. I believe Ms. Clarence is still in possession of the

26    pornography even though my lawyers told her that it was child pornography.

27        17.    There is also a video tape of the deposition depicting Ms.

28

1   Clarence introducing the child pornography into evidence.  I have not seen the
2   video; however, that video is also in the possession of Ms. Clarence.

3          18.  I have attached a copy of a portion of the transcript of the
4   deposition.  On page 222 at lines 3 through 5 Ms. Clarence states that she is
5   showing me the document subsequently marked as Exhibit "9".  That
6   document contained the child pornography.  In the subsequent pages, Ms.
7   Clarence repeatedly refers to the pictures which depict a sexually aroused
8   minor.  See, for example, page 231 at lines 1 through 25 where the
9   downloading of the pictures by her associate Stephen Modde was discussed.   I
10  do not have copies of those documents since my lawyers refused to take them
11  and advised the court reporter not to attach them to our copy of the transcript.

12         19.  After my lawyers learned that the pictures in Ms. Clarence's
13  possession were actually illegal child pornography, my lawyers wrote to Ms.
14  Clarence to advise her of that fact.  I do not believe she took any action but
15  that the photographs are still in her possession.  In addition, the video tape of
16  the deposition which will show Ms. Clarence introducing the child pornography
17  into evidence is, I believe, in her office at 899 Ellis Street, San Francisco,
18  California.

19         I declare under penalty of perjury that the foregoing is true and
20  correct.  Executed on January 31, 2005 at San Francisco, California.

21
22                                   _____
23                                   DANIEL GARCIA
24
25
26
27
28

DECLARATION RE POSSESSION OF CHILD PORNOGRAPHY
GARCIA, *ET AL.* V. WHITE, *ET AL.*, SFSC CASE NO. 414569                    -7-



EXHIBIT A



"I felt dirty," says alleged victim Josh Beam (left, in front of White's San Francisco home with fellow accuser Danny Garcia).

# Child Savior or Predator in Disguise?

## Posing as a philanthropist, police say, San Francisco millionaire Thomas White molested needy boys

Josh Beam was a country boy new to the city when a mutual friend invited him to the home of San Francisco millionaire Thomas White in 2000. The house, says Beam, had everything: a roof deck with a view of the Golden Gate Bridge, a hot tub, even a private disco. After downing several glasses of Scotch, Beam, who was 16 at the time, says he accepted an invitation from White, then 65, to strip naked and jump into the hot tub. What happened next, according to Beam, was both consensual—and illegal. "I let it all happen," says Beam, who alleges White had sex with him repeatedly over the next two years. "But I was taken advantage of, to say the least."

Now Beam and another San Francisco man, Danny Garcia, 20, are suing

White for most of his $100 million fortune, claiming the older man had unlawful sex with them when they were minors. Last month a 14-year-old Mexican boy also filed suit, alleging White molested him starting at age 9. In a statement, White's lawyers call their client a "target of false claims brought in the hope of financial gain." But he faces other legal woes: As the result of an investigation spanning two continents, police in Thailand arrested White earlier this year on child-sex charges brought in Mexico. There, 14 boys have accused him of coercing them into having sex and filming some of the acts—all while he was building a $2.5 million school for orphans.

"Behind the curtain of being a philanthropist, he was doing so many dark



"This person is sick," says a Mexican prosecutor of White (after his capture).

things," says Maria Nicolasa Garcia Reynoso, 39, a children's rights activist who first reported White to officials in 2000. Child-welfare advocates say the White case is part of a decadelong increase in child-sex tourism. In Mexico as many as 16,000 children survive by selling their bodies, often to Amer-

Photograph by DAVID PAUL MORRIS

EXHIBIT B

PEOPLE October 20, 2003  **127**

# Crime



White's palatial Mexican home is patrolled by armed guards and rottweilers.

accused attorney denies the charges.

In San Francisco—where White was known as a successful businessman and the father of an adopted son—many cannot believe such allegations. A Chicago native, he founded his brokerage firm Thomas White & Co. in 1978. "He started on his dining-room table and ended up with a company worth $50 to $100 million," says a pal, insurance agent John Schwobeda. White bought a multimillion-dollar home and gave generously to the San Francisco Ballet and a local gay and lesbian center. "I've known him to be a decent guy," says

with a pool and computer labs.

By then Garcia Reynoso, an exseamstress who works for a group called the Mexican Human Rights Front, had heard tales about the Casa Blanca. "The boys began telling me about this gringo named Tom who asked them to take their clothes off," she recalls. Garcia Reynoso videotaped some of the boys' stories and gave them to officials, who eventually denied White a permit to open the school.

In early 2001 authorities issued an arrest warrant, but White had already fled. Traveling to Russia, Costa Rica, Chile and other countries, he settled in Thailand in May 2002, buying a villa near the beach. "We don't know what to think," says one Thai resort manager about White's arrest. "In my eyes, he is very kind." But to others, like alleged San Francisco victim Josh Beam, White's kindly facade masked sinister motives. "I convinced myself he cared," says Beam. "Now I want to take back what was taken from me."

## "When it was my turn, he told me he gives me 50 pesos for him to [have oral sex with me]"

—from a deposition by MIGUEL, 10, a Puerto Vallarta bubble-gum seller

icans. "These tourists live double lives," says Juan Manuel Estrada, president of FIND, a Guadalajara missing-children's group. "They come here to live out fantasies."

In California the FBI has seized computer files from White's home, and on Sept. 16 arrested his assistant Nathan Lovaas and charged him with trafficking in child pornography and traveling for sex with a minor. Meanwhile, White remains in Thailand fighting extradition to Mexico, where he faces a possible 20-year sentence (a final hearing is scheduled for Oct. 10). His Mexican attorneys say the prosecution is the result of a vendetta. "White is the victim of a conspiracy by a person who claims to be a human-rights organizer," says lawyer José Maria Ortega Padilla. "Most of the boys were pressured by [Garcia Reynoso], and most have made retractions." Garcia Reynoso has countered by suing someone she says is one of White's Mexican legal team, claiming he bribed those who recanted with food, clothes and more. "They were being offered $20 and a bike to change their stories," says David Replogle, the lawyer who represents the California plaintiffs. The

Wayne Friday, a police commissioner and newspaper columnist.

For a time White was also admired in Puerto Vallarta, where he bought an estate named Casa Blanca (the White House) in 1998. He won praise by bringing clean water to a poor village and in 1999 broke ground for Los Niños de Vallarta (the Children of Vallarta), a school for 100 orphans,

J.D. HEYMAN
Adrienne Bard in Puerto Vallarta, Frank Swertlow and Maureen Harrington in San Francisco, John Perra in New York City and Karen Emmons in Thailand



"I couldn't close my eyes to what happened," says children's rights activist Garcia Reynoso.

Photographs by SHAUL SCHWARTZ



MSN Home | My MSN | Hotmail | Search | Shopping | Money | People & Chat

**You are today's WINNER!**

Click here to claim your Cordless Phone!

Search the W

Hotmail    Home    Inbox    Compose    Contacts    Options    Help

jbeam333@msn.com

Free Newsletters | MSN Featured Offers | Find Message

Want a bet

| Save Address(es) | Block |

Previous  Next | Close

From : "Josh Beam" <jbeam333@hotmail.com>
To : jbeam333@msn.com
Subject : Fwd: Re:
Date : Mon, 12 May 2003 15:19:01 -0700

| Reply | Reply All | Forward | Delete | Put In Folder... |

Printer Friendly Version

Post your r
employers

Explore MS

# Joshua

>From: Tom White
>To: Josh Beam
>Subject: Re:
>Date: Tue, 10 Sep 2002 00:10:10 -0700
>
>
>Poor baby. I am sorry to hear of your problem. Nathan says you should have no
>problem finding cock in Fresno or Visalia. As for myself, I have 6 boys I am
>taking care of here ranging in ages from 11 to 18. Cock is no problem. Wish
>you were here. And if you knew what was going on here, you would wish you were
>here also.
>Love,
>Tom

MSN Home
Autos
Business
Buy Tickets
Careers
City Guides
Downloads
Entertainme
Find Friends
Free Wireles
Games
Greeting Car
Health
Horoscopes
House & Ho:
Instant Mes:
Internet Acc
Kids
Learning & F
Love & Rela:
Maps & Dire
MSN 8 Inter
News
Send Money
Shopping
Sports by ES
Travel
Women

The new MSN 8: smart spam protection and 2 months FREE*

| Reply | Reply All | Forward | Delete | Put In Folder... |

Previous  Next | Close

MSN - More Useful Everyday

MSN Home | My MSN | Hotmail | Search | Shopping | Money | People & Chat

© 2003 Microsoft Corporation. All rights reserved. TERMS OF USE   Advertise   TRUSTe Approved Privacy Statement   GetNetWise

EXHIBIT C



EXHIBIT D

On December 29, 2004 , I, Denise Caster received a phone call at approx. 6:30 pm Central Standard Time. When I tried to answer, the person calling had already hung up. My cell phone is equipped with caller ID. I did not recognize the phone number, so I immediately dialed the number back. A woman answered with the name of her company, Mason Investigative Group, a name I did not recognize. I explained that I was not familiar with her company, but had just received a call from the telephone number. She asked me my identity and I refused to provide it. I explained that she called me, that she would have to tell me about her company and what they did before I gave her any information about myself. She tried twice more for my identity and then put me on hold.

At this point, Mike Travers got on the line, identifying himself by name only and asked if I was Denise Caster. I replied yes, and he said, "the real Denise Caster?" I said "Who is this and what do you want?" He explained that he was a Private Investigator with Mason Investigative Group and that he wanted to know how well I knew Danny Garcia. I asked Mr. Travers how he had gotten my phone number. He replied with a simple internet search. At this point, I did not know whether he represented Danny or worked for someone else. I asked Mr. Travers who he was working for. He named a law firm with numerous names. I asked again, who he worked for. After some vague attempts to toss more names of law firms he eventually admitted that the firm represented Thomas Frank White.

He then asked how well I knew Danny Garcia and who had written the article on lnoohr.org in regard to Thomas Frank White. Mr. Travers demanded to know how I had information on Thomas Frank White, and I replied with a 'simple internet search'. I told Mr. Travers that it really didn't matter whether I knew Danny or not, it was none of his business and I did not choose to speak with Mr. Travers any longer. At this point, Mr. Travers began asking if I knew that Danny Garcia was a 'gay hustler in San Francisco' or that 'Danny was trying to extort $10 million dollars from a fine upstanding man, Thomas Frank White'. He told me that he had information about Danny that I should know. He said that Danny was not the person that I thought he was and that I needed what he, Mr. Travers had.

I told him that he was to send me this info via email and to provide his name as well as the name of the company he was working for. He agreed and the conversation ended.

The following day I received an email from Mike Travers, identifying

EXHIBIT E

himself.

as a private investigator with Mason Investigative Group. He then provided hyperlinks to a page on 'gay.com' soliciting sexual favors with pictures that could or could not have been Danny and no names were mentioned. Another site was 'gaydar.uk' with the same type of solicitation. The third link was to 'houseboi.com' that when clicked on never did load on my computer.

The email said that Danny was a scam artist, in search of rich older men to which he could seduce and take money from. Mr. Travers then asked that I contact him and give him all information I had about Danny Garcia, as if the three website links were enough for me to believe in what he was saying about Mr. Garcia. He also demanded that he needed copies of any information that Danny might have provided to us.

Mike Travers then followed up this email with a phone message, that I have saved. It was pushing me to call him and again accused Danny of being a 'gay hustler'.

All of this occurred while my husband and I were traveling to visit family for New Years Day. A rather interesting side note to these events are:

On January 2, 2005 in the evening, the front page of our website was redirected to 'Microsoft.com'. Further our email passwords and that of our website had been compromised. We were denied access to our website and email accounts. In repairing this situation all of our saved emails were lost. On January 3, 2005, our web host repaired our website and sent us a statement in regard to how this happened.

While I cannot be absolutely certain that Mason Investigative Group played a part in our emails and website being compromised, I find it curious that all of this occurred within days.

We, the Undersigned, under Penalty of Perjury, do Swear the above Statement to be true.

Dated this day of January 5, 2005

David B. Caster

Denise L. Caster

**Page 219**

1   Q.  Have you ever met Tano, to your knowledge?
2   A.  Not to my knowledge.
3   Q.  Do you have any recollection of whether he was
4   one of the individuals at Casa Blanca?
5   A.  The name doesn't ring a bell with who was
6   there.
7   Q.  Who is Chicles?
8   A.  Chicles is another one of the alleged victims
9   who I believe was present when I was there.
10   Q.  Present when you were there at which meeting?
11   A.  At Casa Blanca in 2000.
12   Q.  Why is it that you have a memory of that?
13   A.  Because I remember his name and Nathan telling
14   me if meant the same as gum, because apparently that's
15   how they met him; he was selling gum on the street in
16   front of McDonald's on the Marina.
17   Q.  And have you — since the 2000 Casa Blanca
18   trip, have you met with him subsequently?
19   A.  Yes.
20   Q.  When was that?
21   A.  When we were there with People Magazine.
22   Q.  Who was present for that meeting?
23   A.  David Replogle, the photographer for People
24   and Stephanie Salters, the reporter.
25   Q.  And was this meeting conducted in Spanish or

**Page 220**

1   English?
2   A.  Spanish.
3   Q.  Was there an English translation?
4   A.  No.
5   Q.  So you weren't able to follow or track what
6   was being said?
7   A.  Correct.
8   Q.  Do you know whether Chicles was provided any
9   remuneration for his interview?
10   A.  I believe a cheeseburger.
11   Q.  Anything else?
12   A.  No.
13   Q.  Do you know whether Chicles has ever been
14   provided remuneration or monies by you?
15   A.  I have never given him anything.
16   Q.  Do you know whether he was ever provided money
17   by anyone in your legal team?
18   A.  No, I do not.
19   Q.  The final name I have is Michoacano.  Do you
20   know who that individual is?
21   A.  To the best of my knowledge, no.
22   Q.  Is this somebody that you recall being at Casa
23   Blanca?
24   A.  No.
25   Q.  The three other individuals who fall into this

**Page 221**

1   category, may be or may not, the first is Shaggy?
2   A.  Doesn't sound familiar.
3   Q.  The second is Edgar Rebollo.
4   A.  Again, doesn't sound familiar.
5   Q.  Alberto Hernandez?
6   A.  Doesn't sound familiar.
7   Q.  Are there any other witnesses from Mexico that
8   you consider to be witnesses to matters that you feel
9   are pertinent to the claims that you've brought here?
10   MR. HILL:  Objection.  Unclear.  You mean other
11   than witnesses that were listed in the response to your
12   interrogatory request?
13   MS. CLARENCE:  Thank you for the clarification,
14   yes.  Incorporating Mr. Hill's commentary.
15   MR. HILL:  I think you'd better show him a list
16   because it's pretty extensive, and I'm not sure he knows
17   who all was on the list.
18   MS. CLARENCE:  Okay.  Why don't we do that after
19   the break in the interest of saving time.
20   MR. HILL:  Sure.
21   MS. CLARENCE:  Will you write that down?
22   Q.  Mr. Garcia, you've had a profile on
23   Friendster?
24   A.  Yes, I have.
25   Q.  And I show you — do you also have a profile

**Page 222**

1   on Gay.com?
2   A.  Yes, I do.
3   MS. CLARENCE:  I'm going to ask that this document
4   be marked as next in order.  It is a 13-page document
5   which will be marked as Defense 9.
6   (Whereupon Exhibit No. 9 was marked
                for identification.)
7
8   MS. CLARENCE:  Q.  Do you recognize this?
9   A.  Yes, I do.
10   Q.  What is it?
11   A.  It's a user profile.
12   Q.  Is this your user profile?
13   A.  It appears to be.
14   Q.  Did you post this on Gay.com?
15   A.  I believe so.
16   Q.  When did you do that?
17   A.  I think a couple of years ago.
18   Q.  Mr. Garcia, I'm handing you another document,
19   this time a seven-page document with print from
20   Houseboi.com, H-o-u-s-e-b-o-i.com, and ask whether you
21   have ever had a profile on Houseboi.com.
22   A.  It doesn't look familiar.
23   MS. CLARENCE:  I ask that this exhibit be marked as
24   Exhibit 10.
25   (Whereupon Exhibit No. 10 was marked

14 (Pages 219 to 222)

EXHIBIT F

2b17532c-f505-45ae-8c6c-95af27d324a8

Page 223

1     MS. CLARENCE: Q. And, Mr. Garcia, have you ever
2  had a profile on Gaydar.co.uk?
3     A.  Possibly.
4     Q.  I show you a document —
5     A.  Yes, that looks familiar.
6     Q.  — that is two pages long, and ask whether
7  this could be marked as next in order which will be
8  Exhibit 11, please.
9              (Whereupon Exhibit No. 11 was marked
                    for identification.)
10
11    MS. CLARENCE: Q. Does the one before you have two
12 pages in it, Mr. Garcia?
13    A.  Yes, it does.
14    Q.  That's 11.
15        I believe you said that the Exhibit 11 is your
16 profile from Gaydar.co —
17    A.  Yes; it is.
18        (The court reporter asks for clarification.)
19    Q.  Gaydar.co.uk, which let's call "Gaydar" for
20 short; is that acceptable?
21    A.  That's fine, Counsel.
22    Q.  Before we talk about these documents, I'd like
23 to ask whether you've ever used the following Internet
24 e-mail addresses: Dansf21@AOL.com?
25    A.  Yes.

Page 224

1     Q.  Dansf2002@AOL.com?
2     A.  Yes.
3     Q.  RogueDesignsinc@AOL.com?
4     A.  I don't believe so.
5     Q.  Is it your testimony that you don't recall
6  using RogueDesignsinc@AOL.com or you don't believe you
7  did?
8     A.  I'd have to look through my records. I've had
9  probably 50 different screen names in the last few
10 years, so — I'll look through my records and see if
11 it's any of the screen names I've had.
12    Q.  As you sit here today, does it sound familiar
13 to you?
14    A.  No, it does not.
15    Q.  Have you used an Internet e-mail address
16 identified as eurodanny@sbcglobal.net?
17    A.  Yes, I believe so.
18    Q.  Have you used an e-mail address known as
19 eurodanny@hotmail.com?
20    A.  Yes.
21    Q.  Have you used an Internet e-mail address known
22 as rafif — r-a-f-i-f — @csco.ms.com?
23    A.  No, I have not.
24    Q.  Have you used an Internet e-mail address
25 identified as inuendo8@yahoo.com?

Page 225

1     A.  Yes, I have.
2     Q.  Just so we have this all in one place, have
3  you ever had a Friendster profile?
4     A.  Yes, I have.
5     Q.  I'm handing you a one-page document and ask
6  whether you can identify that as a printout of your
7  Friendster profile.
8     A.  Yes, however it's slightly outdated.
9     Q.  But at some point in your —
10    A.  Yes.
11    Q.  — life, this was your printout of your
12 Friendster profile?
13    A.  Yes, it was.
14    Q.  When was the last time you updated that?
15    A.  I believe a couple of nights ago.
16    Q.  And I'd ask that the Friendster profile
17 printout be Defendant's next in order, which will be 12,
18 please.
19              (Whereupon Exhibit No. 12 was marked
                    for identification.)
20
21    MS. CLARENCE: Q. Mr. Garcia, the Internet is a
22 major venue for socializing for you, is it not?
23    A.  Yes, it is.
24    Q.  You use chat rooms and other Internet services
25 to talk with friends?

Page 226

1     A.  Yes, I do.
2     Q.  And to meet new ones?
3     A.  Yes, I do.
4     Q.  And you're online on lot; you would say?
5     A.  Yes.
6     Q.  Approximately how many hours a day do you
7  spend online?
8     A.  Probably eight or ten hours.
9     Q.  And during those eight or ten hours a day that
10 you are online, do you engage in Internet chat?
11    A.  Yes, quite frequently.
12    Q.  And that chat includes discussions,
13 conversations with people that are unknown to you; is
14 that true?
15    A.  Correct.
16    Q.  Have — other than the addresses, e-mail
17 addresses that I've just asked you about, can you give
18 me any other e-mail addresses that you've used since
19 2001?
20    A.  Oh, my goodness. Dansf20@gay.com and the
21 others I'd have look up. I couldn't provide that for
22 you.
23    Q.  What would you have to do to look those up?
24    A.  Well, for older accounts, I don't use them. I
25 primarily use Dansf21@AOL.com.

15 (Pages 223 to 226)

Page 227

1    Q.  Since — I am interested in any addresses that
2  you can provide me since 2001. If you could undertake a
3  comprehensive search for those, I would be appreciative.
4    A.  Yes, I will.
5    Q.  Thank you.
6    Other than e-mail addresses, can you remember
7  the user names you've used since 2001?
8    A.  That's the same.
9    Q.  Are there any that you can recall as you sit
10  here today, other than DanSF20@gay.com?
11    A.  No, usually all my screen names are a
12  variation of that, so —
13    Q.  You testified a moment ago that you don't
14  recall ever using RogueDesignsinc@AOL.com. I'm handing
15  you a one-page copy of an e-mail purportedly from you to
16  Mr. Cassman and ask whether that refreshes your
17  recollection as to whether you ever used
18  RogueDesignsinc@AOL.com.
19    MR. HILL:  Let me see.
20    MS. DYER:  Here's a copy.
21    MS. CLARENCE:  Q.  Have you had an opportunity to
22  review that e-mail printout?
23    A.  Yes.
24    Q.  Does that refresh your recollection?
25    A.  Yes. It looks like an e-mail I sent to Ted

Page 228

1  Cassman.
2    Q.  Does it refresh your recollection as to
3  whether you used RogueDesignsinc@AOL.com?
4    A.  Well, it says that in the form address so I'm
5  assuming that is, but to my recollection, I don't know
6  what e-mail address I sent this from.
7    Q.  Does it refresh your recollection as to
8  whether you ever had the use of that e-mail address?
9    A.  No, it does not.
10    MS. CLARENCE:  I'd like to mark this as next in
11  order, please, which would be 13, I think.
12    (Whereupon Exhibit No. 13 was marked
      for identification.)
13
14    MS. CLARENCE:  Q.  We talked yesterday about
15  laptops you have at home. You said there were four,
16  correct?
17    A.  Correct.
18    Q.  Do your parents have a separate computer at
19  home, other than your computers?
20    A.  Yes, they do.
21    Q.  Do you ever use that computer?
22    A.  No, I do not.
23    Q.  Have you ever used the computer at any of your
24  lawyers' offices for purposes of sending e-mails?
25    A.  Not to my recollection, no.

Page 229

1    Q.  Have you ever accessed the Internet from your
2  lawyers' offices?
3    A.  Yes.
4    Q.  On numerous occasions?
5    A.  On rare occasions, yes.
6    Q.  Have you ever used any of the user names that
7  we discussed a few moments ago while engaging — while
8  engaging the Internet from your lawyers' offices?
9    A.  I would have used DanSF21 probably.
10    Q.  Directly your attention to Exhibit 9, your
11  profile from Gay.com, Mr. Garcia, can you describe for
12  us, please, how it is that you came to post this profile
13  on Gay.com?
14    A.  Gay.com was considered to be one of largest
15  forums for gay people to talk with one another.
16    Q.  When you say large forum, you could tell, in
17  fact, from this profile from the demarcation of whose
18  online that there are 27,348 people online at the time
19  this printout was taken; correct?
20    A.  Correct.
21    Q.  So it's a massive forum?
22    A.  Yes, with millions of users.
23    Q.  And the photographs that appear on the first
24  page of that profile, were those photographs that were
25  posted by you?

Page 230

1    A.  I believe so. They were pretty low resolution
2  but looks but they look familiar.
3    Q.  It appears to me, despite the fact that they
4  are low resolution, you can make out that there are four
5  photos that are evident that were posted and there are
6  four photos that have "Private Photo," and appear to be
7  blocked out.
8    A.  Correct.
9    Q.  Are the — in the places where the private
10  photos are blocked out, does that suggest that they are
11  photos that you posted that you remin for your privacy?
12    A.  Correct.
13    Q.  Despite the fact that you asked that those
14  photos be private, they are posted on the Internet,
15  correct?
16    A.  Correct, but to my understanding, someone has
17  to request to people to review them.
18    Q.  Could you clarify that?
19    A.  On Gay.com someone's supposed to be able to
20  request to be able to view them, and you have to give
21  permission.
22    Q.  So other users on Gay.com can request to
23  access those private photos, and if you consent then
24  they can, in fact, access them?
25    A.  Correct.

16 (Pages 227 to 230)

Page 231

1    Q.  Did you from time to time grant access to
2  those private photos?
3    A.  Yes.
4    Q.  Frequently?
5    A.  Rarely.
6    Q.  For what purpose?
7    A.  If someone I felt I wanted to see the pictures
8  requested it, then sometimes I'd grant approval.
9    Q.  What would be your criteria for determining
10  when you wanted to reveal those photographs?
11    A.  If it was someone I'd been talking to for a
12  long period of time and they wanted to see more
13  photographs of me.
14    Q.  It's true, is it not, that the four
15  photographs that are denoted "Private" are sexually
16  explicit photographs?
17    A.  I don't believe all of them are.
18    Q.  Are there any of the four that you consider to
19  be graphic or sexually explicit?
20    A.  I believe two maybe.
21    Q.  And it's true, is it not, that you have
22  granted access to Gay.com users to access those private
23  photos?
24    A.  Yes, including your former associate attorney
25  Stephen Modde.

Page 232

1    Q.  And other than Mr. Modde, did you grant access
2  to anyone else of those private graphic photos?
3    A.  Yes.
4    Q.  About how many times?
5    A.  I would have to look at the records on
6  Gay.com.
7    Q.  Can you give me an estimate?
8    A.  No, I cannot.
9    MS. CLARENCE:  We need to take a break right now.
10  It can be a brief one but we will pick up right where we
11  left off.
12    THE VIDEOGRAPHER:  This marks the end of Tape 1 of
13  Volume II in the deposition of Daniel Garcia.
14    Going off the record.  The time is 11:17 a.m.
15    (short recess taken)
16    MS. CLARENCE:  Q.  Mr. Garcia, I was just asking
17  you questions about this profile on Gay.com.
18    A.  Yes.
19    Q.  And after doing so realized that this profile
20  is a subject of a stipulation that we have agreed to
21  with your lawyers, and that is that we would not use any
22  information, if it was, in fact, obtained from
23  Mr. Modde.  And I don't know whether this was, in fact,
24  but I want to reiterate that stipulation and tell you
25  that we stand by it and will not use any information if

Page 233

1  it was gained through any violative — any conduct by
2  any attorneys associated with this office violative of
3  any State Bar code.  So I'm going to simply move on with
4  that and say that I stand by the stipulation.
5    There are, however, other profiles that I do
6  want to talk to you about.
7    A.  Okay.
8    Q.  Specifically Exhibit 10, Houseboi.com.  Your
9  testimony, I believe, was that you don't believe this is
10  your user profile?
11    A.  Correct.
12    Q.  And how can you know that?
13    A.  Because I don't believe I ever posted this ad.
14    Q.  Have you ever accessed Houseboi.com?
15    A.  I believe so.
16    Q.  When did you do that?
17    A.  Several years ago.
18    Q.  Have you had an opportunity to review
19  Exhibit 10?
20    A.  Yes, I did.
21    Q.  And do the descriptions or personal profile
22  information provided there sound at all familiar to you?
23    A.  Yes, but pretty much all of this is in the
24  public domain, so — I mean the pictures are the same
25  pictures from my Gay.com profile.  All the information

Page 234

1  is pretty much the same as any other profile I've posted
2  online.
3    Q.  How many times have you posted profiles
4  online?
5    A.  Numerous times.
6    Q.  Is it altogether possible that you did post
7  this and just simply forgot about it?
8    A.  No.
9    Q.  How can you be so sure?
10    A.  Because I know for certain I didn't post it.
11    Q.  Direct your attention to Page 3 of the profile
12  where — under "Description," the words are written:  I
13  have had a recent event in my life which has financially
14  knocked me off my feet.  It is time for a change in
15  pace.  I'm tired of pursuing material rewards with no
16  personal gratification.
17    Do those words seem familiar to you?
18    A.  No, they do not.
19    Q.  Have you ever written those words or words to
20  that effect?
21    A.  No, I don't believe so.
22    Q.  That text that I just read back to you is
23  completely unfamiliar to you, as you sit here today?
24    A.  Correct.
25    Q.  A little further down the profile, it says:

17 (Pages 231 to 234)

SHARI MOSS & ASSOCIATES   (415) 402-0004

2b17532c-f505-45ae-8c5c-95af27d324a8

1  DAVID REPLOGLE, State Bar No. 077875
   LAW OFFICES OF DAVID REPLOGLE
2  A Professional Corporation
   550 Montgomery Street, Suite 550
3  San Francisco, California 94111
   Telephone: (415) 362-4700
4  Facsimile: (415) 781-6683

5  JOHN E. HILL, SBN 045338
   LAW OFFICES OF JOHN E. HILL
6  A Professional Corporation
   8105 Edgewater Drive, Suite 100
7  Oakland, CA 94621
   Telephone: (510) 588-1000
8  Facsimile: (510) 588-1087

9  Attorneys for Plaintiffs
   Daniel Garcia and Joshua Beam
10

11              SUPERIOR COURT OF CALIFORNIA

12            CITY AND COUNTY OF SAN FRANCISCO

13               UNLIMITED JURISDICTION

14  DANIEL GARCIA and          )   Case No. 414569
    JOSHUA BEAM                )
15                             )
                               )
16          Plaintiffs,        )
                               )
17      vs.                    )   DECLARATION RE COMPROMISE
                               )   OF PERSONAL BANK ACCOUNT
18  THOMAS F. WHITE, NATHAN    )   AT WASHINGTON MUTUAL
    LOVAAS, and DOES 1 through )
18  20, inclusive,             )
                               )
19          Defendants.        )
                               )
20  _____)

21         I, Charles R. Garcia, declare and state:

22         1. I am the father of Daniel Garcia, the lead plaintiff in the above

23  case.  The following facts are known to me personally and if called as a witness

24  I could, and would testify competently thereto.

25         2. I am 60 years old.   My wife and I live in a quiet, residential

26  neighborhood in Modesto, California.   We have lived in the same house for 16

27  years.

28         3.  On January 19, 2005 my electronic banking account with

DECLARATION OF CHARLES R. GARCIA        EXHIBIT G      -1-

1  Washington Mutual became locked as a result of an unknown party attempting

2  to access my account and password without my consent or knowledge.   I had

3  to contact my bank to have my password reset.

4           4.    I have worked in the same job for many years.   I am not

5  involved in any litigation or other dispute.   There is no one in my life that

6  would have any reason to hack into my personal bank account.   This is the

7  first time in my entire life that I have been told by my bank that someone had

8  attempted to break into my personal bank account.

9           I declare under penalty of perjury that the foregoing is true and

10  correct.

11           Executed on January 30, 2005 at Modesto, California.

12

13           CHARLES R. GARCIA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   DAVID REPLOGLE, State Bar No. 077875
    LAW OFFICES OF DAVID REPLOGLE
2   A Professional Corporation
    550 Montgomery Street, Suite 550
3   San Francisco, California 94111
    Telephone: (415) 362-4700
4   Facsimile: (415) 781-6683

5   JOHN E. HILL, SBN 045338
    LAW OFFICES OF JOHN E. HILL
6   A Professional Corporation
    8105 Edgewater Drive, Suite 100
7   Oakland, CA 94621
    Telephone: (510) 588-1000
8   Facsimile: (510) 588-1087

9   Attorneys for Plaintiffs
    Daniel Garcia and Joshua Beam
10

11              SUPERIOR COURT OF CALIFORNIA

12            CITY AND COUNTY OF SAN FRANCISCO

13                  UNLIMITED JURISDICTION

14  DANIEL GARCIA and            )    Case No. 414569
    JOSHUA BEAM                   )
15                               )
            Plaintiffs,           )
16                               )
        vs.                       )
17                               )    DECLARATION OF DANIEL GARCIA
    THOMAS F. WHITE, NATHAN       )    REGARDING THEFT OF PROPERTY
18  LOVAAS, and DOES 1 through    )    BY ZEKE FENNEL
    20, inclusive,                )
19                               )
            Defendants.           )
20  _____ )

21          I, Daniel Garcia, declare and state:

22          1.  I am one of the plaintiffs in the above case.  The following facts

23  are known to me personally and if called as a witness I could, and would testify

24  competently thereto.

25          2.  I first met Zeke Fennel in July of 2003.   That first time, Mr.

26  Fennel told me that he was from Rocklin and that he was rich because his

27  father had passed away and he had just inherited all of his father's fortune.  He

28  DECLARATION OF DANIEL GARCIA
    RE THEFT OF PROPERTY BY ZEKE FENNEL                                    -1-

1   did not, at that time, mention that his mother was still alive. He referred to

2   himself as an "heiress." He said that once his grandparents died he would get

3   even more money so that he would never have to work again. He also said he

4   was a bartender, but could not return to work until he recovered from his

5   extensive plastic surgery. At one point, although I do not know if it was at that

6   first meeting, he stated he had a million dollar contract as a bartender. He

7   also said that he was having extensive plastic surgery because if he looked

8   better he would make more money as a bartender.

9        3.   I saw Mr. Fennel perhaps once a week for the next few months.

10  The last time I saw Mr. Fennel on a social basis was in November of 2003,

11  some 4 to 5 months after we met.

12       4.   Mr. Fennel constantly talked about how much money he had

13  and that he had invested $150,000 into his plastic surgery. According to Mr.

14  Fennel it was an investment in his bartending career.

15       5.   At this time I was living with my parents in Modesto. Mr.

16  Fennel said he owned a large house on a golf course in a rich suburb of

17  Sacramento and I was more than welcome to come and stay with him while

18  this action was pending. Mr. Fennel told me I could not trust my parents

19  because they would try and take any money I received in any recovery;

20  however, I could trust him because he was wealthy in his own right.

21       6.   In October I moved some personal possessions to Mr. Fennel's

22  residence.   Included in those personal possessions were court documents

23  relating to this case and 2 laptop computers, a Sony Vaio and an Apple

24  Powerbook.   The Apple was my main computer at that time.

25       7.   I often talked with Mr. Fennel about the lawsuit against Mr.

26  White. Mr. Fennel said I would get a huge verdict and I should be careful who

27  I trusted. He said he could be trusted because he was rich. He then said that

28

DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL                                    -2-

1  he would help me financially if I would pay for another round of plastic surgery
2  removing excess skin all over his body when the White action was over.
3  Apparently as a result of having gastric bypass surgery he had lost a lot of
4  weight and had about 25 pounds of excess skin that needed to be removed.

5        8.   Mr. Fennel also constantly criticized my lawyers, telling me
6  that they could not be trusted.   Mr. Fennel attempted to steer me to a
7  Sacramento lawyer he knew.

8        9.   In retrospect, it was clear that Mr. Fennel was attempting to
9  gain control of me because he saw the possibility of a recovery in this case.  He
10  systematically and repeatedly told me not to trust my parents or my lawyers,
11  the people who have actually been my support throughout this ordeal.   In
12  retrospect Mr. Fennel was acting like a classic grifter, attempting to isolate me
13  from my support system and take control of my life and, as a result, take
14  control of this case.

15        10.  During one encounter with Mr. Fennel I accompanied him and
16  Robert Tamo to San Francisco.   That afternoon we went shopping in Union
17  Square where Mr. Fennel was attended by various store clerks who attended to
18  his every whim.    In the Armani Exchange store Mr. Fennel sought out the
19  manager and told her that he was going to spend an insane amount of money
20  and that he would require personalized attention.   He told me and Robert
21  Tamo that he enjoyed playing the "pretty princess" and that I should pick out
22  anything I wanted and he would pay for it.   Mr. Fennel put my items, as well
23  as his many purchases, on his credit card that he called his "big girl" card
24  because of its high credit limit.   I believe that he spent about $10,000, all on
25  credit.

26        11.  I noticed when he was shopping that the card said "Floyd
27  Fennel."   Mr. Fennel told me that his father had died but he was an
28
DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL                               -3-

1   authorized user and there was no sense in getting a new card since his middle
2   name was also Floyd.   On a later date, Mr. Fennel admitted that he was living
3   off his dead father's credit cards but told me it was totally legitimate since they
4   were in the process of probating his father's estate.   Mr. Fennel told me that if
5   he and his mother told the credit card companies that his father had died that
6   they would cancel the accounts.   According to Mr. Fennel, as long as his
7   name matched the name on the card it was perfectly legitimate.   I did not
8   think it was any of my business what his family did with the credit cards since
9   his mother approved of it.

10          12.   In October of 2003 while I was staying with Mr. Fennel I
11   learned that, in fact, Mr. Fennel did not own the house, that the house was
12   heavily mortgaged, and that his family was strapped for cash. The house was
13   put on the market for sale.   Mr. Fennel told me he was upset because his
14   mother would not give him half of the proceeds from the sale.

15          13.   In November of 2003, Mr. Fennel said he wanted to go to
16   Thailand with me and my parents.   He said he wanted to be there to make
17   sure my parents did not take advantage of me.   I went to Bangkok to see if Mr.
18   White would talk to me.   When we left Sacramento, I left all court documents
19   and my main computer, the Apple, at Mr. Fennel's residence.

20          14.   A few days after we arrived we went to a tailor's shop.   I left
21   the shop with my father to go window shopping.   When I returned, Mr. Fennel
22   was on the phone with his credit card company because his card had been
23   declined.   I heard the last part of his conversation with the credit card
24   company where he asked if they would raise his credit limit.   Mr. Fennel said
25   there was something wrong with his credit card because it was an international
26   purchase and it would take some time to increase his credit limit.

27          15.   The next we went to a jewelry store where Mr. Fennel

28
DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL                                              -4-

1   attempted to charge emerald earrings for his mother.   His card was again

2   declined.    He then asked my mother to put the charge on her credit card

3   because "he had cash at the hotel."    He did not pay my mother back when we

4   returned to the hotel.

5          16.   After we returned to the hotel, I was downstairs in the lobby

6   with my parents.   I then returned to the room I was sharing with Mr. Fennel.

7   Mr. Fennel was signed onto my personal AOL account on my computer.   I

8   asked him to get off the computer because I had to use it.   I then changed the

9   password to guard my personal files.   After I left the room, Mr. Fennel again

10  tried to access my computer without my permission.   I then took my personal

11  effects to my parents' room.

12          17.   The next day we went to the tailor shop to pick up our

13  clothes.   The tailor said that Mr. Fennel had just been there and told him that

14  he was returning to the United States that day.   Late at night, 2 notes were

15  slipped under our hotel room door from Mr. Fennel.   The next morning we

16  went to the front desk and inquired about Mr. Fennel.   The manager then went

17  upstairs and unlocked the door.   All of Mr. Fennel's possessions were gone

18  together with the entire contents of the mini-bar.   We then went downstairs

19  and the manager told us there was an outstanding room service bill from Mr.

20  Fennel in the approximate sum of $1,200.00.

21          18.   When I returned to San Francisco, I called Mr. Fennel

22  numerous times and told him I wanted to recover my possession.   I also sent

23  many e-mails to the same effect.   The week after Thanksgiving Robert Tamo

24  drove me to Rocklin.   When we arrived, Mr. Fennel said that he had already

25  packed all of my property into 3 boxes.   After I took the boxes to the car and

26  opened them, I discovered that they contained very little.   I then asked Mr.

27  Fennel about my clothes.   Mr. Fennel said he had taken them back to the

28

DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL                                    -5-

1  store because he had paid for them and he was taking back his gifts.

2        19.  I then asked Mr. Fennel for my court documents and lap top

3  computer.  Mr. Fennel said "I have already taken care of that."   I insisted on

4  the return of my laptop.   After more words were exchanged, Zeke Fennel finally

5  went upstairs, retrieved the laptop and gave me my laptop computer.

6  However, no court papers were returned on that day or have ever been

7  returned.   Robert Tamo has also signed a declaration concerning these

8  events, a copy of which is attached hereto, marked Exhibit "A" and

9  incorporated herein.

10        20.  A few months later, Shawn Azzizadeh, a lawyer from Los

11  Angeles, called me and told me he was Mr. Fennel's lawyer.   He said Mr.

12  Fennel had given him several boxes containing my court documents and e-

13  mails, including e-mails with my lawyers.   He said he thought the documents

14  could be very damaging to me and that there was a possibility I would recover a

15  large sum of money from Mr. White.   He then demanded $100,000.   He said

16  if I paid the money that they would be happy to return my documents to me.

17  In the second telephone call from Mr. Azzizadeh I told him that I was upset

18  with his attempt to extort money from me.   He said that he had lots of

19  damaging documents and that if I refused to pay he would give them to Mr.

20  White's lawyers.   I asked Mr. Azzizadeh to put his proposal in writing and send

21  it to my attorney.

22        21.  In April of 2004 I received my last telephone call from Mr.

23  Fennel's lawyer.   He told me that if I paid him $50,000 plus $3,000 in legal

24  fees he would return my documents.

25        22.  On January 28, 2005 Ms. Clarence was notified that the

26  documents in Mr. Fennel's possession were stolen property.   Ms. Clarence has

27  not returned any of the documents which I believe were given to her by Mr.

28

DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL              -6-

1 | Fennel and his lawyer.

2 |       I declare under penalty of perjury that the foregoing is true and

3 | correct.

4 |       Executed on January 31, 2005 at San Francisco, California.

5

6 |       DANIEL GARCIA

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL

1   DAVID REPLOGLE, State Bar No. 077875
    LAW OFFICES OF DAVID REPLOGLE
2   A Professional Corporation
    550 Montgomery Street, Suite 550
3   San Francisco, California 94111
    Telephone: (415) 362-4700
4   Facsimile: (415) 781-6683

5   JOHN E. HILL, SBN 045338
    LAW OFFICES OF JOHN E. HILL
6   A Professional Corporation
    8105 Edgewater Drive, Suite 100
7   Oakland, CA 94621
    Telephone: (510) 588-1000
8   Facsimile: (510) 588-1087

9   Attorneys for Plaintiffs
    Daniel Garcia and Joshua Beam
10

11                SUPERIOR COURT OF CALIFORNIA

12             CITY AND COUNTY OF SAN FRANCISCO

13                  UNLIMITED JURISDICTION

14  DANIEL GARCIA and          )    Case No. 414569
    JOSHUA BEAM                 )
15                              )
            Plaintiffs,         )
16                              )
        vs.                     )    DECLARATION OF ROBERT TAMO
17                              )
    THOMAS F. WHITE, NATHAN     )
18  LOVAAS, and DOES 1 through  )
    20, inclusive,              )
19                              )
            Defendants.         )
20  _____)

21         I, Robert O. Tamo, declare and state:

22         1. I am a long time friend of Daniel Garcia, the lead plaintiff in the

23  above case. The following facts are known to me personally and if called as a

24  witness I could, and would testify competently thereto.

25         2. I am 24 years old.  I have lived in the United States since I was

26  an infant and am a permanent U.S. resident.   My parents left Saddam

27  Hussein's Iraq 24 years ago to settle in the United States.   My parents live in

28  Modesto and speak very limited English.   They are also paranoid of authority

DECLARATION OF ROBERT O. TAMO                                        -1-

                                        EXHIBIT A

1 | figures given their many years under the Saddam Hussein regime.

2 |     3.  I have known Daniel Garcia for about 8 years.  We met while
3 | attending high school in Modesto.

4 |     4.  About 18 months ago, Steven Gore, one of Thomas F. White's
5 | investigators came unannounced and uninvited to my parents' home in
6 | Modesto.   He said he worked with the FBI so my parents, fearful of being in
7 | trouble with the authorities, let him in our home.   My parents were very
8 | shaken by that experience and I had to explain to them that Mr. Gore was not
9 | with the government.

10 |     5.  Mr. Gore also spoke with me.  During that conversation, Mr.
11 | Gore said that Daniel Garcia was sexually interested in children.   I knew that
12 | statement to be false and did not know why Mr. Gore would want to spread
13 | false information about Daniel Garcia in our home town.

14 |     6.  I first met Zeke Fennel in August of 2003.   That first time, Mr.
15 | Fennel told me that his father had passed away and he was in the middle of
16 | inheriting his father's fortune.   He said that he would never have to work
17 | again.   He also said he was a bartender with a million dollar contract he had
18 | to fulfill, but could not return to work until he recovered from his extensive
19 | plastic surgery.

20 |     7.   The next time I saw Mr. Fennel was on August 30, 2003 at
21 | Daniel Garcia's parents' home in Modesto.   Mr. Fennel continued to talk about
22 | his inherited wealth.   He also said he had a large amount of credit as a result
23 | of his father.   He also said that he was making a lots of plans for travel and
24 | was taking Daniel Garcia with him.

25 |     8.  The next time I saw Mr. Fennel I accompanied him and Daniel
26 | Garcia to San Francisco.   That afternoon we went shopping in Union Square
27 | where Mr. Fennel was attended by various store clerks who attended to his
28 | every whim.   He told me he enjoyed playing the "pretty princess" and that I

DECLARATION OF ROBERT O. TAMO                                    -2-

1  should pick out an outfit for myself and he would pay for it.    Mr. Fennel put

2  my item, as well as his many purchases, on his credit card.

3        9.  In late November of 2003, Daniel Garcia and his parents

4  returned from a trip to Thailand.   Daniel Garcia asked me to accompany him

5  to Rocklin, California to recover his property from Zeke Fennel's house.   Daniel

6  Garcia had apparently been staying with Zeke Fennel for some period of time

7  before the Thailand trip.   When we arrived, Mr. Fennel said that he had

8  already packed all of Daniel Garcia's property into 3 boxes.   Mr. Fennel also

9  said that he had taken Mr. Garcia's clothing that he had given to Mr. Garcia,

10  stating that it was a gift and he was just taking back the gifts.   After some

11  dispute between the two, Mr. Garcia relented and took the boxes to the car.

12        10.   We then opened the boxes.    There were no court papers and

13  no computer in the boxes.   Mr. Garcia then asked Mr. Fennel about the court

14  papers and the laptop computer.    Mr. Fennel replied that he had "already

15  taken care of all that" but did not elaborate on what he meant.   After more

16  words were exchanged, Zeke Fennel finally went upstairs, retrieved the laptop

17  and gave Mr. Garcia his laptop computer.    However, no court papers were

18  returned.

19        11.   The last time I saw Zeke Fennel was on April 1, 2004 in

20  Sacramento.   I was with Daniel Garcia and 3 other friends at a club in

21  downtown Sacramento.   Late into the evening, Zeke Fennel arrived.   I saw Mr.

22  Fennel and Mr. Garcia involved in some dispute.    I heard Mr. Fennel tell Mr.

23  Garcia that he, Mr. Fennel, would sue him and take every penny including any

24  recovery he might have in the lawsuit against Thomas White.   Mr. Garcia

25  calmly replied that Mr. Fennel could sue him if he wanted but that he should

26  talk to his lawyer.   Mr. Garcia repeatedly told Mr. Fennel to leave him alone.

27  At that point, Mr. Fennel punched Mr. Garcia in the stomach and walked away.

28        12.   Mr. Fennel, who used to work at the club and knew the

DECLARATION OF ROBERT O. TAMO                                    -3-

1  bartender, turned to the bartender and instructed him to have the bouncers
2  throw Mr. Garcia outside.   Within seconds a large bouncer come and picked
3  Daniel Garcia up, carried him outside and threw him to the ground.   Three
4  bouncers then pinned Mr. Garcia to the ground, bashing his head on the
5  concrete.   Mr. Garcia asked me to call the police, which I did.   Mr. Fennel
6  then came outside the club and was talking on his cell phone.   He appeared
7  to be genuinely proud that Mr. Garcia was in pain.

8            13.   Mr. Garcia then collapsed onto the concrete and appeared to
9  have stopped breathing.   Emergency services were called and an ambulance
10 arrived within minutes.   Mr. Garcia was unconscious at the time and the
11 paramedics were examining Mr. Garcia for his vital signs.   While this was
12 happening, Zeke Fennel was standing nearby, watching Mr. Garcia and
13 laughing with his friends.

14            14.   Mr. Garcia was taken to a local hospital.   His forehead had a
15 large scrape and appeared swollen.   His arm had also been badly damaged
16 and he appeared to be in great pain.   The next day Mr. Garcia was released
17 from the hospital and we returned to Modesto.   During the ride, Mr. Garcia
18 was crying in anguish from his injuries.

19            I declare under penalty of perjury that the foregoing is true and
20 correct.

21            Executed on January 30, 2005 at Modesto, California.

22
23                                    ROBERT O. TAMO
24
25
26
27
28

DECLARATION OF ROBERT O. TAMO                                    -4-

1 | DAVID REPLOGLE, State Bar No. 077875
LAW OFFICES OF DAVID REPLOGLE
2 | A Professional Corporation
550 Montgomery Street, Suite 550
3 | San Francisco, California 94111
Telephone: (415) 362-4700
4 | Facsimile: (415) 781-6683

5 | JOHN E. HILL, SBN 045338
LAW OFFICES OF JOHN E. HILL
6 | A Professional Corporation
8105 Edgewater Drive, Suite 100
7 | Oakland, CA 94621
Telephone: (510) 588-1000
8 | Facsimile: (510) 588-1087

9 | Attorneys for Plaintiffs
Daniel Garcia and Joshua Beam
10

11 | SUPERIOR COURT OF CALIFORNIA

12 | CITY AND COUNTY OF SAN FRANCISCO

13 | UNLIMITED JURISDICTION

14 | DANIEL GARCIA and                    )   Case No. 414569
JOSHUA BEAM                           )
15 |                                     )
          Plaintiffs,                    )
16 |                                     )
          vs.                            )   DECLARATION OF DAVID
17 |                                     )   REPLOGLE IN SUPPORT OF EX
THOMAS F. WHITE, NATHAN                )   PARTE MOTIONS TO QUASH
18 | LOVAAS, and DOES 1 through          )   NOTICE OF DEPOSITION,
20, inclusive,                         )   DIRECTING DEFENSE COUNSEL
19 |                                     )   TO RETURN STOLEN PROPERTY,
          Defendants.                    )   AND DIRECTING DEFENSE
20 | _____)   COUNSEL TO DEPOSIT CHILD
                                             PORNOGRAPHY WITH COURT
21

22 |          I, David Replogle, declare and state:

23 |          1. I am an attorney licensed to practice before all courts of the

24 | State of California and the sole shareholder of the Law Offices of David

25 | Replogle, a Professional Corporation, attorneys for plaintiffs in the above case.

26 | The following facts are known to me personally and if called as a witness I

27 | could, and would testify competently thereto.

28

DECLARATION OF COUNSEL RE EX PARTE APPLICATION FOR ORDERS
GARCIA, *ET AL.* V. WHITE, *ET AL.*, SFSC CASE NO. 414569                          -1-

1    2.  On Friday, January 28, 2005 I received by facsimile an

2  unsigned Notice of Taking Deposition of Witness Zeke Fennel purporting to set

3  the deposition for the next Friday, February 4, 2005.   Defense counsel had

4  apparently served the subpoena on Mr. Fennel's lawyer the previous day.   A

5  copy of the unsigned Notice of Deposition with the Deposition Subpoena

6  attached to it is attached hereto, marked Exhibit "A" and incorporated herein.

7    3.  Although I routinely forward documents by facsimile as well as

8  mail, there is no agreement, written or otherwise, that facsimile service would

9  be deemed sufficient service in this case.   However, even if there were such an

10  agreement, the earliest a deposition could be set by facsimile would be

11  Wednesday, February 9, 2005, or 10 days plus the 2 court days required by

12  facsimile service.

13    4.  The tactics engaged in by defense counsel are set forth in some

14  detain in Daniel Garcia's declaration.   I can confirm that I have received calls

15  from at least 2 sources advising me that Ms. Clarence's investigators have

16  begin investigating me personally and advising people to call Ms. Clarence

17  directly so that they could discuss my personal life with her.   Apparently,

18  unable to find incriminating evidence on Mr. Garcia, I have now become their

19  target.

20    I declare under penalty of perjury that the foregoing is true and

21  correct.   Executed on January 31, 2005 at San Francisco, California.

22

23                        DAVID REPLOGLE

24

25

26

27

28

DECLARATION OF COUNSEL RE EX PARTE APPLICATION FOR ORDERS
GARCIA, *ET AL.* V. WHITE, *ET AL.,* SFSC CASE NO. 414569                    -2-

CLARENCE & DYER LLP
Nanci L. Clarence (Bar No. 122286)
Kate Dyer (Bar No. 171891)
Jodi Linker (Bar No. 230273)
899 Ellis Street
San Francisco, CA 94109
Telephone: (415) 749-1800
Facsimile: (415) 749-1694

Attorneys for Defendant Thomas F. White

# SUPERIOR COURT OF CALIFORNIA

## CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| DANIEL GARCIA, et al.,<br><br>    Plaintiffs,<br><br>    vs.<br><br>THOMAS F. WHITE, NATHAN LOVAAS, and<br>DOES 1 through 20 inclusive,<br><br>    Defendants. | Case No.: No. CGC-02-414569<br><br>NOTICE OF TAKING DEPOSITION OF<br>WITNESS ZEKE FENNELL |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at 10:00 PM, on February 4, 2005 at 980 Ninth Street, 16th Floor,

Sacramento, CA 95814, defendant THOMAS WHITE will take the deposition of the witness, Zeke

Fennell, whose address is 6650 Crescent Moon Ct., #307, Raleigh, North Carolina, 27606 or 4800

Kokomo Drive, Sacramento, CA 95835, upon oral examination before a court reporter of the state of

California, duly authorized to administer an oath. Said deposition will continue from day to day,

excluding weekends and holidays, until completed.

///

///

NOTICE OF DEPOSITON OF WITNESS ZEKE FENNELL
CASE NO.: CGC-02-414569

EXHIBIT A

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*<br>JODI LINKER, SBN230273<br>Clarence & Dyer LLP<br>899 Ellis Street<br>San Francisco, CA 94109<br>    TELEPHONE NO.: 415.749.1800    FAX NO.: 415.749.1694<br>ATTORNEY FOR *(name):* Thomas F. White<br>    NAME OF COURT: Superior Court of California, County of San Francisco<br>    STREET ADDRESS: 400 McAllister Street<br>    MAILING ADDRESS:<br>    CITY AND ZIP CODE: San Francisco, CA 94109<br>    BRANCH NAME: | FOR COURT USE ONLY |
|---|---|
| PLAINTIFF/ PETITIONER: Daniel Garcia, et. al | |
| DEFENDANT/ RESPONDENT: Thomas F. White, et. al | |
| **DEPOSITION SUBPOENA**<br>**For Personal Appearance and Production of Documents and Things** | CASE NUMBER:<br>CGC-02-414569 |

THE PEOPLE OF THE STATE OF CALIFORNIA, TO *(name, address, and telephone number of deponent, if known):*
Zeke Fennel, 6650 Crescent Moon Ct., #307, Raleigh, North Carolina 27606
4800 Kokomo Drive, #311, Sacramento, CA 95835

1. **YOU ARE ORDERED TO APPEAR IN PERSON TO TESTIFY AS A WITNESS** in this action at the following date, time, and place:

   | Date: Feb. 4, 2005 | Time: 10:00 am | Address: 980 Ninth Street, 16th Floor, Sacramento, CA 95814 |
   |---|---|---|

   a. ☐  As a deponent who is not a natural person, you are ordered to designate one or more persons to testify on your behalf as to the matters described in item 4. (Code Civ. Proc., § 2025, subd. (d)(6).)

   b. ☐  You are ordered to produce the documents and things described in item 3.

   c. ☑  This deposition will be recorded stenographically   ☑ through the instant visual display of testimony, and by   ☐ audiotape   ☐ videotape.

   d. ☐  This videotape deposition is intended for possible use at trial under Code of Civil Procedure section 2025(u)(4).

2. The personal attendance of the custodian or other qualified witness and the production of the original records are required by this subpoena. The procedure authorized by Evidence Code sections 1560(b), 1561, and 1562 will not be deemed sufficient compliance with this subpoena.

3. The documents and things to be produced and any testing or sampling being sought are described as follows:

   ☑ Continued on Attachment 3.

4. If the witness is a representative of a business or other entity, the matters upon which the witness is to be examined are described as follows:

   ☐ Continued on Attachment 4.

5. **IF YOU HAVE BEEN SERVED WITH THIS SUBPOENA AS A CUSTODIAN OF CONSUMER OR EMPLOYEE RECORDS UNDER CODE OF CIVIL PROCEDURE SECTION 1985.3 OR 1985.6 AND A MOTION TO QUASH OR AN OBJECTION HAS BEEN SERVED ON YOU, A COURT ORDER OR AGREEMENT OF THE PARTIES, WITNESSES, *AND* CONSUMER OR EMPLOYEE AFFECTED MUST BE OBTAINED BEFORE YOU ARE REQUIRED TO PRODUCE CONSUMER OR EMPLOYEE RECORDS.**

6. At the deposition, you will be asked questions under oath. Questions and answers are recorded stenographically at the deposition; later they are transcribed for possible use at trial. You may read the written record and change any incorrect answers before you sign the deposition. You are entitled to receive witness fees and mileage actually traveled both ways. The money must be paid, at the option of the party giving notice of the deposition, either with service of this subpoena or at the time of the deposition.

**DISOBEDIENCE OF THIS SUBPOENA MAY BE PUNISHED AS CONTEMPT BY THIS COURT. YOU WILL ALSO BE LIABLE FOR THE SUM OF FIVE HUNDRED DOLLARS AND ALL DAMAGES RESULTING FROM YOUR FAILURE TO OBEY.**

Date issued: Jan. 27, 2005

|  |  |
|---|---|
| Jodi Linker<br>(TYPE OR PRINT NAME) | *(signature)*<br>(SIGNATURE OF PERSON ISSUING SUBPOENA) |
| | (TITLE) |

(Proof of service on reverse)

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>982(a)(16.4) [New January 1, 2000] | **DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE<br>AND PRODUCTION OF DOCUMENTS AND THINGS** | Code of Civil Procedure,<br>§§ 2020, 2025;<br>Government Code, § 68097.1<br>American LegalNet, Inc. | www.USCourtForms.com |

Attachment 3

Any and all writings as defined by California Evidence Code section 250, including but not limited to all writings in electronic form, that refer or relate to Thomas F. White, aka Thomas Frank White (SSN 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), whose date of birth is February 14, 1936, and/or Daniel Garcia, aka Daniel Carlos Garcia, aka Daniel Dresser, aka Daniel C. Garcia (SNN 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), and/or Nathan Lovaas.

Any and all writings as defined by California Evidence Code section 250, relating to payments from Thomas F. White, aka Thomas Frank White (SSN 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), whose date of birth is February 14, 1936, and/or Daniel Garcia, aka Daniel Carlos Garcia, aka Daniel Dresser, aka Daniel C. Garcia (SNN 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), including but not limited to all bank statements deposit records receipts checks, and credit cards.

| PLAINTIFF/PETITIONER: Daniel Garcia, et. al | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Thomas F. White, et. al | CGC-02-414569 |

## PROOF OF SERVICE OF DEPOSITION SUBPOENA FOR PERSONAL APPEARANCE AND PRODUCTION OF DOCUMENTS AND THINGS

1. I served this *Deposition Subpoena for Personal Appearance and Production of Documents and Things* by personally delivering a copy to the person served as follows:

   a. Person served (name): Shawn Azizzadeh, Attorney for Zeke Fennell

   b. Address where served: The Clift Hotel
      495 Geary St
      SF, CA 94102

   c. Date of delivery: 1/27/05

   d. Time of delivery: 11:35pm

   e. Witness fees and mileage both ways (check one):
      (1) ☐ were paid. Amount: . . . . . . . . . . $ _____
      (2) ☒ were not paid.
      (3) ☐ were tendered to the witness's
          public entity employer as
          required by Government Code
          section 68097.2. The amount
          tendered was (specify): . . . . . . . . $ _____

   f. Fee for service: . . . . . . . . . . . . . . . . . . . . . . $ _____

2. I received this subpoena for service on (date):

3. Person serving:
   a. ☒ Not a registered California process server.
   b. ☐ California sheriff or marshal.
   c. ☐ Registered California process server.
   d. ☐ Employee or independent contractor of a registered California process server.
   e. ☐ Exempt from registration under Business and Professions Code section 22350(b).
   f. ☐ Registered professional photocopier.
   g. ☐ Exempt from registration under Business and Professions Code section 22451.
   h. Name, address, telephone number, and, if applicable, county of registration and number:

| I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. | (For California sheriff or marshal use only) I certify that the foregoing is true and correct. |
|---|---|
| Date: 1/28/05 | Date: |
| ▶ _____ (SIGNATURE) | ▶ _____ (SIGNATURE) |

**Proof of Service**

I, Daniel Portman, declare as follows:

I am over eighteen years of age and not a party to the within action; my business address is 899 Ellis Street, San Francisco, California 94109; I am employed in the County of San Francisco.

On January 28, 2005, I served a copy, with all exhibits, of the following documents:

- NOTICE OF DEPOSITION OF WITNESS ZEKE FENNELL.

_____ (BY MAIL) I am readily familiar with my employer's practices for collection and processing of correspondence for mailing with the United States Postal Service. Following ordinary business practices and placing a true copy of the above-referenced document(s) enclosed in a sealed envelope, with postage fully prepaid, in the United States mail at San Francisco, California, addressed as below:

_X_ (BY FAX) By transmitting by facsimile machine to the number addressed as below; the facsimile machine I used complied with California Rules of Court, rule 2003 and no error was reported by the machine. Pursuant to California Rules of Court, rule 2006(d), I caused the machine to print a transmission record of the transmission.

_____ (BY PERSONAL SERVICE) By personally delivering a copy of said documents to the address(es) below:

_____ (BY OVERNIGHT SERVICE) By depositing copies of the above documents in a box or other facility regularly maintained by FedEx in an envelope or package designated by FedEx with delivery fees paid or provided for as noted below:

Attorney for Plaintiffs
John Hill, Esq.
8105 Edgewater Drive, Suite 100
Oakland, CA 94621

Attorneys for Plaintiffs (via mail)
David Replogle, Esq.
550 Montgomery Street, Suite 550
San Francisco, CA 94111

Attorney for Defendant Nathan Lovaas
Bill Berland, Esq.
1816 5th Street
Berkeley, CA 94710

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct and that this declaration was executed on the above stated date.

Daniel Portman

NOTICE OF DEPOSITON OF WITNESS ZEKE FENNELL
CASE NO.: CGC-02-414569