# EXHIBIT A

Nanci L. Clarence
Kate Dyer
Jodi Linker
Joshua H. Lerner


**CLARENCE & DYER LLP**

Attorneys At Law
899 Ellis Street
San Francisco, CA 94109
Tel. 415.749.1800
Fax. 415.749.1694

www.clarencedyer.com

February 11, 2005

*Via Hand Delivery*

Judge William Cahill
JAMS
Two Embarcadero Center
Suite 1100
San Francisco, CA 94111

Re:   *Garcia v. White et al.*, S.F. Superior Court Case No. CGC-02-414569

Dear Judge Cahill:

Enclosed please find six CDs containing electronic evidence and two large manila envelopes – one containing approximately 61 hard-copies of some of this evidence, the other containing approximately 47 hard copy documents – produced in this case by a third party, which we are lodging with you today. The third party, who is represented by counsel, Mr. Shawn Azizzadeh, is producing this evidence pursuant to subpoena. However, his counsel has advised me that the documents could contain attorney-client privileged communications between parties and counsel in this case and possibly evidence of a crime. Accordingly, rather than accepting this evidence, we respectfully lodge it with you, as duly appointed Referee in this case pursuant to the General Reference signed by Judge Goldsmith and entered on December 2, 2004.

Mr. Azizzadeh and I have agreed to appear before Judge Goldsmith on Monday, February 14, to seek guidance on the disposition of this evidence. However, given the highly sensitive nature of the documents, we did not want to delay lodging them with you immediately.

Very truly yours,

Nanci Clarence

Encls.
cc: All counsel

# EXHIBIT B

LAW OFFICES OF

## DAVID REPLOGLE
A PROFESSIONAL CORPORATION

550 MONTGOMERY STREET, SUITE 550
SAN FRANCISCO, CALIFORNIA 94111

TELEPHONE
(415) 362-4700

FACSIMILE
(415) 781-6683

JALISCO, MEXICO OFFICE
PLAZA MARINA, OFFICINA C12
FRACC. MARINA VALLARTA
PUERTO VALLARTA, JALISCO

February 14, 2005

VIA MESSENGER

The Hon. William Cahill
Judge of the Superior Court, Ret.
Two Embarcadero Center, Suite 1100
San Francisco, CA 94111

    Re:    Garcia, et al. v. White, et al.; SFSC No. 414569;
             Property Stolen by Zeke Fennell

Dear Judge Cahill:

       This is in response to Nanci Clarence's letter to you of February 11, 2005, a copy of which was transmitted to me at 6:22 p.m. last Friday.

       The property that Ms. Clarence has given to you was stolen by Zeke Fennell from Daniel Garcia in November of 2003. The full circumstances of that theft are contained in the enclosed declaration of Mr. Garcia. Mr. Fennell stole the documents relating to this case and then attempted to extort $100,000 from Mr. Garcia as a condition of their return.

       On January 28, 2005 I advised Ms. Clarence that the documents are stolen property. I also advised her that there was a police report of the incident filed at the time of the theft and that the documents should be returned to their rightful owner. A copy of my letter of that date is enclosed. On January 30, 2005 Ms. Clarence responded that she did not have the documents taken by Mr. Fennell. A copy of Ms. Clarence's letter of that date is also enclosed. A follow up police report has been filed with the Modesto Police.

Hon. William Cahill
February 14, 2005
Page two


On February 2, 2005 before Judge Goldsmith, Ms. Clarence again stated that she did not have the property Zeke Fennell took from Daniel Garcia. She further stated that, according to her research, documents are not rendered inadmissible even if they are stolen documents.

On February 4, 2005 I caused an action to be filed before the Sacramento County Superior Court for the return of the stolen property. A copy of that complaint is enclosed.

Mr. Fennell's deposition is scheduled for Wednesday, February 16, 2005 pursuant to subpoena. There has been no disclosure of the documents pursuant to subpoena at this time.

In any event, the property is stolen property, a fact known to all counsel. I would appreciate it, therefore, if you would have your assistant deliver the documents to my office.

Respectfully yours,

DAVID REPLOGLE


cc:   Nanci Clarence (by facsimile)
      John E. Hill (by facsimile)
      William S. Berland (by facsimile)

```
 1  DAVID REPLOGLE, State Bar No. 077875
    LAW OFFICES OF DAVID REPLOGLE
 2  A Professional Corporation
    550 Montgomery Street, Suite 550
 3  San Francisco, California 94111
    Telephone: (415) 362-4700
 4  Facsimile: (415) 781-6683

 5  JOHN E. HILL, SBN 045338
    LAW OFFICES OF JOHN E. HILL
 6  A Professional Corporation
    8105 Edgewater Drive, Suite 100
 7  Oakland, CA 94621
    Telephone: (510) 588-1000
 8  Facsimile: (510) 588-1087

 9  Attorneys for Plaintiffs
    Daniel Garcia and Joshua Beam
10
```

ENDORSED
FILED
San Francisco County Superior Court

FEB - 1 2005

GORDON PARK-LI, Clerk
BY: RONNIE OTERO
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION

| DANIEL GARCIA and JOSHUA BEAM, | Case No. 414569 |
|---|---|
| Plaintiffs, | |
| vs. | DECLARATION OF DANIEL GARCIA REGARDING THEFT OF PROPERTY BY ZEKE FENNEL |
| THOMAS F. WHITE, NATHAN LOVAAS, and DOES 1 through 20, inclusive, | |
| Defendants. | |

I, Daniel Garcia, declare and state:

1. I am one of the plaintiffs in the above case. The following facts are known to me personally and if called as a witness I could, and would testify competently thereto.

2. I first met Zeke Fennel in July of 2003. That first time, Mr. Fennel told me that he was from Rocklin and that he was rich because his father had passed away and he had just inherited all of his father's fortune. He

DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL                                              -1-

1  did not, at that time, mention that his mother was still alive. He referred to
2  himself as an "heiress." He said that once his grandparents died he would get
3  even more money so that he would never have to work again. He also said he
4  was a bartender, but could not return to work until he recovered from his
5  extensive plastic surgery. At one point, although I do not know if it was at that
6  first meeting, he stated he had a million dollar contract as a bartender. He
7  also said that he was having extensive plastic surgery because if he looked
8  better he would make more money as a bartender.

9      3.  I saw Mr. Fennel perhaps once a week for the next few months.
10  The last time I saw Mr. Fennel on a social basis was in November of 2003,
11  some 4 to 5 months after we met.

12      4.  Mr. Fennel constantly talked about how much money he had
13  and that he had invested $150,000 into his plastic surgery. According to Mr.
14  Fennel it was an investment in his bartending career.

15      5.  At this time I was living with my parents in Modesto. Mr.
16  Fennel said he owned a large house on a golf course in a rich suburb of
17  Sacramento and I was more than welcome to come and stay with him while
18  this action was pending. Mr. Fennel told me I could not trust my parents
19  because they would try and take any money I received in any recovery;
20  however, I could trust him because he was wealthy in his own right.

21      6.  In October I moved some personal possessions to Mr. Fennel's
22  residence. Included in those personal possessions were court documents
23  relating to this case and 2 laptop computers, a Sony Vaio and an Apple
24  Powerbook. The Apple was my main computer at that time.

25      7.  I often talked with Mr. Fennel about the lawsuit against Mr.
26  White. Mr. Fennel said I would get a huge verdict and I should be careful who
27  I trusted. He said he could be trusted because he was rich. He then said that
28

DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL     -2-

he would help me financially if I would pay for another round of plastic surgery removing excess skin all over his body when the White action was over. Apparently as a result of having gastric bypass surgery he had lost a lot of weight and had about 25 pounds of excess skin that needed to be removed.

8. Mr. Fennel also constantly criticized my lawyers, telling me that they could not be trusted. Mr. Fennel attempted to steer me to a Sacramento lawyer he knew.

9. In retrospect, it was clear that Mr. Fennel was attempting to gain control of me because he saw the possibility of a recovery in this case. He systematically and repeatedly told me not to trust my parents or my lawyers, the people who have actually been my support throughout this ordeal. In retrospect Mr. Fennel was acting like a classic grifter, attempting to isolate me from my support system and take control of my life and, as a result, take control of this case.

10. During one encounter with Mr. Fennel I accompanied him and Robert Tamo to San Francisco. That afternoon we went shopping in Union Square where Mr. Fennel was attended by various store clerks who attended to his every whim. In the Armani Exchange store Mr. Fennel sought out the manager and told her that he was going to spend an insane amount of money and that he would require personalized attention. He told me and Robert Tamo that he enjoyed playing the "pretty princess" and that I should pick out anything I wanted and he would pay for it. Mr. Fennel put my items, as well as his many purchases, on his credit card that he called his "big girl" card because of its high credit limit. I believe that he spent about $10,000, all on credit.

11. I noticed when he was shopping that the card said "Floyd Fennel." Mr. Fennel told me that his father had died but he was an

DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL                                    -3-

1 authorized user and there was no sense in getting a new card since his middle
2 name was also Floyd. On a later date, Mr. Fennel admitted that he was living
3 off his dead father's credit cards but told me it was totally legitimate since they
4 were in the process of probating his father's estate. Mr. Fennel told me that if
5 he and his mother told the credit card companies that his father had died that
6 they would cancel the accounts. According to Mr. Fennel, as long as his
7 name matched the name on the card it was perfectly legitimate. I did not
8 think it was any of my business what his family did with the credit cards since
9 his mother approved of it.
10     12. In October of 2003 while I was staying with Mr. Fennel I
11 learned that, in fact, Mr. Fennel did not own the house, that the house was
12 heavily mortgaged, and that his family was strapped for cash. The house was
13 put on the market for sale. Mr. Fennel told me he was upset because his
14 mother would not give him half of the proceeds from the sale.
15     13. In November of 2003, Mr. Fennel said he wanted to go to
16 Thailand with me and my parents. He said he wanted to be there to make
17 sure my parents did not take advantage of me. I went to Bangkok to see if Mr.
18 White would talk to me. When we left Sacramento, I left all court documents
19 and my main computer, the Apple, at Mr. Fennel's residence.
20     14. A few days after we arrived we went to a tailor's shop. I left
21 the shop with my father to go window shopping. When I returned, Mr. Fennel
22 was on the phone with his credit card company because his card had been
23 declined. I heard the last part of his conversation with the credit card
24 company where he asked if they would raise his credit limit. Mr. Fennel said
25 there was something wrong with his credit card because it was an international
26 purchase and it would take some time to increase his credit limit.
27     15. The next we went to a jewelry store where Mr. Fennel
28

DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL     -4-

1 | attempted to charge emerald earrings for his mother. His card was again
2 | declined. He then asked my mother to put the charge on her credit card
3 | because "he had cash at the hotel." He did not pay my mother back when we
4 | returned to the hotel.
5 |     16. After we returned to the hotel, I was downstairs in the lobby
6 | with my parents. I then returned to the room I was sharing with Mr. Fennel.
7 | Mr. Fennel was signed onto my personal AOL account on my computer. I
8 | asked him to get off the computer because I had to use it. I then changed the
9 | password to guard my personal files. After I left the room, Mr. Fennel again
10 | tried to access my computer without my permission. I then took my personal
11 | effects to my parents' room.
12 |     17. The next day we went to the tailor shop to pick up our
13 | clothes. The tailor said that Mr. Fennel had just been there and told him that
14 | he was returning to the United States that day. Late at night, 2 notes were
15 | slipped under our hotel room door from Mr. Fennel. The next morning we
16 | went to the front desk and inquired about Mr. Fennel. The manager then went
17 | upstairs and unlocked the door. All of Mr. Fennel's possessions were gone
18 | together with the entire contents of the mini-bar. We then went downstairs
19 | and the manager told us there was an outstanding room service bill from Mr.
20 | Fennel in the approximate sum of $1,200.00.
21 |     18. When I returned to San Francisco, I called Mr. Fennel
22 | numerous times and told him I wanted to recover my possession. I also sent
23 | many e-mails to the same effect. The week after Thanksgiving Robert Tamo
24 | drove me to Rocklin. When we arrived, Mr. Fennel said that he had already
25 | packed all of my property into 3 boxes. After I took the boxes to the car and
26 | opened them, I discovered that they contained very little. I then asked Mr.
27 | Fennel about my clothes. Mr. Fennel said he had taken them back to the
28 |

DECLARATION OF DANIEL GARCIA
RE THEFT OF PROPERTY BY ZEKE FENNEL     -5-