

# Fax Cover

**To:**    John E. Hill Esq.      **Phone:** (510) 729-6330    **Fax:** 510-588-1087
      L/O John E. Hill

      David Replogle Esq.      (415) 362-4700     415-781-6683
      L/O David Replogle

      Geoffrey Rotwein Esq.     415-397-0860     415-397-0862
      L/O Geoffrey Rotwein

      Eric M. Safire Esq.      415-292-1940     415-292-1946
      L/O Eric M. Safire

      Thomas H. Kawaii Esq.     415-296-8880     415-296-8029
      Gwire Law Offices

      Charles R. Breyer      415-522-2062     415-522-3195
      U.S. District Court

**From:**    Karen Clerici      **Phone:** 415-774-2656

**Date:**    January 18, 2008      **Pages (Including Cover):** 25

**Case Name:**    Roe vs. White

**Reference:**    1100052048

**Comments:**     **Originals will follow via US Mail**

Please see attached re: REPORT

For further information contact Karen Clerici at her direct line (415) 774-2656.

This facsimile transmission is confidential. If you have received this transmission in error, please notify the sender at the number listed above and discard the transmission. Thank you for your assistance.

Hon. David A. Garcia (Ret.)
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, California 94111
(415) 982-5267 (main)
(415) 982-5287 (fax)

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOSE ROE, et al., | Case No. C 03-04035 CRB |
| Plaintiff, | **Special Master's Report # 3 Regarding Representation of Plaintiffs and Implementation of Confidential Settlement Agreement** |
| vs. | |
| THOMAS F. WHITE, et al., | Date: |
| Defendants. | Time: |
|  | Courtroom: |
|  | Judge: Hon. Charles R. Breyer |

## **Introduction**

This report details the factual investigation[1] undertaken pursuant to the Order

Directing Cooperation with Special Master of the Hon. Charles Breyer, Judge for The United

States District Court for the Northern District of California, dated October 12, 2007. In

connection with this investigation, the Special Master reviewed all relevant court-filed

documents.  In addition, the Special Master interviewed the following individuals:

---

[1]The Special Master does not purport to make findings of fact, but rather reports the facts of the investigation
and his impressions and conclusions.

- 1 -

1.  David Replogle* (Attorney)

2.  John Hill* (Attorney)

3.  Mauricio Rodriguez Borrego* (Attorney in Mexico)

4.  Eric Safire* (Attorney)

5.  Hilario Silvar Mena (Attorney in Mexico)

6.  Leyla Adriana Cholula Villa (Administrative Judge[2] in Mexico)

7.  Carlos Peña Chavarin (District Attorney, Adscript Judge #2 in Mexico)

8.  Arturo Guzman (CR XVIII)

9.  Jose Delfina (CR XVII)

10. Santiago Mercado Cervantes (CR XV)

11. Marcos Morales Serrano[3] (CR XIII)

12. Juan Ramon de la Rosa Sandoval (CR VIII)

13. Samuel Chavez Morales (JR III)

14. David Guadalupe Villa Jimenez (CR VII)

15. Irving Jean Altamirano Ramirez (CR V)

16. Mario Alberto Armenta Villa y Scusa (CR I)

17. Luis Arnoldo Amaral (CR XVI)

Finally, the Special Master reviewed various other documents provided at the time, or subsequent to each interview. Any such relevant documents will be discussed below.

This report details all pertinent events, as reported to the Special Master, throughout the course of this litigation relating to the legal representation of the plaintiffs in this action.

---

* Indicates that interview took place in San Francisco, California. All other individuals not so indicated were interviewed in Puerto Vallarta, Mexico between November 12-14, 2007.
[2] Criminal Judge #2
[3] This is the name used in the complaint. However, the Special Master was informed at the interview that the name actually appearing on his birth certificate is Antonio Juarez Morales, but that his family informally changed it to what appears in the complaint.

Where possible, the report lays out general consistencies between different accounts. The report also notes significant tensions between accounts.

The report is organized into three parts. The first part discusses the relationships between Replogle, Rodriguez[4] and Hill, both as they were at the outset and as they were when this matter was referred to the Special Master for investigation. Second, the report discusses the relationship between the plaintiffs and those three attorneys, including their respective roles in the case. Finally, the report discusses the relationships between the plaintiffs and Eric Safire, Manuel Flores and Hilario Silvar Mena.

## **Discussion**

I.     THE RELATIONSHIP BETWEEN REPLOGLE, HILL AND RODRIGUEZ

David Replogle, John Hill and Mauricio Rodriguez Borrego all provide an account that is generally consistent as to the time and manner in which they all met. In early September 2002, Daniel Garcia[5] went to Replogle's office and sought assistance contacting an FBI agent regarding his role as one of Thomas F. White's alleged sexual abuse victims. Replogle put Garcia in contact with Marty Parker, an FBI agent apparently already investigating White. At their first meeting, Garcia provided Agent Parker certain information concerning White. Subsequently, in November 2002, Replogle traveled to Puerto Vallarta for the first time, along with Garcia, Agent Parker and an anti-White activist known only as Nicholasa.

At about this time, Hill was a name partner in the firm of Morris, Taylor & Hill, where he was handling litigation matters. Also, at about this time, Replogle was handling

---

[4] In the record of this case, Mr. Rodriguez is often referred to as Borrego. His proper surname is Rodriguez Borrego, and if referred to by one of his surnames, it is Rodriguez.
[5] Daniel Garcia, who is of no relation to the Special Master, was one of the two plaintiffs in the California action.

bankruptcy matters for the firm. Replogle approached Hill about some form of cooperative representation of various individuals who were alleging that Thomas White had sexually abused them. The two agreed to cooperative representation, the contours of which are disputed. Following this discussion, two separate actions were filed in California: the state action and the federal action before this court. The names of both Replogle and Hill appear on each of those complaints.

In order to locate plaintiffs for the federal action, Replogle, along with Daniel Garcia,[6] traveled to Puerto Vallarta, Mexico in late 2002 where they met Rodriguez for the first time. As Replogle explains, he was introduced to Rodriguez through a network of people whom Replogle previously met at conferences on cross-border issues. At the time that the two met, Rodriguez was working as a type of administrative judge[7] who had frequent contact with juvenile delinquents, several of whom claimed to have been sexually abused by Thomas F. White. Replogle and Rodriguez discussed the potential cooperative representation of Mexican sexual abuse victims in a federal action in California. Rodriguez agreed to help in some capacity, the extent to which is disputed. In any event, Rodriguez eventually left his post as an administrative judge to open a law practice and to assist with the case.

In a subsequent trip to Puerto Vallarta in 2003, Replogle and Hill traveled together to meet with Rodriguez; this was Hill's first time traveling to Puerto Vallarta in connection with this case and meeting Rodriguez. The purpose of the meeting was to meet then-Judge Rodriguez.

After the complaint was filed in September 2003, Replogle began making periodic

---

[6] Daniel Garcia, a plaintiff in the State Court action, appears to have assisted in finding new named plaintiffs.
[7] Amongst his duties he conducted a type of arraignment of juveniles and was their first contact with the judicial system. Given his duties, his role was analogous to a magistrate.

trips to Puerto Vallarta with a frequency of about one trip every two weeks. At the outset, Replogle and Rodriguez worked together to locate additional plaintiffs that could be named in the complaint. Some of the plaintiffs were located in Puerto Vallarta's historic district along the Malecon and signed retention documents on the spot. Other plaintiffs were either referred or brought into Rodriguez's Puerto Vallarta office by other plaintiffs already represented in this action. Most plaintiffs signed retention documents in Rodriguez's offices. In addition to finding other named plaintiffs and establishing legal relationships, Replogle and Rodriguez apparently worked together in obtaining rehabilitative services for the plaintiffs.

It is generally understood that Hill had a limited role at the outset of the federal action, or that he at least did not have any client contact until much later. Many of the interviewed plaintiffs could not even be certain that they had ever met Hill. In fact, as will be discussed in greater detail below, Hill's role in the case is an area of great tension.[8]

In any event, Hill did not travel to Puerto Vallarta again until May 2007 at the behest of Rodriguez. At this time, Rodriguez reports that he was becoming increasingly concerned about the integrity of the case but did not feel comfortable discussing his concerns with Replogle. Therefore, Rodriguez explained his concerns to Hill in hopes that Hill would provide some sort of moral support. In essence, Rodriguez claims he began observing irresponsible behavior in Replogle and that, as a result, he was neglecting to provide adequate status updates to the clients. Also, Rodriguez claims that Replogle had stopped providing financial support to the plaintiffs, which led many of them to feel upset and frustrated.[9] All of these factors appear to Rodriguez to have caused some of the clients to express cynicism and

---

[8] It is generally recognized by Replogle and Hill that Mr. Hill's role was that of a litigator.
[9] As discussed below, Replogle provided frequent financial support to the plaintiffs when he visited.

1  doubts that they would ever see any recompense.[10]

2      It is at this critical juncture that the relationships of the attorneys began to crack.

3  Replogle apparently took umbrage at Hill's trip and purportedly fired him shortly thereafter.[11]

4  Rodriguez, on the other hand, expressed dissatisfaction with Hill's response during the May

5  2007 visit and instead decided to dissociate himself from Replogle.[12] Replogle thereafter

6
7  purported to terminate Rodriguez.

8      In August, September and October 2007, Hill says he and a bilingual paralegal named

9  Jose Duran returned to Puerto Vallarta to provide the clients with updates and additional

10 maintenance funds. It was during his last trip in October 2007 that Hill obtained the signatures

11 of 13 plaintiffs on new retention agreements, which accompanied his October 5, 2007 Motion

12 for Partial Disbursement of Settlement Funds filed under seal with this court. Those

13
14 interviewed plaintiffs who signed Hill's declarations say they were given money at the time

15 they signed. The Special Master also notes that, as discussed below, this is consistent with the

16 general pattern described by plaintiffs in which they received money every time they were

17 asked to sign a document.[13]

18     This essentially summarizes the uncontradicted events from the formation of this

19 triumvirate of Attorneys to the point of deterioration at which it was presented to the Special

20 Master for investigation. To better understand the relationships between the three attorneys, it

21 is necessary to discuss some of the conflicting accounts heard in the course of this

22

23 [10] As is discussed below, many of the interviewed clients intimated that they did, in fact, feel neglected by their
24 counsel. It appears that their feeling uninformed was at least a contributing factor to why some of them signed
   declarations recanting their allegations against White.
25 [11] Hill says that, during his May 2007 trip, he provided the plaintiffs with maintenance funds. It appears that the
   plaintiffs consistently looked to the Attorneys for financial assistance.
   [12] By disassociating himself from Replogle, Rodriguez did not intend to disassociate himself from the plaintiffs.
26 [13] The plaintiffs expected financial assistance and demanded the same from the Attorneys whenever they had
   contact with the Attorneys and especially when the Attorneys asked them for anything.
27

investigation.

A.    The Relationship Between Replogle and Rodriguez

Replogle and Rodriguez have different notions of what their relationship was from the outset. As has already been shared with this court, Replogle reports that Rodriguez was not retained as counsel,[14] but rather as an agent in Mexico whose duties largely involved translating and facilitating matters with the plaintiffs[15] when Replogle could not be present in Puerto Vallarta. Rodriguez, on the other hand, says he at all times understood that he was the "Mexican lawyer" on the case and that Replogle agreed to his functioning as such. He believes that the case could not have developed as it did were it not for his efforts as Mexican counsel.

There is a reported divergent understanding as to Rodriguez's compensation. Replogle recounts that he did not execute a retainer agreement with Rodriguez, but acknowledges that the two agreed from the outset that Rodriguez would be paid 20% of the recovery for his services, except for his service as Guardian Ad Litem.[16] As reflected by Replogle's August 4, 2007 letter to this court, Replogle claims the agreement was always that Rodriguez would receive 20% only of those attorneys fees earned for representing the adult plaintiffs and that he had explained to Rodriguez that under California law he could not receive compensation for his services as Guardian Ad Litem. Rodriguez, however, says he at all times believed that his compensation would be 20% of all attorneys fees earned. Rodriguez says he was never informed that, under California law, he could not be compensated for his

---

[14] Evidently because Rodriguez is not licensed to practice law in California.
[15] Replogle's control contact with the plaintiffs.
[16] Replogle reports that he always intended to obtain the consent of the plaintiffs to sharing of fees with Rodriguez at or before the time of the distribution of the settlement funds, though he never discussed this with either the plaintiffs or Rodriguez.

SPECIAL MASTER'S REPORT #3 RE REPRESENTATION OF PLAINTIFFS AND IMPLEMENTATION
OF CONFIDENTIAL SETTLEMENT AGREEMENT
CASE NO. C 03-04035 CRB

representation of the minor plaintiffs and he did not distinguish the services he provided to the adult plaintiffs from the services he provided to the minor plaintiffs. According to Replogle, while he did not provide Rodriguez with the statutory information regarding the role of a Guardian Ad Litem in the United States, he did talk to Rodriguez about the limited role such guardians have in litigation matters.

Replogle's letter to Rodriguez dated June 13, 2005, wherein he confirms his intent to compensate Rodriguez by paying him 20% of the attorneys' fees earned in the case makes no mention of the fact that he would not be compensated for his role as Guardian Ad Litem and appears to recognize that his services were as Mexican counsel. The letter reads:

> This is to acknowledge our agreement concerning attorneys' fees to be earned in the above-referenced action pending before the federal court in San Francisco. In consideration of your continuing efforts on behalf of the plaintiffs in Mexico, we have agreed that you will receive 20% of the attorneys' fees earned in the case.[17]

Replogle's account contradicts both Rodriguez's stated understanding and intention to be "the Mexican lawyer," and the plaintiffs' general understanding that Rodriguez was "a lawyer" on their case.

A contributing factor to the misunderstanding between Replogle and Rodriguez may be the intersection of conflicting legal rules concerning professional conduct. As Rodriguez explained during his interview, in Mexico one may be both a lawyer and guardian in the same

---

[17] The Special Master has received a transcript of proceedings conducted on October 7, 2005, wherein Replogle represents to the Court that there is no writing reflecting Rodriguez's financial interest in the outcome of the case. This statement was made four months after Replogle had acknowledged in writing his agreement that Rodriguez receive 20% of the fees earned in the case.

matter. [18] This was confirmed by Carlos Peña Chavarin, a current prosecuting attorney [19] in the same department where Rodriguez was employed when he first met Replogle. Peña both knew Rodriguez from the outset of this case and understood that he represented the Mexican victims as an attorney. In addition, there is apparently no prohibition against fee sharing in Mexico. According to Rodriguez, "litisconsorcio" is a Mexican legal doctrine that permits joint actors, though not all necessarily attorneys, to proceed in litigation and share in any recovery.

Replogle and Rodriguez also seem to disagree on Rodriguez's value to the case. Rodriguez believes he was an integral part of the case. He credits his own efforts for finding most of the plaintiffs. Rodriguez also says he took the lead on obtaining rehabilitative services for the plaintiffs. Additionally, he notes that while Replogle did make frequent trips to Puerto Vallarta, he was the one left dealing with the plaintiffs on a day-to-day basis. According to Rodriguez, the plaintiffs visited his office on a near daily basis and were incredibly disruptive to his personal and professional life.

Replogle, on the other hand, seems to opine that Rodriguez was of marginal utility in the case. At his interview, Replogle explained that if anything got accomplished in the case, it was because he traveled to Puerto Vallarta and personally ensured that things got done. Replogle recounts that he traveled to Puerto Vallarta approximately 20 times per year for the duration of the litigation, and that his average stay was three nights.

All those plaintiffs interviewed explained that they were under the impression that

---

[18] Accordingly, there does not appear to be a prohibition under Mexican law against an Attorney's receiving compensation for services provided as a guardian ad litem. Indeed it is not clear that Mexican law provides for guardians ad litem as distinguished from guardians. If Mexican law does not specifically prohibit an action, that action is permitted.
[19] His title is District Attorney Adscript Judge #2.

both Replogle and Rodriguez were, during the course of this litigation,[20] their lawyers. Their general understanding was that Replogle was the "American lawyer" while Rodriguez was the "Mexican lawyer." As to their present understanding, the plaintiffs expressed general confusion. Some believed that Replogle "fired" Rodriguez and that he is no longer legitimately concerned with the litigation.[21] Other plaintiffs believe that Rodriguez is still a legitimate lawyer involved in the case, and that he and Replogle are simply arguing over money.

In sum, while there is no written record, other than the letter from Replogle promising Rodriguez 20% of the attorney fees earned in the case, detailing Rodriguez's precise relationship to Replogle, all the interviewed plaintiffs and Rodriguez report that they always believed that that Rodriguez was the "Mexican lawyer" on the case. It should also be recalled that Rodriguez met many of the plaintiffs during his tenure as an administrative judge and that some retainer agreements were signed in Rodriguez's office. Finally, it bears repeating that Replogle admits that he was referred to Rodriguez by his professional network, and that Rodriguez left his position as an administrative judge, at least in part, in order to assist on the case. All of this, together with Replogle's promise to share fees with Rodriguez would seem to support the conclusion that Rodriguez was intended to be more than just a ministerial agent.

B.     Replogle's Relationship with Hill

Hill's account of his relationship with Replogle adds yet another layer of complication.

---

[20] The believed they were their attorneys at least until the recent events resulting in the deterioration of the relationship of the attorneys.

[21] On January 11, 2008, the Special Master received a communication from Rodriguez's local counsel attaching consents signed by fourteen of the plaintiffs wherein they agree that Rodriguez receive 20% of the attorney fees paid in this case. During his interview, Rodriguez had indicated that he was in the process of obtaining consents that would conform to California Rule of Court 2-200. He also indicated that he did not believe that they were necessary.

SPECIAL MASTER'S REPORT #3 RE REPRESENTATION OF PLAINTIFFS AND IMPLEMENTATION OF CONFIDENTIAL SETTLEMENT AGREEMENT
CASE NO. C 03-04035 CRB

Hill maintains that he and Replogle agreed to undertake joint representations in both the state and, this, the federal action. Hill also says that, with respect to this action, the agreement from the outset was that he would do the trial preparation and be lead trial counsel on the case and that Replogle would do the paperwork and handle the client contact. As to the compensation, Hill says that the two agreed to split any recovery 50/50.[22] When this agreement was made, Hill was not informed of Replogle's 20% agreement with Rodriguez.[23] As to the issue of retainer agreements, Hill recounts that Replogle proposed that the plaintiffs in this action sign the standard contingent fee contract used by the Law Offices of John E. Hill, to which Hill agreed.[24]

At some point after Replogle's and Hill's trip to Puerto Vallarta in August 2003, Replogle informed Hill that Rodriguez had referred several potential clients for this action. Hill provided Replogle the Spanish version[25] of his firm's contingent fee agreement with the understanding that the clients would sign the agreements with both Replogle and the Law Offices of John E. Hill as their attorneys. Replogle then traveled to Puerto Vallarta ostensibly to retain the prospective clients and to have them sign the contingent fee agreements provided by Hill.

Apparently, Replogle did not immediately provide Hill with copies of the signed

---

[22] Replogle conversely reports that he always intended to compensate Hill based on his quantum meruit participation in the case and that as distinguished from the State case he was not retained as co-counsel in the instant case, but rather was functioning as an agent of Replogle's to be paid for services rendered.

[23] If Replogle and Rodriguez have an agreement to share in the fees of the case, Mr. Hill believes that that agreement is restricted to the portion of the fees that Replogle is entitled to recover and does not effect his entitlement.

[24] It is unclear what happened between the time that Hill was a partner with Morris, Taylor & Hill and the time that he started with the Law Offices of John E. Hill.

[25] Hill informed the Special Master that his firm's contingent fee agreements are translated into Spanish by a court-certified translator named Lorenzo Montoya, and that he would, if called, testify that he has never translated a contingent fee agreement for Replogle.

contingent fee agreements despite Hill's numerous requests for them. In fact, Hill says that he did not see an executed contingent fee agreement until after the second mediation conference before Judge Spero on June 13, 2005. Following this second mediation conference, Replogle and Kate Dyer of Clarence & Dyer were charged with preparing the settlement documents. According to Hill, it was at this point that he received a phone call from Kate Dyer informing him that Replogle was attempting to create a settlement agreement that made no mention of Hill as an attorney and excluded him as a payee of the settlement funds.

Subsequent to this phone call, Replogle held a meeting in his office, which Hill and Dyer attended. At this meeting, Hill and Dyer reviewed the signed contingent fee agreements in Replogle's possession; this was the first time Hill reviewed the agreements. Hill and Dyer discovered that the agreements had been edited[26] to exclude any mention of Hill and his firm. When Hill confronted Replogle about this, Replogle responded that the contingent fee agreements reflected the clients' wishes.[27] In addition, Hill recounts that Replogle said that he could not pay him 50% of the attorney fees earned because he had invested too much time into the case himself, because he had to pay Rodriguez 20%, and because he had to pay "Danny."[28] Hill says that this is also the first time he learned of the 20% arrangement with Rodriguez and of any potential payment to Daniel Garcia. Hill also says that both Nancy Clarence and Kate Dyer were unhappy with Replogle's contingent fee agreements because they were not the agreements that had been contemplated in the settlement. Hill says that

---

[26] A comparison of the fee agreements signed by the plaintiffs in the State case and those signed by the plaintiffs in the instant case reveals substantial similarity. The one major difference being the omission of Hill from the retainers in the instant case.

[27] The clients when questioned about the distribution of fees amongst the Attorneys, generally expressed indifference, except to note that it should not affect their distributions, a fact confirmed by the consents by the plaintiffs, signed after their interviews, to Rodriguez's receiving 20% of attorney fees earned in the case.

[28] Presumably, this refers to Daniel Garcia.

neither Clarence nor Dyer felt that the case had any settlement value without Hill's involvement.

As a condition precedent to traveling to Thailand and obtaining White's signature on the settlement documents, Dyer apparently required both Hill and Replogle to sign an Addendum to the Confidential Settlement Agreement and Mutual General Release that incorporated Hill as an attorney and payee in the settlement. The Special Master has reviewed this Addendum as attached to Kate Dyer's July 5, 2005 letter to both Hill and Replogle. The Special Master notes that the copy provided by Hill is only signed and dated by John E. Hill, however Dyer evidently received Replogle's signature on her way to Thailand.

Hill's subsequent contact with Replogle is unclear. The next significant event involving Hill does not appear to have occurred until May 2007 when he traveled to Puerto Vallarta to meet with Rodriguez.

C.     The Current Status

Replogle maintains that Hill's compensation should be determined on a quantum meruit basis. As for the 20% ostensibly owed to Rodriguez, Replogle states that he actually has no problem paying Rodriguez 20% of the fees, but that he would want to obtain the plaintiffs' approval beforehand.[29] Replogle also indicates that his intention was always to seek the plaintiffs' approval for Rodriguez's compensation, but that the occasion simply never arose.[30]

Hill maintains that while he is entitled to more than fifty percent of the attorney fees if

---

[29] As previously reflected, approval since has been obtained of 14 plaintiffs by Rodriguez

[30] As previously indicated, Replogle reports that he always intended to obtain the consent of the plaintiffs to sharing of fees with Rodriguez at or before the time of the distribution of the settlement funds.

- 13 -

fees are distributed on a quantum meruit basis, given his out-of-pocket expenses on the case,[31] the efforts he expended on behalf of the plaintiffs, and the value he added to the settlement of the case, he would be happy with 50% of the fees as per his original agreement with Replogle.[32] As for Rodriguez, Hill believes that any portion owed to Rodriguez should come strictly out of Replogle's share since he was not informed of any agreement to compensate him until after the second settlement mediation on June 13, 2005.

II.    THE RELATIONSHIP BETWEEN REPLOGLE/RODRIGUEZ/HILL AND THE PLAINTIFFS

While some of the interviewed plaintiffs indicate that they first met Rodriguez before being introduced to Replogle, they all confirm that they met both Replogle and Rodriguez nearly contemporaneously. Also, all of the plaintiffs confirm that Hill was not usually present in Puerto Vallarta; in fact, few of the interviewed plaintiffs could even be certain that they ever met Hill.

Generally speaking, the plaintiffs did not have a specific recollection about any of the retainer agreements they signed. Nevertheless, all of them recalled that they signed documents for Replogle, Rodriguez or both at the outset of the litigation. A few of the plaintiffs made the general observation that they often did not know what they were signing and that they would only do so if they received financial assistance contemporaneous to their signing of a document. Replogle,[33] Rodriguez[34] and Hill[35] all confirm that the plaintiffs were

---

[31] Other than the $50,000 he paid to Dr. Omar Angelone for expert services rendered, the Special Master did not feel it necessary to inquire whether Hill incurred other out-of-pocket expenses for which he has not received compensation, other than financial assistance provided to the plaintiffs. As to the financial assistance provided to the plaintiffs that matter is discussed below.

[32] Replogle's position is that on a quantum meruit distribution he will be entitled to significantly more than 50% of the fees distributed between Replogle and Hill.

[33] As later discussed, Replogle says that all of the money he provided to plaintiffs was intended as a loan, and he

SPECIAL MASTER'S REPORT #3 RE REPRESENTATION OF PLAINTIFFS AND IMPLEMENTATION OF CONFIDENTIAL SETTLEMENT AGREEMENT

CASE NO. C 03-04035 CRB

periodically given or loaned money. Also, many of the interviewed plaintiffs indicate that both Replogle and Hill provided them money at the time that they signed declarations.

A.   The 40% Contingency Fee

With regard to the 40% contingency fee described in the retainer agreements, the plaintiffs had a general understanding that the 40% was going to compensate Replogle, Rodriguez, and maybe Hill.[36] The plaintiffs, however, did not appear to have an understanding as to whether or how that percentage was going to be divided between the attorneys. At least one interviewed plaintiff[37] said he understood that Replogle and Rodriguez were going to divide evenly the 40% recovery. Another interviewed plaintiff[38] was under the impression that the percentage owed to the attorneys was not 40% but rather 33 1/3%.

None of the interviewed plaintiffs reported that they had discussed the 40% with any of the attorneys or were told that such amount was negotiable. While the contingency fee agreements contain a provision that the agreed-upon fee is not fixed and is negotiable in accordance with California Business and Professions Code section 6147(a)(5), a few of the interviewed plaintiffs indicated that they were illiterate.[39]

---

recorded all advances in a ledger, known to the clients as "the bluebook," though he did not obtain written acknowledgment by any plaintiff of any advances. The bluebook does contain promises by 10 of the plaintiffs to repay money provided by Replogle for their support. Those promises are not specific as to amounts to be repaid and were signed in May and August, 2005.

[34] In Rodriguez's case, it would not appear to be prohibited for a Mexican Attorney to provide financial support to a client with or without acknowledgment of indebtedness by the client.

[35] Hill maintains that he always had the clients sign acknowledgments of indebtedness for all monies he advanced to the clients, and he produced some acknowledgments for review by the Special Master.

[36] Again, all of the interviewed plaintiffs considered both Replogle and Rodriguez to be their attorneys. Only a few of those interviewed knew of Hill.

[37] Samuel Chavez Morales.

[38] Mario Alberto Armenta Villa y Scusa.

[39] The California Rules of Professional Conduct prohibit "unconscionable" fees as determined by the facts and circumstances. Rule 4-200. While the Special Master does not render any opinion as to whether 40% is unconscionable in this situation, should this be a concern to the Court, it seems that the plaintiffs' education and language abilities should be among the facts and circumstances considered.

– 15 –

B.    Financial Support to the Plaintiffs

The plaintiffs consistently indicate that, throughout the course of the litigation, both Rodriguez and Replogle would provide them with financial assistance. The consensus among the plaintiffs seems to be that Replogle provided money less frequently than Rodriguez, but in greater amounts. Rodriguez himself confirms this. At least one plaintiff[40] indicates that the reason he confides more in Replogle than Rodriguez is because the former has given him the most financial help between the two. With the exception of one who claims to keep a personal ledger, none of the plaintiffs knew precisely how much money they have received from either Replogle or Rodriguez. They do, however, acknowledge and understand that all of the money provided by Replogle was a loan that they agreed would be paid after they received their individual award; the plaintiffs do not indicate that they had the same understanding with Rodriguez. In addition, the plaintiffs all seemed to understand that Replogle has kept a record of all loans he made to them. Replogle acknowledged this practice and recounts that all loans he made to the plaintiffs were recorded in "the bluebook." As reflected above, the Special Master was supplied a copy of the "bluebook" for review. This book is essentially a ledger with names, dates and amounts. However, there were no plaintiffs' signatures on the ledgers detailing the sums advanced to the plaintiffs. Moreover, Replogle acknowledges that he did not issue receipts to the plaintiffs memorializing the loans.

Hill's account again adds a layer of complication to this issue of financial support. According to Hill, shortly after the complaint was filed on September 4, 2003, Replogle explained to him that many of the plaintiffs were extremely poor or in some cases completely homeless. Replogle further told Hill that it would be necessary to provide financial assistance

---

[40] Luis Arnoldo Amaral.

1   to the plaintiffs, but that he [Replogle] lacked the funds to do so. Hill, therefore, agreed to pay

2   Replogle $3,000 a month for the purpose of providing the plaintiffs this financial assistance.

3   According to Hill, he told Replogle to obtain signed "promises to repay" from the plaintiffs as

4   required by the California Business and Professions Code. Apparently, this was not done.[41]

5   Hill provided the Special Master a printout of all money transactions made to Replogle

6   for the purpose of providing assistance to the plaintiffs. The printout indicates that between

7   September 16, 2003 and June 8, 2005, Hill issued numerous checks to Replogle in an amount

8   totaling $64,390.00. Replogle apparently repaid Hill this amount when the California case

9   settled in July 2005. Also at that time, Replogle informed Hill that he would take over

10   responsibility for providing financial assistance to the plaintiffs. It is unknown to the Special

11   Master, though, whether the "bluebook" accounts for these amounts originally provided by

12   Hill but repaid by Replogle.

13   C.     Hill's Role in the Case

14   Though not visible to the plaintiffs, Hill says that he had some critical involvement in

15   the case. Namely, Hill researched and retained the expert services of Edgar Omar Angelone,

16   Ph.D., a bilingual psychologist who traveled to Puerto Vallarta in 2004 and interviewed 10 of

17   the plaintiffs. Hill says he paid Dr. Angelone $50,000 for his time and efforts and that Dr.

18   Angelone's reports became the primary exhibit to the mediation briefs used in the two

19   mediation conferences before Judge Eugene Lynch (Ret.) and Judge Spero. Finally, while

20   Hill was not present at either mediation conference, neither Nancy Clarence nor Kate Dyer

21   allegedly felt the settlement had any value without Hill's involvement.

22   D.     Rodriguez's Role in the Case

---

[41] As referenced above written blank promises were obtained of ten of the plaintiffs in May and August, 2005.

SPECIAL MASTER'S REPORT #3 RE REPRESENTATION OF PLAINTIFFS AND IMPLEMENTATION
OF CONFIDENTIAL SETTLEMENT AGREEMENT
CASE NO. C 03-04035 CRB

As has already been discussed, in addition to retaining rehabilitative services for the plaintiffs, Rodriguez appears to have facilitated much of Replogle's interaction with the plaintiffs both before and after they were formally retained. Yet he was involved in one other aspect that bears mentioning. Rodriguez attended both settlement conferences. At the first settlement conference before Judge Lynch, Rodriguez reports that it was he and he alone that rejected the initial offer of $4 million for the Mexican plaintiffs.[42] Rodriguez also attended the second settlement conference before Judge Spero. At this conference, Rodriguez indicates he expressed satisfaction with the settlement offer's being increased to $7 million.

### III.   THE PLAINTIFFS' RELATIONSHIP TO SAFIRE, MENA AND FLORES

The only remaining issue left to discuss is that of the 10 plaintiffs having signed declarations recanting their allegations against White. This necessitates a brief discussion about Safire's involvement, followed by a discussion of Flores and Mena.

According to Safire, his involvement with this case began with a series of telephone calls. He recalls that the he was first contacted by a person named Jose Ortega, who identified himself as a criminal defense attorney for Thomas White, and that he asked whether Safire would help a group of Mexican plaintiffs withdraw their allegations against White. Before Ortega could get much further in the discussion, Safire ascertained that Ortega was not representing the plaintiffs and insisted that he speak with an attorney who represented the individuals in Mexico.[43] Thus ended the first telephone call.

Safire recalls receiving a second telephone call from a person he believes was Flores. Not before long into this second conversation, Safire ascertained that the person on the other

---

[42] Everyone acknowledges that as Guardian Ad Litem, Rodriguez's approval was necessary.

[43] As Safire explained, he wanted to have no direct communications with the plaintiffs and relied on Mexican counsel to advise them as to any conflicts or potential liability should they be successful in withdrawing their allegations in the instant action. He wanted to act essentially as an agent for Mexican counsel.

– 18 –

end of the line was not an attorney and that he did not represent the plaintiffs, and again insisted that he speak with an attorney representing the plaintiffs about the matter.[44] Safire also explained that he made it clear that he did not want to have personal contact with the plaintiffs or to be their advisor and that he expected that a Mexican attorney would counsel and advise the plaintiffs. Safire reports that he did not believe the plaintiffs were subjecting themselves to perjury charges by recanting their allegations. He did not analyze potential civil liability. He made it clear that he relied on the plaintiff's Mexican counsel to inform and advise them of collateral consequences of recanting their allegations.[45]

On the third try, Safire finally was contacted by an attorney: Mena[46]. Mena told Safire that he had come into contact with a group of young men who wanted help withdrawing their allegations against White. Mena also told Safire that the case involving these young men had resulted in a "settlement in Mexico." Safire says that his first recommendation was that the plaintiffs should refuse the settlement proceeds. As he was informed, however, this recommendation would not work because Replogle, who Safire understood represented the plaintiffs, would not allow them to refuse the money. Safire also suggested talking with Replogle to see if he would accommodate the wishes of these 10 plaintiffs. This apparently never happened.

Once it was determined that no other alternative would serve the plaintiffs' wishes, Safire agreed to take on the matter for the amount of $400 per hour.[47] As to how he would be

---

[44] As an aside, the Special Master notes that both Rodriguez and Carlos Peña Chavarin indicate that Flores is not a licensed attorney in Mexico. As it was explained, Flores holds the equivalent of a Juris Doctor without a license to practice. It was also explained that Mena, who is an attorney, works with Flores and performs those tasks for which a licensed attorney is required. It was also explained that Mena is just one such attorney working with Flores. Before the Special Master's interview with Mena, he was told that Mena maintained a straw office so as to give the appearance that he was not affiliated with Flores.

[45] This did not occur. In short it appears that as regards the recanting of their allegations, the plaintiffs did not receive any counseling, much less independent legal counseling.

[46] While Mena's surname is Silvar Mena, and he should properly be referred to as Silvar if referred to by one surname, to avoid confusion, the Special Master refers to him as Mena.

[47] Safire's retention agreement provides that the compensation would be "$400 pesos/hour." Safire explained that this was a clerical mistake that escaped his attention.

- 19 –

compensated, Safire was under the impression that "settlement in Mexico" meant that there were settlement *funds* in Mexico, which Mena would use for compensating Safire.[48]

Safire says he gave Mena precise instructions as to what needed to happen next: that the recanting plaintiffs would need to be videotaped while signing the declarations in support of Safire's Motion to Substitute Counsel. The Special Master has reviewed the videotapes and confirms that Safire's instructions were followed.

It should be clarified that of those interviewed plaintiffs that signed recantation declarations,[49] none of them understood or intended those declarations to compromise the veracity of their original allegations against White. Rather, the overwhelming consensus was that they signed those declarations either because (1) they were threatened with violence and/or imprisonment; (2) they were offered and received money from either Flores or Mena,[50] or (3) a combination of both factors. It bears repeating that all of those interviewed who signed these declarations said they felt frustrated at the time with either Replogle, Rodriguez or both because they had stopped providing them with status updates and financial support.

It should also be noted that nearly all of the interviewed plaintiffs said they feared Manuel Flores. It appears that if threats of imprisonment or violence against the plaintiffs carried any credibility, it was because of Flores' association with those threats. The Special Master notes that while he attempted to arrange an interview with Flores, he was never able to speak with Flores.[51]

The Special Master was, however, successful in meeting with Hilario Silvar Mena, whose office was about as well appointed as the interview was informative.[52] According to

---

[48] Safire reports that he has received no compensation and is not confident that he will.
[49] Only three of the interviewed plaintiffs did not sign recantations. They are Irving Jean Altamirano Ramirez, Mario Alberto Armenta Villa y Scusa, and Luis Arnoldo Amaral.
[50] Only one interviewed plaintiff who signed a recantation declaration did not accept any money in exchange: Santiago Mercado Cervantes.
[51] Safire advised the Special Master that he had directed Mena to arrange Flores' meeting with the Special Master. The Special Master was expecting that Flores would meet with him as requested.
[52] To be clear, Mena's office did not appear functional. It was located on a dirt road across the street from a jail and courthouse and contained one photocopying machine, one manual typewriter, and no more than three books.

SPECIAL MASTER'S REPORT #3 RE REPRESENTATION OF PLAINTIFFS AND IMPLEMENTATION OF CONFIDENTIAL SETTLEMENT AGREEMENT
CASE NO. C 03-04035 CRB

Mena, he began meeting the plaintiffs in April 2007. He claims he agreed to help these plaintiffs recant their allegations even though they did not pay or even promise to pay him in the future. Mena admits that he never counseled or advised the plaintiffs regarding the wisdom of recanting their allegations. Mena says that his secretary located Safire on the Internet.[53] As to the Safire's compensation, Mena says he was prepared to pay him out of his own pocket. Mena further explained that the videotapes accompanying the recantation declarations were recorded at his friend Francisco's office in Puerto Vallarta. He could not, however, recall the office address or his friend's last name. Mena said he did not know either Replogle, Rodriguez, or Hill. Finally, when asked about his relationship with Flores, Mena said that he only knew Flores as a professional acquaintance, but that he did not know him very well and had never worked with him and that he had not been asked to arrange a meeting with Flores. At this point, the Special Master brought to Mena's attention Safire's declaration in Support of his Motion to Substitute Counsel, which indicated that Mena and Flores worked together. When again asked about his relationship with Flores, Mena furrowed his brow and uttered an airy and drawn out, "Que?"

---

[53] Safire confirms that it was represented that he was located on the internet, but that it was Jose Ortega who made this representation and not Mena.

SPECIAL MASTER'S REPORT #3 RE REPRESENTATION OF PLAINTIFFS AND IMPLEMENTATION OF CONFIDENTIAL SETTLEMENT AGREEMENT
CASE NO. C 03-04035 CRB

## **Concluding Observations**

The Special Master has some concluding observations. It became readily apparent to the Special Master that these plaintiffs have not been dealt an easy hand. A few of them came into the interviews with bare feet and torn clothes, and relative states of sobriety.[54] Many of them are illiterate and impoverished. It is not shocking that they might develop some sense of loyalty for one attorney over another based on who provides more financial support, or who has provided the most recent financial support, or that they might sign inconsistent declarations in exchange for money.

As has been reflected above the interviewed plaintiffs generally reflected a present understanding regarding the 40% contingency fee, contained in their retainer agreements with Replogle, and its affect on their recovery.[55] Most certainly they also appreciated at the time of their signing of the retainer agreements that the attorneys would receive compensation for the services they rendered and probably would have understood the nature of a contingency fee agreement if it came to their attention by their reading of the agreement or if it had otherwise been explained to them.

What the Special Master doubts is that the plaintiffs understood at the time that they signed the retainer agreements that they had the right to negotiate the 40% contingency fee. As reported above all of the interviewed plaintiffs reported that they had not had any discussions with any of the attorneys, and certainly not with Replogle, regarding the fee arrangement or the right to negotiate the fee. While some may have read this portion of the agreement, those who are functionally illiterate most certainly did not. The Special Master doubts that they all read the retainer agreement, or read it with adequate comprehension. Even

---

[54] Those who were not completely sober were not affected in their ability to communicate with the Special Master.

[55] The Special Master has some doubt that the plaintiffs understood when they signed the retainer agreements that the amount of the contingency fee was 40% or whether their appreciation regarding the amount crystallized with the recent skirmishes amongst the attorneys and the pendency of the distribution of the settlement proceeds.

- 22 –

those, who may have read the retainer agreement, almost certainly read its terms as being non-negotiable. Given their almost uniform history and penchant for signing documents without a full appreciation of what they were signing, their level of education, lack of sophistication, their economic desperation and personal plight, their social status in relationship to the attorneys, it is safe to conclude that the plaintiffs, more likely than not, did not knowingly or intelligently waive their rights to negotiate the percentage of their contingency fee arrangement.

DATED: January 18, 2008

Special Master
Hon. David A. Garcia, (Ret.)

SPECIAL MASTER'S REPORT #3 RE REPRESENTATION OF PLAINTIFFS AND IMPLEMENTATION OF CONFIDENTIAL SETTLEMENT AGREEMENT
CASE NO. C 03-04035 CRB

## PROOF OF SERVICE BY FACSIMILE & U.S. MAIL

Re: Roe vs. White
Reference No. 1100052048

I, Lisa Banks, not a party to the within action, hereby declare that on January 18, 2008 I

served the attached SPECIAL MASTER'S REPORT #3 REGARDING REPRESENTATION of

PLAINTIFFS and IMPLEMENTATION of CONFIDENTIAL SETTLEMENT AGREEMENT on the

parties in the within action by facsimile and depositing true copies thereof enclosed in sealed envelopes

with postage thereon fully prepaid, in the United States Mail, at San Francisco, CALIFORNIA, addressed

as follows:

John E. Hill Esq.
L/O John E. Hill
8105 Edgewater Drive
Suite 100
Oakland, CA 94621
Tel: 510-588-1000
Fax: 510-588-1087

David Replogle Esq.
L/O David Replogle
550 Montgomery Street
Suite 550
San Francisco, CA 94111 USA
Tel: (415) 362-4700
Fax: 415-781-6683

Geoffrey Rotwein Esq.
L/O Geoffrey Rotwein
400 Montgomery Street
2nd Floor
San Francisco, CA 94104 USA
Tel: 415-397-0860
Fax: 415-397-0862

Eric M. Safire Esq.
L/O Eric M. Safire
2431 Filmore St.
San Francisco, CA 94115
Tel: 415-292-1940
Fax: 415-292-1946

Thomas H. Kawaii Esq.
Gwire Law Offices
235 Pine Street
Suite 1100
San Francisco, CA 94104
Tel: 415-296-8880
Fax: 415-296-8029

Charles R. Breyer
U.S. District Court
Northern District
450 Golden Gate Avenue
San Francisco, CA 94102-3483
Tel: 415-522-2062
Fax: 415-522-3195

I declare under penalty of perjury the foregoing to be true and correct. Executed at

San Francisco, CALIFORNIA on January 18, 2008.

Lisa Banks
JAMS The Resolution Experts