C. JOSEPH SMITH. LL.M.
REGISTERED TRUSTEE

MAILING ADDRESS TELEPHONE: (415) 989-3440
p.0. BOX 2928 FACSIMILE: (4115)989-2755 SAN FRANCISCO, CA 94126-2928

January 20, 2008

Hon. Charles R. Breyer
U.S. District Court Northern District Of California
P.O. Box 36097 San Francisco, CA 94102

RE: JOSE ROE v. WHITE IRREVOCABLE TRUST.

Dear Judge Breyer,

This letter constitutes my report to you on my trip to Puerto Vallarta to initiate distributions to the beneficiaries of the Jose Roe v. White Irrevocable Trust. This is a very difficult case, but I think the trust can be administered to enhance the lives of the beneficiaries. Having now met many of the beneficiaries and having assessed their situation, I would like to recommend to the Court that certain changes be made to the trust arrangement to make it workable in a more realistic way.

Narrative Summary Of Trip

I arrived in Puerto Vallarta ("PV.") on Sunday afternoon, January 13, 2008. In preparation for the trip I had met with Mr. Replogle to gather information and with Judge Garcia to garner his impressions. I understood in advance that the beneficiaries were both psychologically damaged to varying degrees from their experiences of sexual abuse and also significantly disadvantaged from a socioeconomic perspective, sometimes reduced to living on the streets. Seven of them were reported to be incarcerated, respectively, in two different prisons. I expected individuals with inadequate social boundaries and low self esteem who compensated in various ways, including possibly aggressive behavior. Whereas Judge Garcia had met with these men at a meeting room in the Sheraton Hotel, I felt that it was better to isolate them in a less public place and to try to see them Page 2 Hon. Charles R. Breyer

January 20, 2008

individually, to be better able to evaluate each individual in a setting away from the group dynamic.

Prior to my trip I also conducted an extensive search for the right person to assist me in PV. At first, I thought I would simply find an interpreter, but that left me with no place to meet and no one with insights into the Mexican laws and customs, and the social conditions in which these men live. After several false starts, I located an excellent attorney, Mr. Resondo Lopez Mata, who holds an LL.M. from Tulane University School Of Law and who was also employed for several years in Washington, D.C., at the firm of Dorsey & Whitney. I spoke with Mr. Mata on the phone and educated him about the case and my goals. He agreed to provide me with not only his services as interpreter and advisor, but also the use of his small suite of offices, centrally located in PV., and the assistance of his staff as needed. I was unable to quickly obtain from Wells Fargo the

necessary $5,000 retainer he requested, so I advanced the money from my personal funds.

On Sunday evening, I met with Mr. Mata for an hour to plan our strategy. I had prepared an interview form to record as much contact information and family information as we could about each beneficiary. My plan was to meet each beneficiary, one at a time, with Mr. Mata present to interpret and assist. Then we would transfer the beneficiary to Mr. Mata's associate to obtain the information required on the interview form and to copy any identification that was available. After the form was completed, the beneficiary would be returned to me for an exit interview where I would take a photograph, review the information and tell the beneficiary what the next steps would be. I instructed Mr. Mata that it was important that we separate the beneficiaries as much as possible from the group and that he and his staff address them with proper respect, by surnames, and not use familiar nicknames or first names, or treat them in any way as if they were lower class individuals.

The plan for the week was to meet with twelve of the beneficiaries on Monday at Mr. Mata's office. This included eleven beneficiaries in the P.V. area and one from Tijuana, whom I decided to fly to P.V. to interview, for my convenience. On Tuesday, we would visit the bank to assist with the openingeof accounts. In the afternoon, I would meet with the attorney for some of the beneficiaries in the nearby prison of Ixtapa (five beneficiaries are incarcerated there) and then at 4
p.m. enter the prison with the attorney and Mr. Mata to interview the Ixtapa beneficiaries. On Wednesday, I planned to make the three hour drive to Tepic to visit the two beneficiaries incarcerated there and the one beneficiary who resides in that locality.
Page 3 Hon. Charles R. Breyer   January 20, 2008

With our plan in place, we proceeded to Mr. Replogle's hotel to enlist his help in executing our plan. We were joined at the hotel by Mr. Replogle's local assistant, a young man named Pedro, and he brought with him another young man, whom he said was an officer at HSBC bank and who would open accounts for the beneficiaries, even without picture identification. We were also joined by Mr. Mata's partner. Pedro had arranged with the beneficiaries to meet him at noon on Monday at a central location. He said many of them would be late. It was agreed that Mr. Replogle would bring them to us a few at a time. We then discussed options for banking arrangements. I wanted to see if I could open a clearing
account at a bank and make one wire transfer into the account each month which
would then be electronically redistributed to the beneficiary accounts, preferably by me on-line. Mr. Mata had advised me that it was unlikely I would be allowed to open a bank account without first obtaining an FM3 business visa. However, the
bank officer said he could do it. He also said he could open bank accounts with birth certificates alone and would not require picture identification cards. In Mexico the main form of identification is not the driver license, but the voter registration card, which has a photograph and date of birth and must be obtained with proper underlying documentation. Mr. Mata was skeptical because he said the banking laws required identification to open an account, but he said that it was not a risk to me if the accounts were improperly opened. It became increasingly clear to me that one of my tasks was to encourage the beneficiaries to normalize their lives by obtaining things most people have, such as picture identification, bank accounts and a permanent place to live.

On Monday, I arrived at Mr. Mata's office at noon. It was a small suite of three offices, sparsely furnished, on the second floor of a two story shopping center/office complex. About 12:30, Mr. Replogle arrived with about the half of the beneficiaries. They were somewhat unruly and tried to enter as a group. Mr. Mata informed them of our procedures and we invited the first beneficiary into an office.

My interview procedure was simple and straightforward. After confirming the individual's name, I introduced myself, as Mr. Smith, and my attorney, as Mr.
Mata. Each beneficiary was told that I had been sent by the United States Court to institute procedures for beginning distribution to them of cash settlement proceeds. I told them that three things must happen before they would receive any cash distributions: (1) An information form must be completed with Mr. Mata's associate; (2) Picture identification must be presented; and

(3) a bank account must be opened in the beneficiary's name alone into which I could transfer the funds. When these steps were completed, I would distribute into the new account the amount of $800 U.S., converted into pesos. A like amount would be deposited into the account each month thereafter. Only four beneficiaries had picture

identification, so I told the remaining beneficiaries that if they were able to open a
bank account with their birth certificate alone, I would commence the distribution on condition that they each applied for, obtained and presented to me a picture identification card within thirty days.

When we completed the first interview and transferred the beneficiary to Mr. Mata's associate, we discovered that the other beneficiaries had been given money by Mr. Replogle and had gone to buy hamburgers. Mr. Replogle said they would be right back, but when they did not return after one-half hour, I suggested to Mr. Replogle that he go find them, which he eventually did.

In general, the beneficiaries were demanding and unhappy with the process. They had apparently believed that I was bringing cash with me that I was going to hand cash to them at the meetings. Some of them became very angry and aggressive and demanded money instantly. Others immediately began to complain that the $800 per month was not enough and that they wanted more to support aunts, uncles, parents, etc. Others made specific demands for larger sums to purchase houses, land, boats, etc. Apparently, many had been promised, or believed that they had been promised, the outright distribution of large sums of cash. Some believed they would get the entire amount all at once. None were clear on the total dollar value involved and I did not enlighten them. The situation was made more confusing to them by the exchange rate of 10.5 pesos to one dollar and by the practice in Mexico of using the same symbol for pesos and dollars ("$"). In point of fact, this distribution is a significant income in Mexico. Mr. Mata advised me that an apartment for one person could be rented for $75 per month and an apartment for a family for $150 per month. It costs about $25,000 to buy a small
house which is new.

Three of the beneficiaries were obviously on drugs. One of them, Mr. Santiago Mercado Cervantes, was out of control. He first claimed to be a minor and then stated he did not know his birth date and had no identification or birth certificate.
He demanded money immediately and was distressed and angry that it was not given to him. He could not be reasoned with. He rose from his chair and began to pace threateningly. He was persuaded to sit down briefly with Mr. Mata's associate and give some information, but he again became agitated and it looked like he was going to become violent. Fortunately, he eventually opted for crying and we ultimately required him to leave the premises. Later, we spoke to his mother, who volunteered to go to another town to obtain his birth certificate if I would pay her money for expenses. I told her, through Mr. Mata, that I was not going to hand her son money for drugs and that he needed to be in a drug rehab program. She said she had tried before, that she had some men take him by force

to a rehab center, but that he left after a week. Apparently, in Mexico, a person can be held against his will for a week in a facility, but not longer. She agreed to cooperate with another effort at rehab. I advanced her $100 for her trip. After my return to San Francisco, I learned that she had obtained the birth certificate and wanted to open an account for her son. She said that her son had agreed to go to the rehab center where the Mexican movie stars go, which I am told is very expensive. I felt it was a positive sign that he had agreed to some form of treatment program, so I said I would advance $100 to open the account, but that I would not advance more until I had spoken with the Court. I asked Mr. Mata to investigate the requested treatment center location and costs and also to find some other alternatives for private treatment facilities that may be more convenient to P.V. and less expensive.

It took four hours to complete the meetings, but I met with all twelve of the available beneficiaries. After they were sent away, I next met with four mothers of the men in prison and one woman named Ana, with a child, who was the unwed "wife" of another beneficiary in prison. These women all wanted money. Some of them wanted money for their sons, to help them in prison by

buying materials for rehab activity programs, etc. Some of them wanted money to live on themselves. Some of them just wanted to be sure that their sons would not be cheated out of their shares because they were in prison. I reassured them that my job was to make arrangements to pay money for their sons. I told them that if their sons had special needs, they could make application to me through Mr. Mata, but that the decision had to be reviewed by the bank Trustee and perhaps by the Court. They were distressed by this procedure, which seemed to them slow and cumbersome.

On Tuesday morning, at 9 a.m., I went to the bank and met with the bank officer who had come to the meeting on Sunday evening. His manner was completely different in the bank from what it had been at the hotel meeting. He was much less sure about opening accounts. He told me I could not open an account myself without an FM3 visa. Mr. Mata could not open a client trust account for me because in Mexico, there is no provision for attorney client trust accounts. I could not open an account for the trust, because I am not the Trustee. I could also not open an account for the trust because in Mexico only banks may be trustees. It would be permitted for a foreign trustee to open an account only after providing a translated, certified copy of the trust instrument and a legal opinion from a Califorina law firm, also translated, explaining the legalities of the trust. He said this would be time consuming and expensive and he would not recommend it. Mr. Mata said there was a brokerage firm that sometimes opened accounts for foreigners and was not governed by the banking rules. He agreed to investigate it for me, but at that moment, it was necessary to provide funds, a minimum of 1000 pesos ($100) per account, in order to open the accounts. There were then six beneficiaries with picture identification, so initially, we asked the bank to open those six accounts. I withdrew money from my personal ATM account to fund it. It was then determined that the bank would open accounts for those with birth certificates as well, including the men in prison. This meant I would need another $1200 in cash to open the accounts. (That brings the total to 18, excluding, at that time, Mr. Cervantes, who had no birth certificate and was on drugs, and also one beneficiary living in Tepic who had reportedly disappeared).

I left the bank with Mr. Mata to find a place to fax a wire transfer request to my brokerage and arranged to advance additional funds from my personal account in the amount of $1200. It appeared that the process of opening the accounts would take some time. The original estimate by the bank was two hours, but in fact, it took all day. Since the beneficiaries and the mothers of the men in prison were gathering outside the bank and were acting very aggressively toward me, Mr. Mata and I found a small restaurant nearby to use as a base of operations and Mr. Mata periodically went to the bank to check on progress.

I had planned to visit Ixtapa prison, near P.V., at 4 p.m., but first I wanted to meet with the attorney who represented four of the inmates. She agreed to drive over from Guadalajara to meet me and assist with the prison interviews and we diverted her to the restaurant for the initial meeting. She told me that three of the beneficiaries were serving terms of between 4 and 6 years for robbery and that they were about half-way through their respective terms. Her fourth client was awaiting trial in February. The fifth beneficiary in Ixtapa had no attorney, but was also in prison for robbery. Mr. Replogle had hired her recently in November of 2007 to represent these men. He had promised her payment of $5,000 per man for legal fees and travel expenses of $1,000 per month. He paid the travel expenses for November, but has not paid her since then. She wanted money from me. I told her my job was to establish payments to the men and that I could not pay her any money. She also told me that Mr. Replogle had retained her to represent him personally in defending against criminal extortion charges brought against him in Mexico in connection with the White case. With respect to the bank accounts, she said that there was no way for the men to access the accounts from prison. They were permitted small amounts of cash, which family members could bring them for use in the prison store, but there was a limit on the amount and only family members could give it to them using proper procedures. No one could bring any papers or other articles into the prison, except that she, as their attorney could bring them documents to sign. I asked her to take to them the IRS Form W-8BEN which I needed to have signed and also the bank account applications and she agreed. Mr. Mata then advised me that the bank had stated that for each account

the account holder would have to come into the bank personally to activate the account. So, it was not just a matter of having the bank application signed. It was clear there was no way to open accounts for the men in prison, so I decided to cancel my prison visit for this trip. There was nothing to be accomplished. During my interview with the attorney for the prisoners, some of the beneficiaries located us in the restaurant and came inside to demand money in an aggressive way. The staff of the restaurant became distressed. Mr. Mata was able to lead the men
back to the bank. The prison attorney told me that the men in prison behaved the
same way and were very aggressive and demanding.

Ultimately, the wire transfer arrived in Mr. Mata's account, he transferred the funds in the amount of 1000 pesos each into the new accounts and the accounts were opened. The bank advised the men that they could not access the accounts for 48 hours. They came back to me to demand an immediate distribution of cash. The mothers and the young wife of the prison inmates had meanwhile learned that I was not going to the prison and they became demanding as well. At that point, I determined my work for this trip was done and I returned to my hotel.

In summary, of the 20 beneficiaries, I assisted 11 of them with opening accounts while I was in P.V. and in each case transferred into the account $100. A twelfth account for Mr. Cervantes, the man with the worst drug problem, was opened after I left, also with $100. The man from Tijuana, Mr. Villaescuza, who had flown to
p.v. to meet me and who had opened his own account in Tijuana, was paid $600 for travel and hotel expenses as a trust expense and I have now deposited into his account the full $800 for his first distribution. He is perhaps the most normal of the beneficiaries, with an apartment, job, wife and kids.

Of the twelve men I interviewed, all but one said they have a place to live. About
half of them live with a parent and could give me a specific address. The other
half could only give a neighborhood or a hotel name and the implication is that they stay where they can, but do not have a regular living arrangement. Seven out of twelve say they have employment, but only three of those appear to be regular jobs and the rest seem to be situations where they know someone who sometimes gives them day labor for cash. One beneficiary (the most angry one) told me he
had been working in construction but quit his job the prior Saturday in anticipation of the money I was bringing. That mayor may not be true, but it is most likely an attempt at manipulation. Four of the twelve say they are married, but in some of those cases it is not a legal marriage. Two of the twelve say they have children.

Observations

1. In my opinion, the job of the Trustee in this case is not just to distribute money. While it is true that distributing money to the beneficiaries will help them survive, in most cases it is unlikely to significantly improve their lives without other forms of guidance and support. These men have suffered from varying degrees of socioeconomic deprivation in addition to the psychological trauma of sexual abuse and perhaps other abuses as well. My initial impression is that they have low self esteem and many have a victim mentality. My plan is to meet with each beneficiary individually and try to understand his background and present situation so that I can assess his needs. I will wait until the flush of receiving the money has worn off and I will try to separate each man from the group and work with him individually. Some men will not be receptive to this, but others will and my hope is that I will be able to use the money in each man's account to provide for him what services will be most useful. This may include, in a particular case, drug rehabilitation, psychological counseling, and assistance with employment, housing and family issues. The damage to most of these men seems severe and if two or three of them can be nudged into a more normal life pattern I would view that as a huge success.

2. The trust distribution scheme is not workable in this context. There is no way to distribute money to

the men in prison at the present time. There is no provision for withholding the distributions, either by the Trust Protector or the Trustee. As Trust Protector, I am only a conduit. I cannot hold trust funds in an account in the name of the trust because I am not the Trustee and thus cannot use the trust's tax identification number to open an account. I have been using my attorney-client trust account for the initial distributions. There is no authority to pay funds to the children of men in prison or other family members where appropriate. Under the present arrangement, there will be 20 wire transfers per month, which will generate sending and receiving wire transfer fees of about $1400 per month for the trust. Also, the beneficiaries have different needs and they should have separate trust shares from the outset to track the varying amounts which may be distributed to each. Whether these separate shares are represented by funds which are physically separated into separate bank accounts or by internal accounting for separate shares which are held in a combined account is of no consequence. Finally, given the psychologically damaged condition of most of these beneficiaries, it is inadvisable to distribute the entire remaining principal to them at age 30. That age is only five years away for some of them. To give men in their condition what may amount to $200,000 U.S. or more, a fortune by Mexican standards, is not going to help them. They will not be able to use this money productively because they won't know how. They are most likely to either be taken advantage of by others who are after their money, to spend it unwisely, or to use if for drugs or other detrimental purposes. In some cases, it may hasten death, as from drug overdose or from persons attempting to steal it from them. It should be held in trust longer, perhaps to age 50, with Trustee discretion to distribute it after age 30 if the Trustee deems it advisable to do so.

3. There is a tax issue which needs to be addressed. In a trust for U.S. beneficiaries, the trust receives income and has expenses, such as trustee fees, and the net amount, called Distributable Net Income, is taxable to the beneficiaries when it is distributed to them. Taxes then apply depending on the particular tax situation of each beneficiary. In the case of beneficiaries who are not U.S. persons, the trust must withhold income taxes equal to 30% of the gross amount of each distribution, unreduced by trust expenses, and pay it to the IRS as a deposit on behalf of each beneficiary. The beneficiary must then file an income tax return to claim a refund if the tax amount is excessive or not actually due. In the case of Mexico, the withholding rate is reduced to 15% by treaty provisions. This withholding tax does not apply to all types of income. For example, interest paid by a U. S. Bank is exempt from withholding. These men can barely read and write, they do not speak English, they are impoverished, unsophisticated, unadvised and they are unlikely to ever be able to file income tax returns in the United States to claim their tax refunds. Thus, worst case, if the tax withholding occurs, they will each lose 15% X $800 X 12 = $1440 from their trust funds each year (the equivalent of 20 month's rent for an individual). It would be better to authorize the Trustee, in the Trustee's discretion, to invest the funds in U.S. bank accounts and certificates of deposit and to exempt the Trustee from the obligations of the prudent investor rule which would normally require a diversified portfolio of investments. This will eliminate the tax withholding requirement. As a practical matter, this is not an investment disadvantage to the beneficiaries, because it is unlikely (by the bank's own admission) that a bank investment manager can exceed the rate of return that can be achieved with certificates of deposit by investing in a portfolio of stocks and bonds.

4. Filing an annual trust accounting with the Superior Court will be difficult. The trust language seems to require only a report, and not a complete accounting, but as a technical matter, all accountings filed with the Superior Page 1O Court must follow the formal accounting rules (see California Probate Code Section 106O). The detail of these accountings will be somewhat burdensome for twenty different trust shares, but more than that, it accomplishes no purpose and may also be detrimental to administration.

Under the California Probate Code, the accounting must be filed with the court and the beneficiaries must be served with notice. The beneficiaries are in Mexico. The Mexican mail system, I am told, is unreliable. Service would have to be made individually. Once the documents have been received, the beneficiaries will not be able to read them. But they will see the dollar amounts. When they see totals of $4,000,000 plus, some of them will become aggressive and demanding for further immediate distributions. Even if they could understand the accounting and rationally consider it, how would they contest the matter in a U.S. Court? They would have to hire a lawyer. If they chance upon a Mexican lawyer who is disreputable, the trust may then be faced with nuisance suits filed by a lawyer who thinks he can force a settlement from the trust to make him go away. This will take time, cost money and will deplete the trust and divert the Trustee and the beneficiary from the true purpose of working together to improve the beneficiary's life. It will make the beneficiary and the Trustee adversaries.

There is an alternative. The California Probate Code allows for a less formal report to beneficiaries which is not filed with the court, but which contains a statutory warning that the beneficiary may ask the court for review and has 3 years to do so. See California Probate Code Section 16063. This is the normal procedure for smaller trusts. All of the trusts which I presently administer as a professional trustee which are under $5,000,000 follow this procedure and have been removed from continuing court supervision and from the obligation to file formal trust accountings. Each report should cover only the particular beneficiary's share and not disclose the funds held by the entire trust.

5. The trust provides for distribution to the beneficiary's heirs in the event of his death before final distribution. This is problematic. Identifying and locating heirs in Mexico is difficult and it does not follow the same rules as in the United States. It would involve a determination by a Mexican Court because in many cases, people claim to be spouses, etc., but are not actually married. For example, one beneficiary calls a certain person his father, but apparently he is actually his foster father and the beneficiary has never been adopted. The beneficiary was angry that his real parents might get his money, rather than his foster father. Similarly, the young woman who says she is the spouse of a man in prison, holds his baby and is pregnant with another, but is not legally married to him. So, she would get nothing if he died in prison. It would be better to give each beneficiary a power to appoint his remainder interest to any person by written document delivered to the trustee before his death, with the right to change it from time to time. In default of providing a written document appointing his share, it should be distributed to his heirs. In most cases, this would simplify administration and achieve the result most desired by the beneficiary.

6. There is also a problem with the disappearance of beneficiaries. If a beneficiary disappears and cannot be found and never reappears, what should the Trustee do with his share? He is not legally deceased, so the funds cannot be distributed to his heirs. Must the Trustee hold them forever? Some mechanism must be provided. This is not a hypothetical question. One beneficiary, Mr. Rodriguez, of Tepic, is presently missing. He may reappear or he may not. There is some sense that he is hiding out of fear of Mr. White's agents. I suggest that if a beneficiary disappears and cannot be found by the Trustee after a diligent search after a five year period, that the beneficiary's share be distributed to or for the benefit of his known children, if any, and if none, then be reallocated among the remaining beneficiaries.

Summary Of Recommendations

A. The Trustee should be authorized to withhold distributions from any beneficiary if the Trustee in his sole and absolute discretion deems it advisable to do so, including the minimum monthly distribution.

B. The Trustee should be authorized, in his sole and absolute discretion, to make any distribution, including the minimum monthly amount, to third persons for the benefit of the beneficiary, rather than directly to the beneficiary.

C. The Trustee should be authorized, in his sole and absolute discretion, but with the consent of the beneficiary, to pay some portion or all of the beneficiary's distribution to or for the beneficiary's children, his spouse, or the mother of his children.

D. The Trust should be administered as separate shares for each beneficiary from the outset.

E. The Trustee, in his sole and absolute discretion, should be authorized to hold the trust assets in bank accounts, bank instruments, and bank certificates of deposit, and should not be obligated to comply with the prudent investor rule or to hold the assets in a diversified investment portfolio.

F. The Trustee should be required to issue annual reports to each trust beneficiary covering his share alone and following the requirements of California Probate Section 16063 and should not be obligated to file formal court reviewed accountings in the absence of a court order to do so.

G. Final distribution of each beneficiary's share should be made when he attains the age of 50 years, but may be distributed to him at any age after age 30 if, in the Trustee's sole and absolute discretion, the Trustee deems it advisable to do so.

H. In the event of death before distribution, the share of the deceased beneficiary should be distributed as he may from time to time appoint in a written document signed, dated, witnessed and delivered to the Trustee prior to his death. In the absence of a validly executed power of appointment, the residue of a deceased beneficiary's share should be distributed to his heirs at law as determined under the laws of the State of Jalisco, Mexico.

I. If a beneficiary disappears and after a period of five years cannot be found by the Trustee after making a diligent search using methods determined by the Trustee in his sole and absolute discretion to be adequate, then at that time, or at any time thereafter, the Trustee may, in his sole and absolute discretion, in lieu of continuing to hold such missing beneficiary's trust share, distribute such share to or for the benefit of such missing beneficiary's known children, if any, or if none, then the Trustee may reallocate such missing beneficiary's share among the remaining trust beneficiaries, including both then current beneficiaries and beneficiaries who may at such time have already received final distribution of their respective trust shares.

J. The foregoing changes, if adopted, should be written into a new court order which amends the trust instrument in its entirety to avoid confusion with apparently conflicting terms. **It** is preferable that the trust be established under a court order and not as a trust agreement

because there is no "Trustor" in this case and it creates confusion in presenting the trust agreement to a financial institution under these circumstances.

I look forward to discussing my recommendations with you in person. If at any time you have questions or I can be of assistance to you in any way, please feel free to call me.

Very truly yours,

                                                C. Joseph Smith