1  preliminary hearing. I don't know where the phone is. I

2  imagine, from what the records indicate, that Mr. Dean has in

3  his possession under seal. Mr. Replogle's phone (415) 999-3111

4  was seized from his office --

5           THE COURT: Okay.

6           MR. NIROULA: -- on Montgomery Street and sealed by a

7  special master. Now, whatever was sealed was sealed by Judge

8  Haines. Mr. Replogle, who was present at that, clearly redacted

9  the name of all of his clients, his clients who, being

10 Mr. Garcia and Mr. Niroula, also redacted, if there were any. I

11 don't recall (unintelligible) redacting anything, but

12 Mr. Replogle, for the record, did redact other clients.

13          However, the People after that fact-finding, have gone

14 and gotten a search warrant or a subpoena -- I don't recall

15 exactly what it is -- to get the records that were already

16 sealed. That's what I'm pointing out to the Court. A superior

17 court magistrate made a ruling that --

18          THE COURT: I got that part.

19          MR. NIROULA: -- if the People wanted something else,

20 they had time to file a writ, not be asking for a search warrant

21 and not telling the judge who signed the search warrant that a

22 superior court magistrate has already made a decision. He did a

23 fact finding.

24          THE COURT: Okay.

25          MS. DiMARIA: Your Honor, we're discussing apples and

26 oranges here. For starters, I wasn't at the in camera hearing

27 so any --

28          THE COURT: Ms. DiMaria, I know that already. I'm

1  trying to sort what we're going to do here.

2  MS. DiMARIA: Again, Your Honor, I feel that I'm being
3  accused of misconduct by Mr. Niroula, and I feel I should have
4  the right to correct on the record his incorrect accusations.

5  Number one: Since I wasn't there for the in camera, I
6  don't know what Judge Haines said.

7  THE COURT: Me neither. Go ahead.

8  MS. DiMARIA: Number two: We did not receive any
9  information from the physical phone itself. There are two ways
10  to get items from a phone. You can plug in the device, the
11  phone, and you can download it, or can you go to the company
12  such as AT&T and request records.

13  We have not touched Mr. Replogle's phone. We did not
14  download it. We haven't had it. It must be with Special Master
15  Martin Dean as Mr. Niroula says, because it's never been in our
16  custody, and we got no information from it. The only
17  information that we got was in the care, custody, and control of
18  AT&T in the form of records.

19  So I think it's very important to clear up that
20  distinction, since Mr. Niroula is basically accusing me of
21  misconduct. So I think that distinction needs to be clear on
22  the record.

23  MR. NIROULA: Your Honor, if I could state for the
24  record, I am not trying to make any accusations.

25  THE COURT: Okay.

26  MR. NIROULA: Perhaps if the People had communicated
27  both with the defense and Judge Haines in seeking the direction
28  that they should have taken versus communicating with the

1    special master who simply was appointed for the reason by Judge
2    Haines, we would not be sitting here having this argument here
3    today.

4              THE COURT: First of all, it's not an argument.

5              Yes, Mr. Dolan.

6              MR. DOLAN: I have a suggestion.

7              THE COURT: Yes.

8              MR. DOLAN: As I understand Ms. DiMaria's identifying
9    her exhibits, could we agree that during the week of the 20th,
10   once we get our juror panel put together, we just take a look at
11   the exhibit sheets she intends to introduce and then talk
12   specifically about them, where they came from and whether or not
13   they're going to pass muster under Laff and keep it real simple
14   that way.

15             THE COURT: Yes, thank you. New subject. New subject.
16   All right. We will do that.

17             I told you what my rule is, so don't break it.

18             The issue of spousal privilege, which I found
19   fascinating, by the way, because I didn't know about it,
20   apparently, Mr. Replogle and Alex Nguyen are registered domestic
21   partners. And that's what I get out of the -- I don't have
22   evidence of that, other than what you have told me, Mr. Dolan.
23   I read in re the marriage Cases, which is 43 Cal.4th at 757.

24             MS. DiMARIA: I'm sorry, sir. Can you say that again?

25             THE COURT: In Re the Marriage Cases.

26             MS. DiMARIA: Okay.

27             THE COURT: 43 Cal.4th 757 which basically say -- let
28   me find the quote -- I can't find the page, but it says -- this

1   quote, quote: "The privileged nature of confidential

2   communications between partners," unquote, applies to domestic

3   partners.

4           They've modified the Domestic Partner Act several

5   times, but the Supreme Court of California, written by Chief

6   Justice George, had a long discussion about that. I have no

7   doubt that the intent of Chief Justice George when he wrote that

8   and the law is that any communication made between registered

9   domestic partners is privileged. Okay. That's the way I read

10   it.

11           Now, as we know in a regular married case, you can't

12   subpoena the spouse unless they fall into one of the categories

13   like domestic violence, you can, but otherwise, you can't.

14           Here, it appears that Mr. Alex Nguyen is on the witness

15   list. So my question is, does the spousal privilege -- and

16   there's a marriage communication privilege, they're different --

17   one, the spousal privilege is the spouse has to raise it; in the

18   marital communication privilege, either lawyer can raise it.

19           So, hypothetically, the spouse can say, "I'll come and

20   I'll testify, waiving the privilege." They can do that. But

21   neither side -- but they can't waive the communication privilege

22   because the defendant can say, "No, you can come in and testify.

23   You can't" -- "I object to you testifying about what was said

24   because that falls in the communication privilege."

25           Here, I don't know what the D.A. intends to do, but

26   that issue is not before me. I think Mr. Nguyen, whom I've seen

27   in court on occasion, is on the witness list.

28           MS. DiMARIA: Yes, sir. If I may respond because it

1 | might clear things up --

2 | THE COURT:  Yes.

3 | MS. DiMARIA:  -- when I saw Mr. Dolan's trial brief, I

4 | looked into it myself.  Everything Your Honor just said, I tend

5 | to agree with.  My only concern, however, is proof that they

6 | were actually legally domestic partners.

7 | THE COURT:  Yeah, I tried to look that up; I couldn't

8 | find it.

9 | MS. DiMARIA:  If I may, Your Honor, Mr. Dolan has

10 | handed me a photocopy of their certificate, but with all due

11 | respect, this case involves fraud and forgery of documents.

12 | Unless I get a certified copy, I don't feel comfortable

13 | accepting --

14 | THE COURT:  May I see it.

15 | MS. DiMARIA:  -- photocopies.  If I were to receive a

16 | certified copy, you will be getting no challenge from me because

17 | I agree with you on the state of the law.  Just given the nature

18 | of this case, I do not feel comfortable with a photocopy without

19 | it being certified.

20 | MR. DOLAN:  I may be able to explain to the Court, I've

21 | asked for the originals to be sent down, and I'll receive those

22 | in the next couple of days.  I'll provide a copy of the

23 | originals to the People, not the originals because, of course,

24 | Mr. Nguyen will want to keep the originals.  But I'll present

25 | them to the Court, so the Court can confirm they're not

26 | fraudulently created.

27 | MS. DiMARIA:  I'd like to see them.

28 | MR. DOLAN:  Absolutely.  I did provide a copy, as the

1  Court can see, but I'll have the originals here no later than
2  next week when we take up the issue. I should have them in a
3  couple of days.

4         THE COURT: Okay.

5         MS. DiMARIA: Then that will be a moot issue.

6         THE COURT: All right. For purposes of 402 hearings,
7  the second issue is the spousal privilege/marital privilege
8  issue. I'll reserve judgment on that until I get a certified
9  copy of the registered domestic partnership document between
10 Mr. Nguyen and Mr. Replogle.

11        If there's a certified document that shows that there
12 is, that those two folks are -- were in a registered domestic
13 partnership, then it would be my ruling this Ms. DiMaria cannot
14 even subpoena Mr. Nguyen. And we're not going to go through
15 this having Mr. Nguyen come in here and assert the privilege in
16 front of the jury. That isn't going to happen.

17        MS. DiMARIA: Your Honor, I wouldn't even ask that.

18        THE COURT: Yeah, I know. Okay, then we understand
19 each other, everybody; right?

20        MR. DOLAN: He was just mentioning something. When we
21 present the original documents to the Court, since there is a
22 subpoena issue, we'll ask to have the subpoena quashed. It's a
23 technicality.

24        And I understand Ms. DiMaria, presuming we get it down
25 here and that we have not committed fraud upon the Court
26 unknowingly, then that will be an issue.

27        THE COURT: Okay. I don't know. I assume Mr. Nguyen
28 is -- has something to say about the case, probably adverse to

1  Mr. Replogle and -- but if -- he can't do it if they're
2  registered domestic partners. I mean, that's just the way it
3  is. The law is the law. We have to follow it. It is what it
4  is.

5       Okay. So for the minute order, table that until we get
6  certified form, document, okay.

7       All right. Issue number three: Is Clifford Lambert
8  dead?

9       MS. DiMARIA: Yes.

10      THE COURT: Well, People versus Crew, which I read,
11 31 Cal.4 822, talks about the elements of corpus delicti in that
12 regard. One: The injury, loss, or harm and criminal agency
13 that has caused the injury, loss, or harm are the elements of
14 corpus delicti.

15      And then if that's sufficient to -- and Crew, again, is
16 a situation where somebody disappeared and they never saw them
17 again, and it was a woman. She was killed going across country
18 by her husband, apparently a long, involved backpacker.

19      My understanding here is that Robert Taylor, who is a
20 neighbor of Mr. Lambert --

21      MS. DiMARIA: No, sir. He worked for Mr. Lambert.

22      THE COURT: In any case, last saw him at 3:00 p.m. on
23 December 5th. He was told that Mr. Lambert was going to meet
24 with an attorney at 5:30 on December 5th, and that person, that
25 is, Mr. Taylor, has never seen Mr. Lambert since.

26      Taking the fact pattern here, looking at the Crew case,
27 I think there's enough to show that the elements of the corpus
28 delicti have been met and, therefore, Mr. Taylor can testify as

1  to that.

2          There's enough circumstantial evidence for me to
3  believe that Mr. Lambert is dead. Hence, the corpus delicti
4  murder has been proved. Besides that, it doesn't need to be
5  beyond a reasonable doubt. The slight or prima facie showing is
6  sufficient.

7          On that subject, though, I am aware, because
8  Ms. DiMaria, you told me, and Mr. Garcia told me, there's no
9  physical evidence in the house of any blood or anything. So I
10 assume the defense will probably want to raise that, which they
11 can, and I assume they may want to argue to the jury Mr. Lambert
12 isn't really dead. Of course, they can do that if they want.

13         But that alone, the fact there's no blood in the
14 house -- and apparently the evidence is that he was stabbed to
15 death by Mr. Bustamante. That's what I've heard; I don't know.
16 One would think there would be a lot of blood, but maybe there
17 wasn't any. Go ahead.

18         MR. GARCIA: I would also bring in the fact that there
19 was no blood found in the trunk of his car as well. And as I
20 brought to the Court's attention, there was a pattern here where
21 there was an allegation Mr. Niroula had in fact murdered
22 Mr. Manning under almost identical circumstances almost a year
23 to the date, and yet Mr. Manning has been known to be alive and
24 well. So if we're looking at other possibilities, I would bring
25 that to the Court's attention.

26         THE COURT: Well, Mr. Garcia, everyone can put on --
27 the defense can put on evidence of that. There's no blood in
28 the house or the car. That's impossible. Whatever you want to

1   put forth, then you're entitled to do that to negate the death.

2   Of course, you can do that.  You have to call experts, whatever

3   you have to do.  I think you have a right to.

4        But for the moment, for purposes of corpus delicti rule

5   for murder, it's been met.  All right.  So that doesn't

6   foreclose you, Mr. Garcia, or any of the other defendants from

7   putting on physical evidence that Mr. Lambert was not murdered,

8   like no blood, for example, or anything else.  Okay.

9        Issue number four, which we won't get to until later

10  today, maybe, is the statements of Defendant Bustamante to

11  Arthur Jimenez are against his penal interests.  "Yes" or "no."

12  And the statements of Mr. Bustamante to Arthur Jimenez are

13  against the penal interest of Garcia Niroula and Replogle?

14  "Yes" or "no."  I think "yes" to both, but I'm open to hearing

15  what you think about it.

16       1230 of the Evidence Code states against penal interest

17  a fact intensive inquiry and they must be trustworthy.  The

18  Greenberger case, 58 Cal.4 298, which I had read in its

19  entirety, and People versus Cervantes et al., 118 Cal.App.4 162,

20  which I have read in its entirety, talk about all that stuff.

21       So that issue will be subject to probably lots of

22  discussion here in the next week or so would be my guess,

23  because there's lots of statements, I understand, that the D.A.

24  is going to seek to admit by Bustamante to Jimenez, and those

25  statements as to each of the four defendants.

26       It appears to me they are statements against penal

27  interest.  Real fast before noon, is that one of the statements

28  is outside a bar somewhere, and statements are made that I have

```
1   problems with trustworthiness of that statement because I have
2   to make findings that it was trustworthy.  If it wasn't
3   trustworthy, it's not coming in.  I haven't -- I'm not there
4   yet.  That jumps out at me.
5           But the other statements and, Ms. DiMaria, and lawyers,
6   do I need to make a finding as to each statement?  I think I do.
7           MR. NIROULA:  Yes, Your Honor.
8           THE COURT:  Each proffered statement, I have to say
9   yes, it's trustworthy, and I have to say yes to -- as to each
10  defendant, so then -- so that may take a while because I don't
11  know what the statements are.
12          Ms. DiMaria, at some point we need to go through each
13  statement you're proffering.
14          MS. DiMARIA:  Well, Your Honor --
15          THE COURT:  Not today, obviously, but that's probably
16  going to take a lot of time.
17          MS. DiMARIA:  I'll submit the transcripts of both
18  interviews, and I'll submit the transcript of the prelim.  There
19  is going to be hundreds of pages.
20          THE COURT:  Oh, well.
21          MR. GARCIA:  Your Honor, I would make that distinction
22  as I'm the only defendant here who Mr. Bustamante doesn't
23  personally know, so I think I'd have a greater standing to
24  object to any statements he made, which would be double or
25  triple hearsay.  Jimenez saying Bustamante said Niroula said,
26  and I'm somehow involved, I think that's really a stretch.
27          THE COURT:  Good point.  No, I bring this up now
28  because we need all of us to discuss this, and I need to know
```

1  what exact statement is being proffered as to which defendant.

2          So -- I understand now Mr. Jimenez is going to testify;
3  right.

4          MS. DiMARIA:  That's the last he told me, and that's
5  the last discovery I provided to the defense.

6          MR. NIROULA:  Your Honor, if I may, the People in their
7  trial brief indicate Mr. Jimenez's testimony against Defendant
8  Niroula is admissible as it is corroborated by text messages.
9  Once again, before we reach that point, I'm in the process of
10  filing a motion where those text messages probably would not be
11  brought against Defendant Niroula because of their questionable
12  turpitude.

13          THE COURT:  Okay.  I'm just trying to use our time
14  expeditiously.  So that subject appears to take the longest to
15  go through, I would think, given all the other stuff.  If you
16  all want to talk about it.

17          Okay.  Anything else?  It's now almost noon.

18          MR. NIROULA:  I have a quick query with the
19  prosecution, Your Honor.  I understand from the preliminary
20  transcripts and Detective Browning's testimony and Ms. Reed's
21  questioning that law enforcement obtained Mr. McCarthy -- I'm
22  not sure whether a gun was obtained or a silencer was
23  obtained --

24          THE REPORTER:  Mr. Niroula, you have to slow down.  I
25  can't understand what you're saying.

26          DEFENDANT NIROULA:  My understanding from Mr. -- a
27  holster was obtained.  I don't know if the gun had a silencer,
28  if it doesn't have a silencer.  I'm also wondering if they have

```
 1   done a ballistics test on that gun.  If they haven't, I'd like
 2   the opportunity to do so.
 3             THE COURT:  Ballistics tests for what?  There is no
 4   evidence of a gunshot here?  So he has a gun or not, so what?
 5             MR. NIROULA:  I would like to have a ballistics test
 6   done, Your Honor.
 7             THE COURT:  To prove what?
 8             MR. NIROULA:  That I can disclose at trial.
 9             THE COURT:  All right.  Mr. Niroula, if you need money
10   to do that, you need to give me a motion and I'll approve it if
11   it's relevant.  I've been approving -- if you need to go hire an
12   expert, you need to have a motion, you need to tell me what you
13   want to do.
14             I'll decide to pay for it or not, depending, based on
15   whether it's relevant.  If it's relevant, I'll pay for it.
16   Everybody understands that.  If it's relevant, I'll pay for it.
17   If I determine it's not relevant, I'm not paying for it.
18             Let's stop.  It's 12 minutes past 12:00.  We have to
19   eat.  Thank you, everyone.  We're off the record.  See you back
20   at 1:30.
21                      (Lunch recess.)
22        (Jury voir dire not transcribed in the record on appeal.)
23             (Outside the presence of the prospective jury.)
24             THE COURT:  Okay.  Remember, everyone, we don't meet
25   tomorrow.  Anything else we need to do now or what, anybody?
26             MS. DiMARIA:  Your Honor, actually, I'm a little
27   concerned about comments that were made this morning.
28             THE COURT:  About what?
```

1          MS. DiMARIA: I'm going to be asking for a hearing to

2  be set this Friday in regard to the jail and Mr. Garcia and

3  Mr. Niroula's access in the jail.

4          THE COURT: Well, the problem is that I said what I

5  said, and I believe it to be true. But the court of appeal has

6  one of these cases and has Mr. -- well, actually, Mr. Replogle's

7  case would be up there. That wasn't an issue. Mr. Garcia's

8  writ is now at the appellate court in which he lays out a lot of

9  what I said, perhaps more articulately than me. And Mr. Niroula

10  is going to fill out his.

11          MS. DiMARIA: Yes, sir, but with --

12          THE COURT: So we'll see how it shakes out.

13          MS. DiMARIA: -- but with no disrespect intended

14  whatsoever --

15          THE COURT: Yes. Yes, go ahead.

16          MS. DiMARIA: -- honestly, no, Your Honor, the People

17  just would like to have the record more clear. Mr. Garcia and

18  Mr. Niroula have not necessarily, in my opinion, throughout this

19  case and throughout the discovery always been honest and

20  forthright. And the People feel that if we can put on some

21  evidence from the jail to see if their allegations or

22  accusations are in fact accurate, we'd like the opportunity to

23  do so.

24          THE COURT: Let say that they are. Then what happens?

25          MS. DiMARIA: Then we'll have to deal with it at that

26  point in time. But at this point, I question --

27          THE COURT: What day is Friday, what date?

28          MS. DiMARIA: It's the 17th.

1    THE COURT: 17th. And who do you propose to come in
2    and tell us about all that?

3    MS. DiMARIA: My understanding, Your Honor, is that the
4    sergeant and the investigator that has been dealing with them on
5    a routine basis are going to be the ones to testify. It's the
6    most I could do over the lunch hour. I've also been trying to
7    talk to the writs and appeals office at my office about the way
8    things lie right now.

9    If Your Honor would like me to withhold this request
10   until after tomorrow's session when I have more time to talk to
11   my office. I tried to do -- I couldn't get ahold of the
12   appropriate people at my office. I don't mind withholding my
13   request until tomorrow. But at this point, that's the advice
14   that I've been given.

15   MR. GARCIA: Your Honor, may I respond to a few
16   comments? I don't know what exactly the district attorney is
17   questioning my integrity on. However, I would have no
18   objection -- in fact, I would like to bring Corporal Lewis,
19   because she's made some comments regarding phone calls -- and I
20   thought we had dealt with this issue -- that the majority of my
21   phone calls, I'd say about 99 percent of them are privileged.
22   And so it's my understanding from Corporal Lewis as of two days
23   ago there are no records kept when privileged calls are made.
24   I'm a little baffled how she knows so much about my calling
25   habits.

26   THE COURT: I don't know.

27   MR. GARCIA: So I would like some clarification on the
28   record as to how she's able to know who I'm calling and how much

1    time I'm spending talking on the phone, whether I'm talking to
2    lawyers, preparing a writ, or investigating my case.

3             I would also bring up the fact that we've had four
4    months to prepare. The district attorney has had 18 months, and
5    she's had full support of the government and the Department of
6    Justice, the Secret Service, the Riverside County Sheriff's
7    Department, four or five different municipal police departments
8    and so on. Homeland Security. I mean, you name it. She's got
9    everyone imaginable assisting her. I'm sure her budget far
10   exceeds what ours has been. She's had plenty of time. And
11   she's a seasoned lawyer; she knows exactly what she is doing.

12            THE COURT: And what does this have to do with the
13   jail?

14            MR. GARCIA: Well, there's been some concerns about how
15   the district attorney is getting her evidence. I would bring to
16   the Court's attention that she was able to somehow intercept all
17   of our mail, without a warrant, by getting, I guess, someone by
18   the name of Linda Hughes, who works in the sheriff's department,
19   to go through the property boxes and photocopy documents when
20   I've got, of course, tons of privileged communications in my
21   property box.

22            This was done surreptitiously without my knowledge,
23   without my consent, without a warrant. And she essentially is
24   gaining an unfair advantage in this case by being able to
25   intercept phone calls, intercept our private and privileged
26   mail, go into our property boxes.

27            I think these are serious issues. So if she wants to
28   bring in the jail staff, I'm all for it because I'd like to ask

1   a few questions of my own.

2          THE COURT: Mr. Garcia, and everybody else, I sat here

3   and I said when Captain Gregory was the commanding officer of

4   the jail, as soon as he became aware of problems, which he

5   wasn't at first, as soon as he became aware of problems, he

6   fixed it. That is true. Captain Gregory did a wonderful job.

7   I wish he was still the commanding officer, but I don't run the

8   sheriff's department. He was reassigned to be the chief of

9   police in La Quinta which is probably more prestigious or a step

10  up or whatever.

11         But, as I said before, some of the problems in the jail

12  are not necessarily ones that could be solved by the captain,

13  because he didn't design the jail. The physical layout of the

14  jail was as he inherited, "he" being Carter, and then Gregory

15  and now the new captain. They inherited what they got.

16         I understand all that. But, gentlemen and ladies,

17  change comes from above. It doesn't come from the bottom. If

18  you're going to change something in a bureaucracy, you need to

19  change it at the top.

20         And we need to fix the access of pro pers to the

21  library or computer systems so they can get their discovery in

22  reasonable time. I have doubts that that's occurring. So --

23         MR. NIROULA: And Your Honor --

24         THE COURT: -- but nonetheless, the allegation by both

25  Mr. Garcia and Mr. Niroula and their -- Mr. Garcia's writ has

26  already been filed and Mr. Niroula's writ that will be filed, is

27  that they're not prepared, and the thrust of it as I get it is

28  one of the reasons they're not prepared is they don't have

1  access to all the discovery because of problems in the jail.

2         Is that overstating it, Mr. Garcia?

3         MR. GARCIA:  No, I think that's very accurate, and I

4  would also add that when Your Honor came back from vacation, we

5  brought up the issue of redaction.

6         THE COURT:  That's a different subject.  Don't change

7  the subject.

8         MR. GARCIA:  Well, no, I think that's important because

9  Your Honor ordered that we would receive all of the discovery

10  unredacted once the district attorney gave us the Bates numbers

11  or the five names or so.  That has never occurred.  Therefore,

12  we never redacted the documents ourselves; therefore, I haven't

13  received them yet, because we're still waiting on Ms. DiMaria to

14  fulfill her end of the agreement.

15         MS. DiMARIA:  That's not true.  I narrowed it down to

16  five names.  Mr. Bolanos and I had a discussion.  There was

17  never an agreement as to for me to go through the Bates numbers.

18  But I believe Mr. Bolanos said -- I don't recall how many names,

19  but there were very few.

20         MR. NIROULA:  Your Honor, if I may inquire.  If

21  Ms. DiMaria is calling the jail investigator and the sergeant,

22  will the Court permit me to put the jail detective on the stand

23  and question her under voir dire?  Because she was involved in

24  restricting me for one month in the jail for having access to

25  represent myself.  That is a fact that is been established

26  before the Court.

27         It is a fact --

28         THE REPORTER:  Please slow down, sir.  I can't

1  understand you.

2  MR. NIROULA: -- also that Mr. Quinn has given us
3  testimony that he was informed by this -- he was oblivious of
4  it; he had never prior knowledge of this. He only came to be
5  aware of this when the jail investigator via Ms. DiMaria brought
6  it to his attention.

7  The People have always represented, Your Honor, that
8  they have nothing to do with the jail. Once again, I would like
9  to put it on the record that if the People have nothing to do
10  with the jail, why is it that the jail investigator went to
11  Mr. Quinn through the district attorney's office and not
12  directly to Mr. Quinn.

13  So, clearly, if the Court permits me to put the jail
14  investigator -- I thought about it, I mulled over this, Your
15  Honor, and in the fact that over one month that I was kept in
16  the dark.

17  I would like to put this on the record, I even
18  considered -- I even considered accusing Your Honor, the trial
19  judge. But I completely admonished myself because I think the
20  magistrate who has the ability to make some very strong
21  decisions are required in this case, and I don't think there is
22  a judge in this county who will have the courage to make those
23  decisions.

24  So if the district attorney is going to call this
25  investigator and she is going to give testimony, I would like to
26  be under oath, under the penalty of perjury, under voir dire.

27  THE COURT: And what decisions would those be,
28  Mr. Niroula?

1  MR. NIROULA: Decisions as to what, Your Honor?

2  THE COURT: I don't know. You just said the judges in

3  the county doesn't have the courage to do it. What are you

4  talking about?

5  MR. NIROULA: Oh, no, no. I felt that Your Honor would

6  be the most appropriate one and with the utmost courage to make

7  those decisions when my motions came in front of you. That's

8  why I chose not to go that route, because the Court is aware

9  that I did inquire of the Court repeatedly, and I was completely

10  kept into oblivion. And at that time, security was given as an

11  explanation.

12  Ms. DiMaria repeatedly told us on the record, "I don't

13  know," "I don't know," but at that time, under the ruse of

14  security, did this jail investigator listen to every single

15  privileged conversation between Mr. Tira and me? Was my trial

16  strategy exposed?

17  Because subsequently every piece of evidence I have

18  asked for discovery, Ms. DiMaria has objected to. There's a

19  pattern here, Your Honor. I asked for the mirror image of the

20  iPhone on June 18th. We quabbled [sic] over it.

21  Detective Simon Min said iPhones don't have mirror

22  images. Mr. Tira is witness to that.

23  THE REPORTER: Please slow down, sir. Slow down. We

24  have to go back a little bit, and please repeat.

25  "Simon Min said iPhones don't have mirror images."

26  MR. NIROULA: -- mirror images, on June 18th.

27  Ms. DiMaria indicated on our 1050 on September 1st that the

28  Secret Service made an iPhone mirror image. In fact, it was a

1  police officer in Nashville, Tennessee who made the iPhone

2  mirror image.

3        So if we are being accused on the record of making

4  misrepresentations, then I would like the record corrected that

5  I've met with the jail investigator twice.

6        Your Honor has been a district attorney in this county.

7  The jail investigator's job is to bring inmates who want deals

8  to the district attorney's office.

9        I've raised this question before. Why are we dealing

10  with the jail investigator? The jail investigator does not make

11  decisions on housing people. The jail investigator does not

12  make decisions on access.

13        When investigator Enrique Tira arrived this weekend at

14  8:00 o'clock in the morning to see me, the jail told him come

15  back at 4:00 o'clock. When he arrived at 4:00 o'clock, they had

16  no answer. We're being forced to go to trial. We are in trial.

17  And we have no access.

18        THE COURT: Mr. Tira, enlighten me on that, please.

19        INVESTIGATOR TIRA: Friday morning I was there. I was

20  working on the writ and some motions, Your Honor, and I went out

21  at 8:00 o'clock in the morning --

22        THE COURT: On this Friday?

23        INVESTIGATOR TIRA: This Friday, yeah.

24        THE COURT: Which was September the 10th. Okay.

25        INVESTIGATOR TIRA: And I was told to come back after

26  4:00 o'clock for best access. I attempted to get a spot across

27  the street, but that wasn't available either, so I was basically

28  just told after 4:00 o'clock would be the best.

1        MS. DiMARIA: And were you able to see him after 4:00
2  o'clock?

3        INVESTIGATOR TIRA: Well, I was here about 3:00, 3:30.
4  I met with the sergeant, spoke about some issues. Basically
5  what I was trying to get to him was that the trial is beginning;
6  once the trial begins, we're going to need access basically
7  seven days a week at any time.

8        We just can't -- it's a little hard for us too to make
9  just our schedule to fit whatever the jail's going to allow us
10  to do. Most of the time I do about midnight, 11:30, 12:00
11  o'clock at night, but there's just days that that's almost
12  impossible. We got to get some sleep, too.

13        I sent my runner after hours that day, and they were
14  able to get in.

15        THE COURT: They were?

16        INVESTIGATOR TIRA: They were. I'm not sure what time
17  they were in. But like I said, I wasn't able to do it, and I
18  was just told to do it after 4:00 o'clock, Your Honor.

19        THE COURT: I'm looking at the Riverside County
20  Sheriff's Department Corrections Division Policy Manual about
21  pro per inmates, on page 2 of this document, paragraph 7.1,
22  quote: "Court-appointed investigators for pro per inmates may
23  visit the inmate anytime of the day or night," unquote. So...

24        MR. NIROULA: Your Honor, in terms of the law library,
25  I've spoken with the sergeant. There's only one computer in the
26  law library.

27        THE COURT: That needs to change.

28        MR. NIROULA: For reasons of that, I have talked to

1   Sergeant Tesinsky over a gazillion times about removing that
2   keep-away between me and Mr. Garcia so that -- we don't need to
3   be housed together, but if we're in the same law library having
4   access.

5          But clearly, it's not happening.  Why?  Because the
6   jail investigator does not want to be in the law library, both
7   of us together?  Why?  I'm going to leave that for the Court's
8   own guessing.

9          THE COURT:  So there's one laptop computer in the law
10  library?

11         MR. NIROULA:  There's one screen in the law library.

12         THE COURT:  One screen?  What else is in there?

13         MR. GARCIA:  That is it.  It's just a touch screen
14  computer.  It's very basic.  There's no printing capabilities,
15  no saving capabilities.

16         In addition to Captain Gregory, the only other person
17  left in the jail who has been spectacular is Sergeant Tesinsky.

18         THE REPORTER:  I'm sorry.  Mr. Garcia, pull that
19  microphone up to you, please, sir.

20         THE COURT:  And the Court will second that.  My
21  conversations with him -- he's always been helpful with -- to
22  the Court and helpful to you guys in pro per.  Yes, I agree with
23  that.

24         But the problem, folks, is sergeants don't make policy.

25         MR. GARCIA:  Correct.

26         THE COURT:  He has done what he can do and more than
27  that; he's been very helpful.

28         MR. GARCIA:  He also tried to address an issue with

1    us -- I guess it was about, what was it, Thursday? -- with being
2    able to access the Bates documents on a thumb drive. We had
3    some technical hurdle with that. So him and Corporal Lewis
4    worked for a couple of days and were able to resolve some of
5    those issues. But if it were not for him, I wouldn't have any
6    access and wouldn't be making any progress. He's bent over
7    backwards. He's in constant communication with Mr. Bolanos, and
8    he makes every effort possible.

9         But, like you said, he's not able to change policy.
10   Only the captain and above can do that. So perhaps we need to
11   bring in the captain like we did with Captain Gregory and ask
12   him why is it we were able to accomplish these things under
13   Captain Gregory? I mean, maybe this captain will make the same
14   efforts. But until we bring him in and ask him, I don't see
15   anything changing.

16             THE COURT: All right. Anything else?

17             MS. DiMARIA: Your Honor, it's up to you. I can wait.

18             THE COURT: Yes, it is.

19             MS. DiMARIA: No, of course.

20             THE COURT: I'm not so sure that in my present frame of

21   mind I want to listen to anybody from the jail at the moment.

22             MS. DiMARIA: Okay.

23             THE COURT: Because I tell you what, you know, I have

24   been trying to get this trial on track for months, and it seems

25   that every time I turn around, there's a problem with getting

26   access for pro per inmates to the law library and their

27   investigator and the outside world, basically.

28             I realize that apparently they can use the phone and

1    discovery, but print copies when they need to. That's not

2    happening. That's basic. It's more than that. That's just

3    basic. It's not being done.

4            MS. DiMARIA: Although their investigators can print

5    it, but, Your Honor --

6            THE COURT: I know. But, nonetheless, you know, again

7    what I've said is true. And I'm not saying anybody's malicious

8    about it. That's not what I'm saying. I'm just saying the jail

9    doesn't seem to want to change and come in to the 21st Century.

10    And my guess is that is because somebody at the top doesn't

11    know.

12            MS. DiMARIA: May I have permission, Your Honor --

13            THE COURT: Yes.

14            MS. DiMARIA: -- may I have permission to speak with

15    some people at my office and decide whether or not I want to

16    renew this request tomorrow, rather than you making the decision

17    today? I don't mind that.

18            THE COURT: Oh, I -- the issue is because of that, does

19    Mr. Garcia and does Mr. Niroula -- have they been allowed to

20    prepare themselves adequately to go to trial on an LWOP murder

21    case. That's the question.

22            MS. DiMARIA: And --

23            THE COURT: And, yes, I warned them. Yes, I told them.

24    Yes, I know all that, and I did, and I'm torn between, again,

25    Mr. Replogle has a right to his trial and he's not going to

26    waive time. Okay, I understand all that.

27            I'm trying to balance his right to a speedy trial,

28    which he has a right to, and Mr. Niroula and Mr. Replogle's

1    that isn't a problem anymore, but the other areas are.

2            And you know, once again, I reread Jackie Lee Wilson

3    versus Superior Court of LA County. This is a California

4    Supreme Court 21 Cal.3d 816, and it goes on and on and on about

5    the rights of pro per inmates. And this was 1978, folks.

6    That's 30 years ago or more.

7            And the Supreme Court of California was saying,

8    basically: "Pro per privileges are, of course, intimately

9    related to the right of self-representation because of their

10    impact on the ability and opportunity of an incarcerated

11    defendant to prepare a defense. Restriction of defendant's pro

12    per privileges is therefore a matter of considerable importance

13    to the exercise of his Constitutional right of

14    self-representation." That's 1978. And it goes on and on with

15    other examples.

16            I do think that the sheriff needs to fix the problem

17    with pro pers and give them an updated modern library. And the

18    only way that's going to happen is if the sheriff himself orders

19    it all done.

20            In all candor, the sheriff may not know about this. He

21    has 2,000 people or more in his department. I'm sure he has

22    other issues he deals with on a daily basis. But this needs to

23    be dealt with on a command level. If not, nothing is going to

24    change.

25            It's all about money. That's the way it is. I mean,

26    come on, that's the problem. They need to go out and buy

27    updated laptop computers, thumb drives with access with

28    printers, so pro pers cannot only have access to their

1    [sic] right to be prepared for their trial. Mr. Bustamante
2    apparently is neutral. He hasn't said anything one way or
3    another, so I'm not so worried about his view.

4            But that's where we're at. I'm trying to wrestle with
5    this and trying to be fair to everybody, because I have a duty
6    to be fair to everybody. That's all. I'm just wrestling with
7    how to resolve it in a reasonable manner is all.

8            MS. DiMARIA: I understand, Your Honor. Can we
9    readdress this tomorrow instead then?

10           THE COURT: Yeah, sure. Of course. We don't -- I'm
11   looking at my schedule for this Friday, which is the 17th, and I
12   don't see anything on here. Well, let's just think about it is
13   all.

14           Anything else, anybody?

15           MR. NIROULA: And, Your Honor, with the Court's
16   permission, I'd like to put this on the record. I know for a
17   fact that if Your Honor were a federal judge, we would have a
18   laptop; we would have a cell phone; we would probably even --

19           THE REPORTER: Please slow down, sir.

20           MR. NIROULA: -- have a laptop, a cell phone, and a
21   satellite device to talk to our investigators. I'm fully aware
22   of this, Your Honor.

23           The situation is so terse that for seven months there's
24   no sharpener in the housing unit that I've been housed with.
25   Like Ms. DiMaria says, I have (unintelligible). Since February
26   I have told the jail there is no pencil sharpener.

27           Your Honor has said, Mr. Niroula, write your motions
28   with a pencil. When I don't have a sharpener and I tell the

1   jail, they gave me a pencil that is this long (indicating) that

2   is pre-sharpened. How can I write a 15-page motion with two

3   little pencils that are this long?

4        Since February (unintelligible) I tell the tank

5   (unintelligible) a pencil sharpener, they tell me it's not one

6   of our priorities.

7        MR. GARCIA: Actually, Your Honor, as silly as this may

8   sound --

9        THE COURT: It's not silly.

10       MR. GARCIA: -- it actually is absolutely true we can

11   order through commissary a maximum of six three-inch golf

12   pencils. There is no sharpener. I've been told there's no

13   pencil sharpener. I'm in a medical cell. There's no pencil

14   sharpener. The deputies will not sharpen them for us.

15        This is a common problem. What the inmates do is they

16   break apart their razors for shaving and try to shave down the

17   pencils, and they get written up and lose three weeks worth of

18   commissary if they're found with an altered razor.

19        I would actually invite Your Honor and the district

20   attorney to take a tour of the facilities to see firsthand,

21   since perhaps Ms. DiMaria hasn't seen what it's like to

22   physically be in custody, and to see what we're facing, to see

23   what the law library is, to see what our accommodations are, to

24   see how many boxes of documents we have. I would have no

25   problem with that. Maybe it would help clarify what some of the

26   issues are.

27        THE COURT: Well, folks, it is certainly frustrating to

28   me, and it's probably more frustrating to Mr. Garcia and

1   too lazy and don't want to change.

2           THE COURT: I would not adopt the word "lazy." I would
3   adopt, "We have always done it this way," as a reason, which is
4   a common answer for most bureaucracies; when you're asked why
5   you're doing this, their answer is, "We've always done it this
6   way." That's a very bureaucratic answer, because it's the
7   truth, because bureaucracies work on a certain schedule, and
8   it's worked for that bureaucracy, and so it works fine. So they
9   always have done it that way. That's correct.

10          In this instance, that part of it, the access for pro
11  pers, needs to change. It does.

12          And you might be right, Mr. Garcia, maybe the way to do
13  it to take a writ of habeas corpus to the federal court. Maybe
14  that would be the way to do it. I don't know. I'm not
15  suggesting it.

16          All right. Is there anything else before we knock off
17  for the day?

18          MS. DiMARIA: No, sir. I'd like to be excused,
19  actually.

20          THE COURT: All right.

21          MS. DiMARIA: Thank you.

22          THE COURT: We're done. Thank you.

23          MR. NIROULA: Just for the record, no flu shot yet,
24  Your Honor.

25          THE COURT: Yeah. We -- what were you told about that?
26          MR. NIROULA: I have not been told anything. In fact,
27  before I even had requested the warden to give an order, they
28  already knew that I requested a flu shot.

1          I did speak to the sergeant, and the sergeant is very,
2    very helpful --
3          THE COURT:  I know he is.
4          MR. NIROULA:  -- and the lieutenant is as well.  But
5    the thing is I don't know at this point, the lack of
6    communication.
7          THE COURT:  Remind me, Mr. Niroula, in the morning,
8    please.  Remind me first thing when you come in, all right,
9    please.
10         MR. NIROULA:  Thank you, Your Honor.
11         THE COURT:  All right.  We're off the record.  Thank
12   you.
13         INVESTIGATOR TIRA:  1:30, Your Honor?
14         THE COURT:  Right 1:30, not in the morning.
15         MR. GARCIA:  Your Honor, could I get a court order for
16   today's transcript?
17         THE COURT:  Maybe.  Let me talk to the court reporter.
18   She's backlogged, folks.
19                    (Proceedings concluded.)
20
21
22
23
24
25
26
27
28

REPORTER'S CERTIFICATE


PEOPLE OF THE STATE OF CALIFORNIA,    )
                                      )
            PLAINTIFF,                )
                                      )
    VS.                               )    CASE NO. INF064492
                                      )    (INF064301 CONSOLIDATED)
KAUSHAL NIROULA,                      )
DAVID REPLOGLE,                       )
DANIEL CARLOS GARCIA,                 )
MIGUEL ADOLFO BUSTAMANTE,             )
CRAIG ANTHONY MCCARTHY,               )
                                      )
            DEFENDANTS.               )
                                      )


        I, KATHLEEN P. CAGNEY, CERTIFIED SHORTHAND REPORTER NO.
10850, HEREBY CERTIFY:

            ON 01-08-10, 02-08-10, 02-26-10, 03-05-10, 04-30-10,
05-10-10, 05-14-10, 05-28-10, 08-04-10, 08-05-10, 08-06-10,
08-11-10, 08-13-10, 08-17-10, 08-30-10, 08-31-10, 09-01-10,
09-03-10, 09-07-10, 09-08-10, 09-09-10, 09-13-10, 09-14-10,
09-15-10, 09-20-10, 09-21-10, 09-22-10, 09-23-10, 09-27-10,
09-28-10, 09-29-10, 10-04-10, 10-05-10, 10-06-10, 10-07-10,
10-14-10, 10-18-10, 10-19-10, 10-21-10, 10-25-10, 10-27-10,
11-01-10, 11-02-10, 11-08-10, 11-10-10, 11-15-10, 11-16-10,
11-22-10, 11-23-10, 11-24-10, 12-01-10, 12-06-10, 12-07-10,
01-03-11, 01-25-11, IN THE COUNTY OF RIVERSIDE, STATE OF
CALIFORNIA, I TOOK IN STENOTYPE A TRUE AND CORRECT REPORT OF THE
TESTIMONY GIVEN AND PROCEEDINGS HAD IN THE ABOVE-ENTITLED CASE,
PAGES 302-444; 543-797; 798-815 SEALED; 816-839; 840-855 SEALED;
856-937; 938-953 SEALED; 954-955; 956-973 SEALED; 974-1000 BLOCK

NUMBERED; 1074-1269; 1270-1283 SEALED; 1284-1295; 1296-1307
SEALED; 1308-1330; 1331-1343 SEALED; 1344-1799; 1799-1 -
1799-122 BLOCK NUMBERED; 1800-1868; 2205-2613; 2775-3110;
3264-3425; 3589-3898; 4302-4426; 4566-5033; 5366-5492;
5641-5793; 5912-6161; 6808-6835; 6836-6859 BLOCK NUMBERED; AND
THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPTION OF MY
STENOTYPE NOTES AND IS THE WHOLE THEREOF.

DATED:   INDIO, CALIFORNIA, SEPTEMBER 8, 2011.

KATHLEEN P. CAGNEY, CSR 10850

```
Kaushal Niroula
Defendant In Pro Per
Booking # 200910575
Indio Jail
PO.BOX 1748
INDIO, CA 92201
```

**Appearing here in as interested third party**

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **JOSE ROE et al**<br><br>**Plaintiffs**<br><br>**Vs.**<br><br><br>**Thomas F White et al**<br><br>**Defendants** | ) CASE NO: C 03 – 04035 CRB<br>)<br>) **DECLARATION OF STANLEY STEPHEN**<br>) **SPRING IN SUPPORT OF INTERESTED THIRD**<br>) **PARTY KAUSHAL NIROULA'S MOTION TO**<br>) **QUASH AND MEMORANDUM IN SUPPORT**<br>) **OF MOTION TO QUASH SUBPOENA TO**<br>) **PRODUCE DOCUMENTS INFORMATION OR**<br>) **OBJECTS OR TO PERMIT INSPECTION OF**<br>) **PREMISES IN A CIVIL ACTION.** |

TO: NATHANIEL M COUSINS MAGISTRATE/JUDGE OF THE UNITED STATES
DISTRICT COURT AND ALL COUNSELS OF RECORD HEREIN.

### DECLARATION OF STANLEY STEPHEN SPRING II ESQ

1. l am domiciled in Baton Rouge, Parish of East Baton Rouge, Louisiana, and have been a member in good standing of the Louisiana State Bar Association since 1981, never having been suspended or disbarred.

2. l am either and /or have been a member of the 5th Circuit Court of Appeals (New Orleans), 11th Circuit Court of Appeals (Atlanta), 4th Circuit Court of Appeals (Richmond), and United States Court of Military Appeals (Washington D.C.), and previously admitted Pro Hac Vice in various cases in Maryland, Virginia, Texas, California, Florida and North Carolina.

3. I am a member of the firm of Spring & Spring LLC which consists of myself and my father Stanley A Spring who is a member of the Florida Bar, Former Chief Counsel of the Florida Bar, Retired FBI Special Agent of the Federal Bureau of Investigation, and US Naval Intelligence.

DECLARATION OF STANLEY STEPHEN SPRING IN SUPPORT OF INTERESTED THIRD PARTY
KAUSHAL NIROULA'S MOTION TO QUASH AND MEMORANDUM IN SUPPORT OF MOTION TO
QUASH SUBPOENA TO PRODUCE DOCUMENTS INFORMATION OR OBJECTS OR TO PERMIT
INSPECTION OF PREMISES IN A CIVIL ACTION.

1

4. I am a member of the Association of Former Intelligence Officers.

5. I have attached hereto my curriculum vitae hereto.

6. One of the firm's present Clients is Kaushal Niroula who is presently incarcerated in the Indio Jail at Indio California. In order to provide advice and assistance, the firm now maintains a home in the Indio area.

7. I was present in the Indio area recently between the dates of January 20 2012 and January 30 2012.

8. Making almost daily visits with Mr. Niroula; I accompanied William J Picard on a jail visit with Daniel Carlos Garcia on Sunday January 29, 2012.

9. During that jail visit, Mr. Garcia showed to Mr. Picard and myself a portion of a the computer forensic report of Mr. Chris Pavan, computer forensic expert. The portion shown to us disclosed that there is privileged information belonging to Kaushal Niroula from his former representation by Mr. David Replogle former California Lawyer.

10. In addition on Friday January 27 2012 I was present in Judge Downing's courtroom at various times. After the court proceedings were adjourned, Mr. Picard and myself met with Mr. Pavan in the parking lot of the Indio Courtroom where we had been. Mr. Pavan related that he had inspected the hard drive of Daniel Garcia's computer in dispute and it contained privileged materials belonging to Kaushal Niroula.

11. From having been present at Judge Downing's Courtroom and hearing on January 27,2012 and having read various filings and representations and arguments presented on January 27, 2012 in open court it is known to me that a copy of the Daniel Garcia's computer hard drive of which Mr. Garcia showed me a report and Mr. Pavan also informed me and Mr. Picard of Mr. Niroula's privileged communication and material being contained within, is in the possession of attorneys and or their agents representing Thomas F White.

12. I have also at Mr. Niroula's request read and thoroughly reviewed the En camera Sealed Transcripts of proceedings conducted on May 1 2009 and June 18, 2009 before the Honorable Charles F Haines.

13. The statements contained within Mr. Niroula's memorandum of law indicating that his privileged material arising from his representation by David Replogle and the Honorable Charles Haines sustaining that privilege and sealing the privileged materials are true and correct to the best of my knowledge information and belief after having read those sealed transcripts.

**DECLARATION OF STANLEY STEPHEN SPRING IN SUPPORT OF INTERESTED THIRD PARTY KAUSHAL NIROULA'S MOTION TO QUASH AND MEMORANDUM IN SUPPORT OF MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS INFORMATION OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION.**

2

**14.** I formerly and successfully represented a retired Navy Commander who was charged in an approximate 16 Count indictment for alleged violations of Louisiana's child pornography law. This case involved substantial digital evidence gathered from various computers by the Louisiana Attorney General's High tech Crime Unit. During that case we retained the services of John Simek of Sensei Enterprises in Fairfax, Virginia. As a result, the case of State of Louisiana v John Mickelson, Case No. 01 – 04 – 120, Section :IV, established the first forensic computer protocol for transmittal of mirror images of hard drives containing child pornography to Mr. Simek from Louisiana to Virginia. After an approximate five (5) day trial in which Mr. Simek testified, Mr. Mickelson was acquitted on all charges. As a result of that trial I am quite familiar with proper computer forensic examination procedures and protocols both generally and technically, since I have formerly taught TSCM (Technical Surveillance Countermeasures) and TIO (Technical Intelligence Operations) to various sectors of the US government and private business communities, including acting as a security consultant in Central America and Russia, the particulars of which are protected under the provisions of the National Security Act of 1947.

**15.** Mr. Simek after conference with myself and Mr. Picard at his offices in Fairfax, Virginia, in June of Last year agreed to appear as Mr. Niroula's forensic expert in his current legal difficulties in Indio, California. Mr. Simek's spouse Sharon Nelson also of Sensei Enterprises is a member in good standing of the Virginia State Bar.

**16.** I mention the preceding two (2) paragraphs because from the materials which I have personally reviewed the" forensic" computer procedures and protocols utilized in Mr. Niroula's current legal difficulties in Indio by Detectives Min, and Browning and Prosecutor Lisa Di Maria regarding digital evidence are flawed.

**17.** In addition I have reviewed privileged telephone calls between Mr. Niroula and his former and prospective attorneys, which were not only recorded, but also disseminated to various law enforcement personnel. In none of these recordings I reviewed, was anyone placed on notice that these privileged wire communications were being intercepted, monitored, and or distributed to third parties which I found to be of great interest since California has specific criminal statutes protecting privileged communications like these and California is what I call a " minority " state in the United States which requires two party consent in order to lawfully record and /or wire communication. I believe the provisions of 18 USC 2510, et seq., still apply in the State of California.

**18.** As a result of these past events involving the Sheriff's office and personnel of the Riverside county Sheriff's Office, communication with Mr. Niroula has not only required specific Court Orders from Judge Downing designating certain telephone numbers to be privileged, but also the filing of a "babble" motion seeking a Court

DECLARATION OF STANLEY STEPHEN SPRING IN SUPPORT OF INTERESTED THIRD PARTY
KAUSHAL NIROULA'S MOTION TO QUASH AND MEMORANDUM IN SUPPORT OF MOTION TO
QUASH SUBPOENA TO PRODUCE DOCUMENTS INFORMATION OR OBJECTS OR TO PERMIT
INSPECTION OF PREMISES IN A CIVIL ACTION.

Order to allow myself, members of Mr. Niroula's Court appointed assets and Mr. Niroula to play a babble tape during jail visits to frustrate any eavesdropping devices which I understand are routinely used by the Riverside County Sheriffs Office for any and all of these privileged communications for Mr. Niroula and all inmates ( pretrial detainees or convicted persons) throughout Riverside County jail facilities maintained by the Riverside County Sheriffs Office in California. In addition according to GTL the telephone provider, which pays the Sheriff an annual fee of $2,000,000.00 to operate this system, the calls are additionally data mined using computer assets similar to those deployed by the National Security Agency in Operation Echelon on a global basis. My understanding of the ongoing interception monitoring and dissemination of privileged wire and/or oral communications by the Sheriff's Office of Riverside County and others was confirmed on Friday February 3,2012 as reflected in the declaration of Demi Tolbert Esq member of the California bar being used in the litigation of Mr. Niroula's babble motion.

19.I include the above statement because attempting to have privileged conversations with Mr. Niroula and anyone else housed in a Riverside County Jail is extraordinarily difficult and time consuming. As a result of this situation, I have actually sought and obtained permission from Judge Downing to confer with Mr. Niroula in Judge Downing's courtroom when not in use as a result of Judge Downing's gracious consent and keen concern for the viability of the attorney client privilege.

20.During the course of my last presence in the Indio area, I read the sealed transcripts of the Special Master proceedings before the Honorable Charles F Haines on May 1 2009 and June 18 2009. Premised upon those readings I state that the assertions from Mr. Niroula in his memorandum of Law in support regarding his privileged materials on David Replogles Toshiba Laptop and Dell Desktop are true and correct.

21.I declare under penalty of perjury under the laws of the State of California and Louisiana that the foregoing is true and correct although this is being executed in Louisiana and I have electronically signed this declaration.

Executed this 6th Day of February, 2012

*S. Stephen Spring, II*

S. Stephen Spring, II, LBN: 12347  Spring & Spring LLC  Baton Rouge, Louisiana

**DECLARATION OF STANLEY STEPHEN SPRING IN SUPPORT OF INTERESTED THIRD PARTY
KAUSHAL NIROULA'S MOTION TO QUASH AND MEMORANDUM IN SUPPORT OF MOTION TO
QUASH SUBPOENA TO PRODUCE DOCUMENTS INFORMATION OR OBJECTS OR TO PERMIT
INSPECTION OF PREMISES IN A CIVIL ACTION.**

## CURRICULUM VITAE

Name:                                  Stanley Stephen Spring, II

Business Address:                      733 East Airport Avenue, Suite 104
                                       Baton Rouge, Louisiana 70806

Business Telephone:                    225.932.9671
Business Facsimile:                    413.451.8923
Business Email:                        springlaw@gmail.com

Citizenship:                           USA

Education:                             *Universite de Moncton*
                                       L'Ecole de Droit International
                                       New Brunswick, Canada 1990

                                       *Center for Bilingual and Multicultural Studies*
                                       Cuernavaca, Mexico 1989

                                       *Louisiana State University*
                                       Baton Rouge, Louisiana Juris Doctor 1981

                                       *University of Southwestern Louisiana*
                                       Lafayette, Louisiana B.A. 1974.

                                       *North Florida University*
                                       Jacksonville, Florida 1972

                                       *The Florida State University*
                                       Tallahassee, Florida 1970.

Licensure:                             The Louisiana State Bar Association LBN: 12347
                                       Member in Good Standing

                                       U.S. Eastern, Middle, Western Districts of Louisiana
                                       4th, 5th, and 11th Circuit Courts of Appeal (U.S.)
                                       U.S. Court of Military Appeals (Washington, D.C.)
                                       *Pro Hac Vice* Appearances: California, Virginia, Florida,
                                       Texas, North Carolina, and Maryland

Professional Law Associations:         The Louisiana State Bar,
                                       The Federal Bar Association

1

(Present & Past)                        National Police Accountability Project
                                        National Lawyer's Guild
                                        Massachusetts Chapter of NLG
                                        Association of Former Intelligence Officers
                                        The Baton Rouge Bar Association
                                        Louisiana Association for Justice
                                        American Bar Association
                                        American Immigration Lawyers Association
                                        American Trial Lawyers Association
                                        American Association of Criminal Attorneys
                                        Louisiana Criminal Defense Lawyers
                                        Federalist Society
                                        Who's Who in the World 1994
                                        Who's Who in American Law 1993

Other Professional Associations:       Certificate of Appreciation from U.S. Army Units 513 and
                                        202 for Special Operations Training Received in 2003 prior
                                        to deployment to Iraq.
                                        Successfully Completed Israeli Tactical Point and Shoot
                                        Firearms Techniques and Personal Safety from Terrorist
                                        Capture – 2003. (Firearms Course is same course taken by
                                        IDF Commandos)
                                        American Society for Industrial Society
                                        Espionage Research Institute
                                        Business Espionage Controls and Countermeasures
                                        Association [ Association Russia Sector Advisor]
                                        Selected as 1 of 40 worldwide participants at St. Anthony's
                                        College, Oxford, England in Oxford's Round Table
                                        Discussions for Spring, 2001 – "Employment
                                        Discrimination"
                                        NATIA (National Association Technical Investigators
                                        Association)
                                        COPEX (Covert Operations Procurement Exhibitions –
                                        Classified Exhibition) Miami – Baltimore
                                        Guest Speaker – Surveillance Expo 1990-95 ( Co Speaker
                                        with G. Gordon Liddy)
                                        Guest Speaker – National Convention of Insurance Security
                                        Agents – "Investigators Fraud Conference" N.O. La.
                                        January 1995.
                                        Invitee and Guest Lecturer – KGB Yekaterinburg, Russia
                                        December 1994. "Technical Intelligence Operations and
                                        Technical Surveillance Countermeasures"
                                        World Trade Center. New Orleans, Louisiana
                                        City of Lafayette International Business Advisory Council

*State of Florida v. Blackmon*, 1993.
Escambia County, Pensacola, Florida.
Case Dismissed after State of Florida concurred with
Motion to Suppress All Evidence crafted by Stephen Spring
and filed as Co-Counsel appearing *Pro Hac Vice*
Defendant was charged with arson with a minimum,
mandatory sentence if convicted of three (3) years hard
labor

*State of Louisiana v. Mickelson. 2007.*
1st Case In Louisiana history adopting computer
protocol in child pornography cases allowing transport of
ghost hard drives with evidence to private, computer
forensic expert outside of Louisiana
19th Judicial District Court. Baton Rouge, Louisiana.
Defendant acquitted after five day trial for indictment of 15
counts of child pornography stemming from four (4)
computers with over 1200 photographs and movies
stipulated to be child pornography.

*City of Zachary v. Chiasson. June 3, 2008.*
Appointed by City of Zachary as Special Prosecutor to
Defend City of Zachary on terminated, former Chief of
Police's appeal to Civil Service Board. Defeated attempt
for injunction by terminated Asst. Chief and obtained
unanimous verdict (5-0) with three new Board Members to
affirm firing after 6 day trial.

*In Re: Louisiana Employer(Names Withheld)*
Obtained H-1B visa for Mechanical Engineering Asst.
For Building Offshore Oil Platform Cranes at Current
Prevailing Wages <u>during Presidential Moratorium
on Offshore Drilling</u>

*State of Louisiana v. Ovide*, March 15, 2011
**2nd Degree Murder**. After selecting half a jury
prosecutor amended charge to manslaughter.
Final Sentence: 3 yrs hard labor with credit for time served

| | |
|---|---|
| Professional Experiences: | Spring & Spring, LLC. Baton Rouge, Louisiana.<br>Litigators in Civil, Immigration and Criminal Matters. |

Spring & Spring, Ltd. Baton Rouge, Louisiana.
Litigators in Civil, Immigration and Criminal Matters.

Spring, Spring & Associates.
Pensacola Florida. (1996-1999)
Florida practice limited to Immigration and Federal
Appeals to the 11th Circuit Court of Appeals. Atlanta, Ga.

Stephen Spring & Associates
Yekaterinburg, Russia.

Director Operations
Corporacion Adel-Seguridad Electronica, S.A.
Tegucigalpa, San Pedro Sula, Honduras
Provided technical services to Government

Director Operations
The Academy. Tulsa, Oklahoma.
Provided instruction in classified contracts to
various U.S. military and government personnel.
Conducted national and international TSCM operations

Trial Attorney
Louisiana – Washington, D.C.

Security Consultant

Travel Base:     Canada; Honduras; Belize; Guatemala; El Salvador; Indonesia; Singapore; Japan; Taiwan; People's Republic of China; Hong Kong; Mexico; Italy; Monaco; France; Egypt; Greece; Cayman Islands; England; Sweden; Finland; Ireland; Russia

Languages:     English (Fluent); Spanish and French (Limited); Russian & Arabic (Minimal)

1  Kaushal Niroula
   Defendant In Pro Per
   Booking # 200910575
   Indio Jail
2  PO.BOX 1748
   INDIO, CA 92201

3  **Appearing here in as interested third party**

4

5              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
6                SAN FRANCISCO DIVISION

7

8  **JOSE ROE et al**                    ) CASE NO: C 03 – 04035 CRB
                                          )
9              **Plaintiffs**             ) **DECLARATION OF WILLIAM PICARD**
                                          ) **IN SUPPORT OF INTERESTED THIRD PARTY**
10             **Vs.**                    ) **KAUSHAL NIROULA'S MOTION TO**
                                          ) **QUASH AND MEMORANDUM IN SUPPORT**
11                                        ) **OF MOTION TO QUASH SUBPOENA TO**
   **Thomas F White et al**              ) **PRODUCE DOCUMENTS INFORMATION OR**
12                                        ) **OBJECTS OR TO PERMIT INSPECTION OF**
             **Defendants**              ) **PREMISES IN A CIVIL ACTION.**
13

14

15 TO: NATHANIEL M COUSINS MAGISTRATE/JUDGE OF THE UNITED STATES

16 DISTRICT COURT AND ALL COUNSELS OF RECORD HEREIN.

                    **DECLARATION OF WILLIAM PICARD**
17
   1. I am primarily domiciled in Lafayette, Parish of Lafayette, Louisiana, and retired as
18      Police Captain from the Lafayette City Police Department in August of 2010.

19 2. Currently I am licensed Private Investigator in good standing in Louisiana.

20 3. I provide paralegal services and Investigative Consulting separately to the Law Firm
      of Spring and Spring LLC and am additionally appointed by Hon. David B Downing
21    as the paralegal for Kaushal Niroula in Pro Per for his current legal difficulties in
      Indio California under the Supervision of Court appointed Motion Writer Julie S
22    Page Esq.

23 4. I have attached hereto my curriculum vitae hereto.

24
   5. One of Spring & Spring's present clients is Kaushal Niroula who is currently
25    incarcerated at the Indio Jail in Indio California .I am further aware that in order to

   **DECLARATION OF WILLIAM PICARD IN SUPPORT OF INTERSTED THIRD PARTY KAUSHAL NIROULA'S**
   **MOTION TO QUASH AND MEMORANDUM IN SUPPORT OF MOTION TO QUASH SUBPOENA TO PRODUCE**       1
   **DOCUMENTS INFORMATION OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION.**

provide assistance and advice to Mr. Niroula, Spring & Spring now maintains a home in the Indio area.

6. I was present in the Indio area recently between the dates of January 20 2012 and January 30 2012 and on other separate occasion in the past.

7. Making multiple visits with Mr. Niroula; I accompanied Stephen Spring of the firms on a jail visit with Daniel Carlos Garcia on Sunday January 29, 2012.

8. During that jail visit, Mr. Garcia showed to Mr. Spring and myself a portion of a computer forensic report of Mr. Chris Pavan, computer forensic expert. The portion shown to us disclosed that there is privileged information belonging to Kaushal Niroula from his former representation by Mr. David Replogle former California Lawyer.

9. In addition on Friday January 27 2012 I was present in Judge Downing's courtroom at various times. After the court proceedings were adjourned, Mr. Spring and myself met with Mr. Pavan in the parking lot of the Indio Courtroom where we had been. Mr. Pavan related that he had inspected the hard drive of Daniel Garcia's computer in dispute and it contained privileged materials belonging to Kaushal Niroula.

10. From having been present at Judge Downing's Courtroom for the hearing on January 27, 2012 and having read various filings, representations, and arguments presented on January 27, 2012 in open court, it is known to me that a copy of the Daniel Garcia's computer hard drive, of which Mr. Garcia showed me a report of, and Mr. Pavan also informed me, as well as Mr. Spring, that Mr. Niroula's privileged communication and material being contained within, is in the possession of attorneys and or their agents, representing Thomas F White.

11. I have also at Mr. Niroula's request, read and thoroughly reviewed, the En camera Sealed Transcripts of proceedings conducted on May 1 2009 and June 18, 2009 before the Honorable Charles F Haines.

12. The statements contained within Mr. Niroula's memorandum of law indicating that his privileged material arising from his representation by David Replogle and the Honorable Charles Haines sustaining that privilege and sealing the privileged materials are true and correct to the best of my knowledge information and belief after having read those sealed transcripts.

13. In addition I have reviewed privileged telephone calls between Mr. Niroula and his former and prospective attorneys, which were not only recorded, but also disseminated to various law enforcement personnel. In none of these recordings I reviewed, was anyone placed on notice that these privileged wire communications were being intercepted, monitored, and or distributed to third parties which I found to be of great interest since California has specific criminal statutes protecting privileged communications like these and California is what I call a " minority " state

in the United States which requires two party consent in order to lawfully record and /or wire communication. I believe the provisions of 18 USC 2510, et seq., still apply in the State of California.

14. As a result of these past events involving the Sheriff's office and personnel of the Riverside county Sheriff's Office, communication with Mr. Niroula has not only required specific Court Orders from Judge Downing designating certain telephone numbers to be privileged, but also the filing of a "babble" motion seeking a Court Order to allow myself, members of Mr. Niroula's Court appointed assets and Mr. Niroula to play a babble tape during jail visits to frustrate any eavesdropping devices which I understand are routinely used by the Riverside County Sheriffs Office for any and all of these privileged communications for Mr. Niroula and all inmates ( pretrial detainees or convicted persons) throughout Riverside County jail facilities maintained by the Riverside County Sheriffs Office in California. In addition according to GTL the telephone provider, which pays the Sheriff an annual fee of $2,000,000.00 to operate this system, the calls are additionally data mined using computer assets similar to those deployed by the National Security Agency in Operation Echelon on a global basis. My understanding of the ongoing interception monitoring and dissemination of privileged wire and/or oral communications by the Sheriff's Office of Riverside County and others was confirmed on Friday February 3,2012 as reflected in the declaration of Demi Tolbert Esq member of the California bar being used in the litigation of Mr. Niroula's babble motion.

15. I include the above statement because attempting to have privileged conversations with Mr. Niroula and anyone else housed in a Riverside County Jail is extraordinarily difficult and time consuming. As a result of this situation, I have actually sought and obtained permission from Judge Downing to confer with Mr. Niroula in Judge Downing's courtroom when not in use as a result of Judge Downing's gracious consent and keen concern for the viability of the attorney client privilege.

16. During the course of my last presence in the Indio area, I read the sealed transcripts of the Special Master proceedings before the Honorable Charles F Haines on May 1 2009 and June 18 2009. Premised upon those readings I state that the assertions from Mr. Niroula in his memorandum of Law in support regarding his privileged materials on David Replogles Toshiba Laptop and Dell Desktop are true and correct.

17. I declare under penalty of perjury under the laws of the State of California and Louisiana that the foregoing is true and correct although this is being executed in Louisiana and I have electronically signed this declaration.

Executed this 6 th Day of February 2012.

**William Picard**

William Picard Private Investigator/ Paralegal

DECLARATION OF WILLIAM PICARD  IN SUPPORT OF INTERSTED THIRD PARTY KAUSHAL NIROULA'S MOTION TO QUASH AND MEMORANDUM IN SUPPORT OF MOTION TO QUASH SUBPOENA TO PRODUCE        3 DOCUMENTS INFORMATION OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION.